2951

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              -  -  -

 4    FINJAN, INC.,                      )     Civil Action
                                         )
 5              Plaintiff,               )
                                         )
 6         v.                            )
                                         )
 7    SYMANTEC CORP.,                    )
      WEBROOT SOFTWARE, INC.,            )
 8    WEBSENSE INC., and SOPHOS, INC.,   )
                                         )
 9              Defendants.              )     No. 10-593-GMS

10                              -  -  -
                         Wilmington, Delaware
11                   Tuesday, December 18, 2012
                            9:00 a.m.
12                       Day 13 of Trial
                              -  -  -
13
      BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
14                                    and a Jury

15    APPEARANCES:

16            PHILIP A. ROVNER, ESQ.
              Potter Anderson & Corroon LLP
17                    -and-
              PAUL J. ANDRE, ESQ.,
18            LISA KOBIALKI, ESQ.,
              JAMES HANNAH, ESQ.,
19            HANNAH LEE, ESQ., and
              JONATHAN S. CAPLAN, ESQ.
20            Kramer Levin
              (Redwood Shores, CA)
21
                              Counsel for Plaintiff
22

23

24

25
```

1    APPEARANCES CONTINUED:

2              DENISE SEASTONE KRAFT, ESQ.
               DLA Piper LLP (US)
3                      -and-
               JOHN ALLCOCK, ESQ.,
4              KATHRYN RILEY GRASSO, ESQ., and
               SEAN CUNNINGHAM, ESQ.
5              DLA Piper LLP (US)
               (San Diego, CA)
6
                                   Counsel for Defendant
7                                  Sophos, Inc.

8              MARYELLEN NOREIKA, ESQ.
               Morris Nichols Arsht & Tunnell LLP
9                      -and-
               JENNIFER A. KASH, ESQ.,
10             DAVID NELSON, ESQ., and
               SEAN PAK, ESQ.
11             Quinn Emanuel
               (San Francisco, CA)
12
                                   Counsel for Defendant
13                                 Symantec Group

14             THOMAS C. GRIMM, ESQ.
               Morris Nichols Arsht & Tunnell LLP
15                     -and-
               ANTHONY M. STIEGLER, ESQ., and
16             JOHN KYLE, ESQ.
               Cooley LLP
17             (San Diego, CA)

18                                 Counsel for Websense Inc.

19

20                             -  -  -

21

22

23

24

25

```
 1                    THE COURT:  Good morning.  I think we have a
 2      witness on the stand.
 3                    (Jury enters courtroom at 9:02 a.m.)
 4                    THE COURT:  Good morning.  Please, take your
 5      seats.
 6                    Proceed, Mr. Kyle.
 7                    THE COURT:  Thank you, Your Honor.
 8                    Once again, ladies and gentlemen of the jury, my
 9      name is John Kyle.  I am one of the attorneys representing
10      Websense.
11                    THE COURT:  You may proceed, Mr. Kyle.
12                    ... MARTIN BUNCHER, having been previously
13      sworn as a witness, was examined and testified further
14      as follows ...
15                        DIRECT EXAMINATION CONTINUED
16      BY MR. KYLE:
17      Q.    Mr. Buncher, can you relate to the jury who you are
18      and why you are here?
19      A.    My name is Martin Buncher.  I conducted a primary
20      research study, the objective of which was to determine the
21      motivation for purchasing the Websense product.
22      Q.    I want to refresh the jury's recollection on where we
23      left off on Friday.
24                    Mr. Grimm, can I get Slide 9001.
25                    So we left off on Friday talking about this
```

```
 1    slide, in particular, the 57-percent bar on the chart.  I

 2    had asked you, 57 percent of Websense customers rated the

 3    RTSS feature as essential.  That seems like a high number.

 4    Why didn't you consider that to be a driver of demand?

 5    A.    Right.  My response, in my response I gave the analogy

 6    of purchasing an automobile, where various elements that

 7    they are using in the construction of an automobile are

 8    essential.  But we need to go beyond what is perceived as

 9    essential to see which of the essential features are most

10    important, because that would be most likely driving your

11    purchase.

12              If your preference was for a stylish car, versus

13    a performance car, versus something else, it would be which

14    of the essential features would be in your mind as being

15    most important.

16    Q.    Let's move on to explore that a little bit.

17              Can I get 7156-7, Mr. Grimm.

18              In particular, Question 10 on 7156-7, that is

19    one of the aided questions that you asked the respondents?

20    A.    Yes.

21    Q.    What was the purpose of asking Aided Question 10?

22    A.    Well, Question 10 asked them to rank-order the

23    features that they had already identified as essential in

24    their particular situation, so that we would know which one

25    was foremost and more likely to be driving the purchase for
```

1    that particular Websense product.

2    Q.    Mr. Grimm, can I get Slide 9201.

3                What does Slide 9201 reflect, Mr. Buncher?

4    A.    It reflects how many times a specific feature received

5    first place in the rank order of the features that were

6    essential to any given individual.

7    Q.    That is where the Web Security Gateway product --

8    A.    Web Security Gateway product, which the results again

9    were representative of all of the five Websense products

10   that we studied in the project.

11   Q.    If I can get Slide 7156-8 and 9, or Exhibit 7156-8 and

12   9 side by side.

13                You also testified, Mr. Buncher, last week that

14   in addition to open-ended questions and aided questions you

15   asked a series of price sensitivity questions.  Right.

16   A.    That's correct.

17   Q.    And what's reflected on Questions 11 through 13(e)?

18   A.    These price sensitivity questions were designed to

19   measure the impact of the realtime security feature in terms

20   of the perceived price element of the product.  That's

21   essentially what the purpose was.

22   Q.    So you were trying to measure what customers would be

23   willing to pay for the features added versus the preexisting

24   product?

25   A.    First, whether they thought it would have an impact in

1    terms of either increasing or not affecting or decreasing

2    the actual product price.  We left all three possibilities

3    open to them to tell us.

4    Q.    Can I get Slide 57, Mr. Grimm.

5          What do you reflect on Slide 57, Mr. Buncher?

6    A.    The perceived impact on price of the realtime security

7    scanning feature was mixed and not very substantial.  We had

8    56 percent of the respondents telling us that they thought

9    the product would cost more, 35 percent said that it would

10   have no impact on price, and nine percent actually thought

11   it would reduce the price, for whatever reason.

12         Also, of the 56 percent that thought it would

13   cost more, we had asked them as well as everybody else how

14   much more or how much less it would cost, and about

15   three-quarters, 72 percent of those who thought it would

16   cost more felt the increase in price attributable to the

17   realtime security scanning feature would be five percent or

18   less.

19   Q.    Last question, Mr. Buncher:  Based on the survey you

20   conducted and the responses that we discussed over the two

21   days that you were on the stand, what were your conclusions

22   with respect to the realtime security scanning feature and

23   what drives demand for Websense product?

24   A.    In this study, we had a lot of internal consistency

25   with the data.  All of the questions that we asked pointed

Buncher - direct

```
 1    to the same conclusion, that is that the realtime security

 2    scanning feature is not primary in driving the demand for

 3    this product.  It's other features, mainly, in the five

 4    categories, the image and reputation of the company.  But if

 5    you look at specific features, it is the URL filter feature

 6    which is most frequently mentioned relating to the purchase

 7    of the product rather than any of the realtime security

 8    scanning.

 9              MR. KYLE:  Thank you, Mr. Buncher.

10              THE COURT:  All right.  Mr. Andre.

11               MR. ANDRE:  Thank you, Your Honor.

12                       CROSS-EXAMINATION

13    BY MR. ANDRE:

14    Q.    Good morning, Mr. Buncher.  My name is Paul Andre.  We

15    haven't met yet.  I will be asking you a few questions this

16    morning.

17              You talked about the URL filtering feature.  How

18    long has Websense been selling a URL filtering feature?

19    A.    It's beyond the scope of my knowledge.

20    Q.    You don't know how long they have been a primary URL

21    filtering company?

22    A.    That's beyond the scope of my assignment and my

23    knowledge.

24    Q.    You didn't factor that into your consideration when

25    you were doing a survey as to how many people and how long
```

1    those people have been buying URL filtering as opposed to

2    the relatively new feature, RTSS?

3    A.    The five products that we studied all had the realtime

4    security scanning feature in them.  I believe they also had

5    the URL filtering feature in them.  That would be what would

6    be relevant in the design of the survey.

7    Q.    You didn't think it was relevant because you looked at

8    I believe you said about 75,000 past and current customers

9    of Websense, that is who you sent the survey to?

10   A.    There were actually more than 80,000 initial contacts,

11   but we filtered the list down to eliminate duplications from

12   the list.

13   Q.    Of those 80,000 people or 75,000 people you sent

14   surveys to, you didn't think it was important to understand

15   if they had been buying URL filtering for the last 15, 20

16   years and just RTSS the last year?

17   A.    We didn't survey to that many people.  We collected

18   surveys amongst a sample of a thousand respondents.

19   Q.    You say you sent surveys out to how many people now?

20   A.    We sent them out in batches, I believe in terms of

21   25,000 at a time.

22   Q.    How many batches did you sent out?

23   A.    Either one or two.

24   Q.    You don't know how many surveys you actually sent out,

25   25 or 50,000?

Buncher - cross

1    A.     We sent out a first batch of 25,000 and started

2    collecting data and started to receive completed interviews.

3    We sent out after a certain period of time, several days, a

4    second batch.  What we collected were the first 1000 good

5    quality completed interviews.

6    Q.     I guess my question is, you didn't think it was

7    relevant to know what their past history was with Websense,

8    for example, if they were a Websense customer for the last

9    15 years buying URL filtering, you didn't think that was

10   relevant to understand what importance they placed on

11   various product features?

12   A.     In studying the product features, I was given a list

13   of what Websense considered as all relevant features for

14   each of the five products.  And we had a list of 19 or 21 or

15   so features, depending on what the product was.

16   Q.     So the features that you listed that was provided to

17   you by Websense, it wasn't something you came up with.

18   Correct?

19   A.     That's correct.

20   Q.     Now, those features of the product that you included

21   included things like the company reputation.  Correct?

22   A.     That's correct.

23   Q.     They also include the customer technical support.

24   Correct?

25   A.     I would have to look at the list to confirm.

2960

Buncher - cross

1   Q.    I believe you can look at it in your binder under

2   DX-17156.  On Page 4 of that, there is a list that goes --

3   gives you an example list.  Bottom of the page.  You include

4   issues like company reputation, customer technical support,

5   and the price.  Correct?

6   A.    Yes.

7   Q.    Now, in your opinion, are those really features of the

8   product?

9   A.    Features is a very broad term.  We are looking at

10  the -- asking respondents questions in terms of their

11  perceptions of the product.  Their perception is our reality

12  in terms of marketing research.

13         So they would not probably distinguish between a

14  feature of a product as its image versus a functional

15  feature such as a performance-oriented feature.

16         This list compiled was meant to be very broad in

17  terms of what it offered them to rank as essential, quote,

18  features.

19  Q.    My question to you is, as a survey expert, isn't a

20  company's reputation a feature of a product?

21  A.    By the consumers' perceptive I would say yes.

22  Q.    Now, with respect to the survey sample, did you make a

23  determination as to whether or not they were currently using

24  the RTSS function?

25  A.    Yes.  One of our screening questions was to determine

Buncher - cross

1    of our sample of a thousand how many were current versus

2    past users.

3    Q.    Did you determine how many people were using the

4    Websense product before the launch of the RTSS function?

5    A.    I don't believe that was a question in the survey.

6    Q.    Did you find it relevant to know what they were using,

7    what Websense products they were using prior to the recent

8    launch of the RTSS function?

9    A.    No.

10   Q.    You made assumptions that potential respondents would

11   be IT managers and decision-makers in purchasing security

12   software.  Isn't that correct?

13   A.    That's who we were -- if you look at the job titles

14   that were on the customer base list that was given us, you

15   will see that most those job titles related to those

16   individuals.  But basically, what we were after were people

17   that were involved in the decision-making to purchase the

18   product regardless of what their title was.  That would also

19   account for people that maybe weren't IT professionals at

20   one time to group into that position.

21            Again, the target group that we were after, we

22   identified to screen in our sample, those were people that

23   were using the product in the present or past, but more

24   specifically, when we tested our product features were

25   actually using or had been involved in the decision to use

Buncher - cross

1     that specific product.

2     Q.     So, you went to people that Websense provided you the

3     email address to, correct, and sent out these surveys?

4     A.     I was given to believe that that was a fairly complete

5     list of their customers.

6     Q.     Over what time period was this a list of those

7     customers?  Were they long time customers?  Were they recent

8     customers?  What time period?

9     A.     When the list was compiled?

10    Q.     No.  What time period did the customers span?  Were

11    they recent customers?  Were they customers for 20 years?

12    A.     I was told that it was a complete, relevant list of

13    their customers.  I don't have the specific details of how

14    long they had been customers.

15    Q.     So anyone who had ever bought a Websense product could

16    potentially be on that customer list?  They could have

17    bought a product back in 1999 and they would be on that

18    list?

19    A.     That's beyond the scope of my knowledge.  The question

20    that we asked about current and past usage was the one that

21    was relevant for us in studying these particular applied

22    Websense products.

23    Q.     My question is -- I am trying to make it very clear --

24    you didn't look into the facts one way or another whether or

25    not these were customers from ten, 15 years ago as opposed

1    to recent customers.  Correct?

2    A.    Let me find the questionnaire and I will give you the

3    specific question that we used.

4    Q.    It's a very simple question I am asking you.  Did you

5    try to make a determination as to whether or not these

6    customers were long-term customers of Websense or they were

7    more recent customers only?

8    A.    We didn't investigate the specific time span.  I was

9    simply provided the list from Websense and used that list.

10   Q.    Thank you.  That's what I was trying to get to.

11   A.    Okay.

12   Q.    I want to focus your attention to your question No. 9.

13   A.    I have it in front of me.

14   Q.    In this question, you ask them to check the box if you

15   felt each feature is essential in a product like this.

16   Correct?

17   A.    The question asked them to check a box for each

18   feature that they had identified -- sorry, for each feature

19   listed for that product, whether it was essential,

20   desirable, or non-important.  There were three boxes and

21   they could check either one of the three for each feature.

22   Q.    I believe in your deposition in this case, you stated

23   that if something was essential, it meant that that

24   particular feature had to be there in order for the

25   respondent to buy it.  Correct?

Buncher - cross

1    A.    My interpretation of the word "essential" is it would

2    have much more meaning in terms of product purchase than

3    something that was simply desirable or not as important.

4    And exactly what goes into the consumer perception of the

5    word "essential," we could never know unless we had an open

6    end study to probe what they thought "essential" meant.

7              But this scale that I used is one that we have

8    used in many, many hundreds of surveys to delineate the

9    relative role that futures play, whether they are essential,

10   desirable, or not.

11             So I have no concern about the use of the word

12   "essential" in terms of saying what is most important to

13   them in purchasing the product.

14   Q.    I appreciate that answer, but that wasn't my question.

15   I said:  In your deposition in this case, you said the word

16   "essential" means it has to be there for the customer to buy

17   it.

18             That's what you testified to earlier in this

19   case.  Correct?

20   A.    Yes.

21   Q.    Thank you.

22             And if you go to the answers to question nine,

23   you can find the answers in DX7155?

24             Now, on Page 64, this is the answer to question

25   nine with respect to one of the accused products, the Hosted

Buncher - cross

1    Web Security Gateway, a/k/a, the Cloud Web Gateway product.

2    Do you see that?

3    A.    Web Security Gateway, yes.  It begins on Table 38-1 at

4    the top of the page there?

5    Q.    That's correct, yes.

6          Now, if you look at the, towards the top of the

7    page, it talks about URL filtering.  Do you see that?  It

8    says 91 percent of the respondents declared that URL

9    filtering had to be in the product as essential.  Correct?

10   A.    Yes.

11   Q.    And if you go down towards the bottom of the page, you

12   will see the Real-Time Security Scanning.  So 65 percent of

13   the respondents said that that was an essential feature in

14   the Web Security Gateway -- the Hosted Web Security Gateway

15   product.  Correct?

16   A.    Correct.

17   Q.    A couple lines above that, you have an antivirus

18   category.  Do you see that?

19   A.    Yes.

20   Q.    56 percent of the people responded yes to antivirus.

21   Correct?

22   A.    Yes.

23   Q.    So in this particular situation, you would say that

24   for the essential answer for the customers, you'd have the

25   URL filtering, the Real-Time Security Scanning, and then the

1   antivirus.  Correct?

2   A.    You are rank ordering the percentages?

3   Q.    Yes.

4   A.    Yes.

5   Q.    And based on how you determine to be essential, you

6   stated that, under this scenario, 65 percent of the

7   respondents believe that the RTSS is essential and would be

8   required for them to buy the Hosted Web Security Gateway

9   product.  Correct?

10  A.    Right.

11  Q.    Go to Page 70 of that same exhibit, Exhibit DX7155,

12  this is for the Triton Enterprise.  And in response to this,

13  you have, once again, the URL filtering at 91 percent.  Do

14  you see that?

15  A.    Correct.

16  Q.    And you go to the Real-Time Security Scanning, it's

17  70 percent.  Do you see that?

18  A.    Correct.

19  Q.    And then the antivirus is 35 percent?

20  A.    Correct.

21  Q.    So based on your understanding, 70 percent of the

22  respondents stated that in order for them to buy the Triton

23  Enterprise product, that they would require the RTSS

24  functionality.  Correct?

25  A.    Correct.

Buncher - cross

1    Q.    And that ranks higher than antivirus functionality?

2    A.    In that particular instance, yes.

3    Q.    Go to Page 76 of the same exhibit, DX7155, you see

4    that this is the Triton Security Gateway Anywhere product?

5    A.    That's correct.

6    Q.    And on the URL filtering, there is 75 percent of the

7    respondents rated this as an essential feature.  Do you see

8    that?

9    A.    Yes.  That, again, was the most often mentioned

10   feature.

11   Q.    And if you go down to the Real-Time Security Scanning,

12   it was 69 percent.  Do you see that?

13   A.    69, correct.

14   Q.    So in this particular product, the Triton security is

15   pretty close to the same number of individuals who responded

16   that the RTSS is almost the same as the URL filtering as far

17   as what would be essential for them to make a buying

18   decision?

19   A.    Yes.  I believe I testified to this point earlier,

20   that many of the features that were listed received a

21   substantial response as essential in purchasing the car.

22   Q.    Got it.  I understand.

23   A.    Okay.

24   Q.    I am just trying to make sure we get the raw data here

25   instead of some summary charts.

Buncher - cross

1              Then on the line "antivirus," only 50 percent of

2      the people thought antivirus was essential.  Do you see

3      that?

4      A.    Yes.

5      Q.    So, once again, the Real-Time Security Scanning is

6      much higher than the antivirus functionality.  Correct?

7      A.    Yes.

8      Q.    If we go to Page 82 of this exhibit, DX7155, you see

9      what is essential for the customers to buy in the Web

10     Security Gateway product, you have 90 percent for URL.  Do

11     you see that?

12     A.    Yes.  Again, it's the first place.

13     Q.    And Real-Time Security Scanning is 57 percent.  Do you

14     see that?

15     A.    I see that.

16     Q.    And then antivirus is at 32 percent.  Do you see that?

17     A.    Antivirus is at 31 percent.

18     Q.    31 percent, I am sorry.

19              So based on your data here, 57 percent of the

20     respondents required that the feature of the RTSS would be

21     required to buy the product.  Correct?

22     A.    That's correct.

23     Q.    Let's go to the last one of these slides for answer

24     No. 9, the Web Security Gateway Anywhere product, and if you

25     go to the top, the URL filtering, I believe it's 88 percent.

Buncher - cross

1    Do you see that?

2    A.    I am sorry.  What page?  89?

3    Q.    I am sorry, page 88 of DX7155.

4    A.    Yes.  Standard URL filtering in first place with

5    88 percent.

6    Q.    And then you go towards the bottom of the page, you

7    see the Real-Time Security Scanning at 75 percent.  Do you

8    see that?

9    A.    Correct.

10   Q.    And then antivirus is at 57 percent.  Correct?

11   A.    I see that.

12   Q.    So 75 percent of the respondents of your survey stated

13   that they would require the RTSS functionality to buy the

14   Web Security Gateway Anywhere product.  Correct?

15   A.    That's correct.  For this particular question, that

16   was the response.

17   Q.    Now, in every instance, I believe you showed on your

18   demonstrative slides 090-01, when people looked at the

19   single-most important feature of the Gateway products they

20   found to be important to buying this product, URL filtering

21   was number one.  Correct?

22   A.    Yes.  That was the -- the rank order positions.

23   Q.    I think the data showed, if you had to pick one

24   feature you wanted for the Web Gateway product, you'd want

25   URL filtering number one.  Correct?

2970

Buncher - cross

1    A.     No, that wasn't the question.  The question was asked

2    of the features you consider to be essential, please rank

3    them in order of importance to you, and URL filtering came

4    out as the first ranked position 45 percent of the time for

5    the Gateway product.

6    Q.     And then the RTSS was No. 2.  Correct?

7    A.     That's correct, by about a fourth of the response

8    level.

9    Q.     And that was higher than company reputation, price,

10   and any of the other features?

11   A.     Well, we are plus or minus three percent, so the

12   difference between RTSS and company reputation would not be

13   significant, but it would be higher than price.

14   Q.     I am just looking at the numbers here.  It's

15   11 percent and eight percent --

16          THE COURT:  He is explaining the statistical --

17   what is that called, a margin?

18          THE WITNESS:  Probability.

19   BY MR. ANDRE:

20   Q.     Margin of error.  And in fact, the margin of error

21   statistics, they can vary widely depending on your sample

22   size and how you do your survey?

23   A.     They vary on a number of issues.

24   Q.     When you talk about statistics and doing surveys and

25   marketing, this is just a -- you do your best, but there is

Buncher - cross

1    always going to be a margin of error on this, right?  There

2    is going to be, depending on how you set up the survey and

3    what questions you ask and -- and a lot of different things

4    can influence the ultimate decision.  Correct?

5    A.    I don't understand that question.  I am sorry.  It's

6    too compounded.

7    Q.    You are kind of doing a taste test versus Pepsi?

8    A.    Yes.

9    Q.    If Coke does it, Coke always with wins, but if Pepsi

10   does it, Pepsi always wins.  Correct?

11   A.    I can't testify to that.

12   Q.    Fair enough.  Just trying to give an analogy.

13             You have ranked RTSS as No. 2 under URL

14   filtering.  If you go back to DX-7156, Page 4, there is a

15   list of features that you included.  I believe there is

16   about, it looks like 15 or 20 different features of this

17   product that you included.  Correct?

18   A.    Well, you could count them for the actual number.

19   Yes.  That would be fine.

20   Q.    Of all those features, the RTSS ranked No. 2 right

21   behind the URL filtering.  Correct?

22   A.    Yes.  But considerably behind the URL filtering.

23   Q.    Fair enough.

24             You didn't take into account the fact that

25   Websense, for almost its entire history, had been a URL

Buncher - cross

1    filtering company and only launched the RTSS functionality

2    in the last few years, that didn't factor into your equation

3    as to your survey analysis.  Right?

4    A.    No, and with good reason.

5             MR. ANDRE:  I have no further questions, Your

6    Honor.

7             THE COURT:  Mr. Kyle, your redirect.

8             MR. KYLE:  Thank you, Your Honor.

9                      REDIRECT EXAMINATION

10   BY MR. KYLE:

11   Q.    You said with good reason right there at the end, Mr.

12   Buncher.  What was that good reason?

13   A.    Well, because we were looking at the current picture

14   of how the consumer addresses the product, and that's why we

15   presented this list of features, which was very broad and

16   all-encompassing and it gave him the chance to tell us,

17   after we reminded him what those features were, if you

18   remember, this was the second level of questioning, where we

19   suggested, consider these possibilities, you didn't mention

20   them spontaneously, but we want to make sure we are covering

21   them, which one played a role and what was the nature of

22   that role and then, relative to how you consider them as

23   important or not, which ones really were at the top of your

24   list.

25             We were looking at a single question there that

Buncher - redirect

1    counsel was asking me about.  But the more important

2    understanding was the next question, which said, of those

3    features you consider to be essential, what do you think do

4    you rank first.  And every time we did that, URL filtering

5    came out.

6            I don't see any reason to negate our finding

7    that just because URL filtering had been around for longer

8    than realtime security scanning -- they are looking at those

9    two in a contemporary sense, to say, here is realtime

10   security scanning, here is 18 or 19 other features, which

11   one do I pick out, I pick out URL filtering.

12   Q.    Thank you.

13           Mr. Andre had asked you some questions about the

14   products you studied and the time frame of those products.

15   You studied the accused products in this case.  Right?

16   A.    Studied what products?

17   Q.    The accused products?

18   A.    Yes, correct.

19   Q.    And all of those accused products include the RTSS,

20   realtime security scanning functionality.  Is that correct?

21   A.    That's correct.  They were in the list for each one of

22   the five products that we studied.

23   Q.    Each of the accused products was, to your

24   understanding, launched in the past couple years, as Mr.

25   Andre said, since Websense introduced the --

Buncher - redirect

1           MR. ANDRE:  Objection, leading, Your Honor.

2           THE COURT:  Yes, it is, Mr. Kyle.  Rephrase it.

3    BY MR. KYLE:

4    Q.    The slides we had put up concerned the Web Security

5    Gateway product.  Again, why did you select the Web Security

6    Gateway product as what we put up as an exemplary of the

7    accused products?

8    A.    Because I was told that the Websense Gateway product

9    was the first product in which the realtime security

10   scanning feature was introduced.  And I also was told that

11   the realtime security scanning product was present in all

12   five of the product versions that we studied.

13   Q.    Last question:  Did any of the questions that Mr.

14   Andre asked you cause you to reconsider or change your

15   opinions at all in this matter?

16   A.    No, they did not.

17   Q.    Once again, tell the ladies and gentlemen of the jury,

18   based on your expertise and the survey you conducted and all

19   the information you reviewed, what did you conclude was the

20   driver of consumer demand for the five Websense accused

21   products?

22   A.    What is driving demand for this product to me is very

23   obvious from the facts that you look at, derived from what

24   this type of purchaser and their use of the product told us,

25   that realtime security scanning is not a major factor.  It's

1    primarily, as they perceive the product, the product

2    reputation and its image.  But if you turn their attention

3    towards features in the broadest sense, they will pick out

4    URL filtering as the most important feature that they think

5    of in terms of features when they are considering purchasing

6    the product.

7                    MR. KYLE:  Thank you.  I have nothing further,

8    Your Honor.

9                    THE COURT:  Mr. Buncher, you are excused, sir.

10                   THE WITNESS:  Thank you very much.

11                   (Witness excused.)

12                   MR. KYLE:  Your Honor, Websense now calls Dr.

13   Ryan Sullivan.

14                   ... RYAN MICHAEL SULLIVAN, having been duly

15   sworn as a witness, was examined and testified as

16   follows ...

17                   THE COURT:  Do you have binders, Mr. Kyle?

18                   MR. KYLE:  Yes, sir.

19                        DIRECT EXAMINATION

20   BY MR. KYLE:

21   Q.    Good morning, sir.  Could you please introduce

22   yourself to the ladies and gentlemen of the jury?

23   A.    Good morning.  I am Ryan Sullivan.  And I am an

24   economist with the consulting firm of Quant Economics in San

25   Diego.

Sullivan - direct

1    Q.    What were you asked to do in this case, Dr. Sullivan?

2    A.    I was asked to determine what would be the appropriate

3    royalty that would be paid by Websense to Finjan in the

4    event that the '194 patent is found to be valid and

5    infringed.

6    Q.    Before we get into the details of that, can you tell

7    the ladies and gentlemen of the jury at a high level what

8    your expert conclusions are with respect to what you were

9    asked to do?

10   A.    In my opinion, the appropriate royalty would be a

11   one-time lump-sum payment for the life of the '194 patent in

12   the event that the '194 patent is found to be valid and

13   infringed.  And the amount of that royalty would be one

14   million dollars.

15   Q.    May we have Slide 4401, please.

16         Dr. Sullivan, can you tell the ladies and

17   gentlemen of the jury briefly about your educational

18   background?

19   A.    Certainly.  I have a Bachelor's degree, Master's

20   degree, and a Ph.D., all in economics, and all from the

21   University of California San Diego.

22   Q.    Can you provide the ladies and gentlemen of the jury a

23   summary of your employment background?

24   A.    Sure.  I am the founder, president and chief economist

25   of Quant Economics, Inc.  I have been performing

Sullivan - direct

1      professional economic research and analysis for 20 years

2      now, with a focus on intellectual property and technology.

3      I am also an invited member of the Economics Leadership

4      Council at the University of California San Diego.  And in

5      that role, I advise the faculty on the Department of

6      Economics on the practice of economics in private industry.

7      Q.    How many times have you served as an expert witness in

8      a patent case, Dr. Sullivan?

9      A.    Without counting, I would say that it has been well

10     over 100 times that I have been retained in a patent damages

11     matter.

12     Q.    Plaintiff's side, defendant's side, or both?

13     A.    Both.  It varies from time to time depending on what I

14     am working on.  But it's roughly 50-50 over time.

15                MR. KYLE:  Your Honor, Websense tenders Dr.

16     Sullivan as an expert in the area of economics and

17     calculation of reasonable royalty.

18                THE COURT:  Any objection?

19                MR. ROVNER:  No objection, Your Honor.

20                THE COURT:  The Doctor is accepted as an expert

21     in those areas.

22     BY MR. KYLE:

23     Q.    Let's talk about your scope of work a little bit.

24     What materials and evidence did you review in reaching your

25     opinions in this matter?

1    A.      I reviewed a great deal of documents and data.

2            This consisted of license agreements, market

3    research reports by third companies, deposition testimony,

4    as well as the data underlying the survey that was performed

5    of Websense's customers by Dr. Martin Buncher.

6    Q.    Can I get Slide 33, Mr. Grimm.

7            We provided a very high-level summary of your

8    conclusions in this matter.  Can you provide the jury

9    perhaps a discussion of what is displayed on this slide with

10   respect to your conclusions in the matter?

11   A.    Yes.  So I have implemented six different methods of

12   determining what the appropriate royalty would be here in

13   the event there is a finding of infringement.  They range

14   from a low of approximately 300,000 up to a high of

15   approximately 1.2 million.  And based upon the totality of

16   the economic research analysis that I performed, it is my

17   opinion that the appropriate royalty would be one million.

18   Q.    That's a one-time lump-sum royalty?

19   A.    Yes, that's right.

20   Q.    Can you describe for the jury the methodology you

21   employed to reach these numbers?

22   A.    The methods that I used isolated and measured the

23   value of the contribution of the accused functionality,

24   which is the realtime security scanning feature, RTSS, in

25   the accused product, which is known as Web Security Gateway.

Sullivan - direct

1          The first four methods you can see here are

2    based upon four of the questions from Mr. Buncher's survey.

3    I utilized there the data from the Websense customer

4    responses.   I adjusted those with revenue data, profit data,

5    as well as the relative bargaining positions between the two

6    parties, to determine what the one-time lump-sum payment

7    would be.   Then I corroborated that analysis with the

8    Microsoft agreement and the Trustwave agreement.

9    Q.    Let's talk about that methodology in some detail.   The

10   jury has heard a lot from several witnesses over the past

11   couple days about these things called the Georgia-Pacific

12   factors.   Did you also employ the Georgia-Pacific factors,

13   Dr. Sullivan?

14   A.    Yes, I did.  All 15.

15   Q.    Can I get Slide 4901, Mr. Grimm.

16          What is reflected on Slide 4901, Dr. Sullivan?

17   A.    The basic methodology here is one of specifying a

18   hypothetical negotiation between Websense on the one hand,

19   Finjan on the other.   The hypothetical negotiation here

20   would have occurred in the third quarter of 2008.   That's

21   the time at which Websense launched their Web Security

22   Gateway product with the accused RTSS feature.

23          And there are a number of economic factors that

24   are from Georgia-Pacific that directly influence what the

25   appropriate lump-sum royalty payment would be here.   Those

1    are the commercial relationship between the parties,

2    profitability of the products at issue, contribution of the

3    patented technology, sales of nonpatented products, as well

4    as licensing and license agreements that the parties have

5    entered into.

6    Q.    So you said the hypothetical negotiation would have

7    occurred in the third quarter of 2008.  Why is that?

8    A.    That's the time at which the Web Security Gateway

9    product was launched with the accused RTSS component to it,

10   and the damages period, and the period over which the

11   lump-sum royalty would cover for the life of the patent.

12   And the '194 patent is said to expire in November of 2017.

13            So we have a period of time going from third

14   quarter 2008 out through November 2017.

15   Q.    Remind us what the world's economic condition was at

16   the time of the hypothetical negotiation in Q3 2008?

17   A.    Well, I think we probably all pretty well remember

18   personally that the world was entering into a global

19   economic recession right at that time.

20   Q.    Now, let's talk about some of these key factors in

21   detail and dig a little deeper.

22            Let's talk about the commercial relationship

23   first.  What is your understanding of Finjan's financial

24   situation at the time of the hypothetical negotiation

25   between Websense and Finjan?

Sullivan - direct

1    A.    They were in a very poor financial position.

2    Q.    And you reviewed Mr. Parr's testimony, trial testimony

3    in this matter?

4    A.    Yes, I have.

5    Q.    And do you recall that Mr. Parr said that in his

6    opinion, Finjan's financial condition did not relate to any

7    of the 15 Georgia-Pacific factors?

8    A.    I did hear that.

9    Q.    Do you agree?

10   A.    No, I do not.

11   Q.    Why not?

12   A.    The financial condition of the parties and their

13   bargaining position is directly relevant to the hypothetical

14   negotiation.  Specifically, that plays into three of the

15   Georgia-Pacific factors.  Georgia-Pacific Factor 5 relates

16   to the commercial relationship between the parties,

17   including their bargaining positions.

18           Factor 8 relates to the profitability of the

19   products utilizing the patented technology.  Here, those

20   products of Finjan's and their profitability or really the

21   lack thereof and the lack of commercial performance of those

22   products directly influences the hypothetical negotiation

23   and is relevant.

24           And finally, Factor 15 is the hypothetical

25   negotiation construct itself.  It's the outcome of that

1    negotiation.  And it is very much influenced by the relative

2    bargaining positions of the parties and where they sit with

3    the negotiation.

4    Q.    Mr. Grimm, can I get Slide 9601, please.

5          What are you reflecting on Slide 9601, Dr.

6    Sullivan?

7    A.    This demonstrates the distressed financial position

8    that Finjan was in.  In 2007 and 2008, Finjan lost

9    approximately $20 million in each of those two years, and

10   2008, again, being right when the hypothetical negotiation

11   would have occurred.  You can see on the chart that is here

12   on the left, this is a forecast of the cash position that

13   Finjan expected to happen over the end of 2008.  Again, this

14   is right at the time of the hypothetical negotiation.

15         They were going into a very precarious position

16   with their cash.  In their words, they wanted to stop the

17   bleeding by cutting costs.  So they were taking very

18   significant measures with their business to find a way to be

19   able to stay solvent and be able to continue as a running

20   operation.

21   Q.    What do you understand about Finjan's desire to be

22   acquired by other companies at or about the time of the

23   hypothetical negotiation with Websense?

24   A.    At this time, Finjan retained an investment bank known

25   as American's Growth Capital.  They wanted to find a

Sullivan - direct

1    purchaser for the assets of Finjan, including their

2    intellectual property and their patents.  They were shopped

3    to approximately 33 different companies, including Google,

4    Microsoft, Symantec, Websense, Trend Micro, BlueCoat, as

5    well as others.

6              None of those companies had an interest in

7    acquiring those assets of Finjan's products or their

8    intellectual property.  And ultimately, then, what did

9    happen is at the end of 2009, Finjan was acquired by M86,

10   the entire company.

11   Q.    What is your understanding of whether M86 has been

12   profitable selling Websense products after that act --

13   strike that.

14             What is your understanding of whether M86 has

15   been profitable selling Finjan products post-acquisition?

16   A.    Deposition testimony indicates that M86 has not been

17   able to make a profit off of Finjan's products.

18   Q.    So just to summarize for the jury, how would Finjan's

19   financial condition at the time of the hypothetical

20   negotiation have impacted that negotiation?

21   A.    In a couple of ways it would have an impact.  One, it

22   would suggest that the appropriate structure of the royalty

23   would be a one-time lump-sum payment for the life of the

24   patent.

25             This would provide Finjan with all of the

1    royalties and all of the money up front, which would satisfy

2    their financial needs at that time, or at least partially.

3              In addition, a lump-sum royalty does not require

4    any sort of auditing or tracking of how the use of the

5    technology goes over time.  That means the administrative

6    costs associated with that royalty structure is much

7    smaller.  That would help Finjan conserve on their costs of

8    administering the royalty -- administering the license.

9              And, in addition, given their distressed

10   financial position, the amount of that lump-sum royalty

11   would be less than it otherwise would be.

12   Q.   So let's now turn our attention to the financial

13   condition of Websense at about the time of the hypothetical

14   negotiation, in particular, the role that the accused

15   functionality played with respect to Websense products as a

16   whole.  Are you with me?

17   A.   I am.

18   Q.   If I can get Slide 34.

19             What are you reflecting on Slide 34,

20   Dr. Sullivan?

21   A.   This is a chart I put together that shows Websense's

22   revenue on an annual basis, and this goes from 2001, out

23   through 2011, and I have broken it out into two pieces.

24             The blue columns that you see are for all the

25   revenue associated for non-accused products and services,

Sullivan - direct

1    and the green pieces that you can see at the top, starting

2    in 2008 and going through 2011, that is the revenue

3    associated with the accused Web Security Gateway product,

4    and it's the, really, it's the upgrade amount, going from

5    Web Security, which is a non-accused product, up to Web

6    Security Gateway, which is the accused product.

7              So there is really two key take-aways here.

8    One, I think it's pretty obvious to see that the share of

9    overall revenue for Websense that is attributable to the

10   accused product is very small.  It's a small portion of

11   Websense's business.  And I think the other key takeaway is

12   that the other products and services, such as Web Security

13   and Web filtering and the URL filtering products and that

14   technology is continuing to see growth and improvement

15   throughout this time period, even after Web Security Gateway

16   was introduced and even in spite of the global economic

17   recession.

18   Q.    Let's turn to the Websense product profit margin.

19   What are you reflecting on Slide 37?

20   A.    The appropriate profit margin for Websense to be

21   considering here in our analysis is 10 percent.

22              Now, that's a modest profit margin, yet, it is

23   healthy.  And this reflects the -- you know, profit is, of

24   course, the difference between revenue, you subtract off

25   costs, and you get profit.

Sullivan - direct

1               There is two main types of costs that need to be

2      deducted from revenue to get to profit here.  The cost of

3      sales or the cost of revenue -- these are the direct costs

4      that Websense would incur -- but also the operating

5      expenses, and operating expenses that include sales and

6      marketing, research and development, and general and

7      administrative.

8               What we are looking at here is the introduction

9      of a new product with new technology.  That requires

10     research and development to bring that product to market.

11              We also need to sell and market that product.

12              So these are very real costs that Websense did

13     incur and would have to incur, and, as a result, they should

14     be considered when evaluating the profit margin.

15              Additional support for doing so is recognizing

16     that those operating expenses, the components of them, R and

17     D, sales and marketing, and the like, those are all highly

18     correlated with revenue.

19              That means when revenue increases, those costs

20     increase as well, and that's another way of demonstrating

21     that those are costs that, as an economist, I should be

22     taking into account.

23     Q.    So I have put up a slide that Mr. Parr used during his

24     testimony, which relates to Georgia-Pacific Factor Eight.

25              Do you agree with that slide, Dr. Sullivan?

1    A.    No, I do not.  The number at the far left, the

2    87.3 percent profit margin, that's a gross margin that does

3    not account for these operating expenses I just referred to.

4    So it does not include or account for research and

5    development, sales and marketing, and the like.

6              So that would be overstating the profit margin.

7              The next box to the right, the 11.9 percent,

8    that is, albeit a little bit different, very close to my

9    10 percent, and it is the same amount that's being measured

10   there, it's, you know, it's both an operating profit, the

11   difference is just a time period, so that part is fair.

12             And then the other two numbers are excluding

13   some or all research and development expenses, and, again,

14   that would not, in my opinion, be appropriate.

15   Q.    So, how does Websense's financial position, at the

16   time of the hypothetical negotiation, influence your opinion

17   with respect to that negotiation?

18   A.    Given the modest but healthy profit position that

19   Websense was in, and combined with the notion that the

20   accused functionality and the accused product is a

21   relatively small component, small role within Websense,

22   Websense would be in a superior bargaining position than

23   Finjan in the hypothetical negotiation.

24   Q.    And once again, you reviewed Mr. Parr's testimony.

25   You recall that he had an analogy to the Hope Diamond?

2988

Sullivan - direct

1    A.    Yes, I do.

2    Q.    And do you recall him equating the Hope Diamond to the

3    '194 patent?

4    A.    In essence, yes.

5    Q.    What was Mr. Parr's analogy?

6    A.    As I recall it, he was indicating that the value of

7    the Hope Diamond would be the same in the hand of a starving

8    bum on the street as it would be on display of a showroom of

9    a millionaire's mansion.

10   Q.    Do you agree with Mr. Parr's analogy?

11   A.    No, I do not.

12   Q.    Why not?

13   A.    Simply put, the value at which an asset is going to

14   exchange hands, the amount at which somebody buys it or

15   sells it is going to depend very much on what it is and the

16   position that they are in and what it is that they are

17   seeking to achieve.

18          Frankly, Mr. Parr's bum on the street is going

19   to demand less for the Hope Diamond than is a millionaire

20   who is sitting in their mansion, and that's -- that's basic

21   economics, but I suppose it's just common sense, too.

22   That's what happens in the real world.

23   Q.    So, let's shift to another one of the factors that you

24   considered as part of the hypothetical negotiation, which is

25   contribution of the patented technology.  How did you

2989

Sullivan - direct

1    determine the contribution of the patent of the '194

2    technology, the overall value of Websense value as a whole

3    in your analysis?

4    A.    I performed extensive Websense research and analysis.

5    As I stated, I looked at third-party Websense research

6    reports, I looked at financial filings, I looked at sales

7    and probability, and in particular, I also considered the

8    survey data underlying the customer responses from Websense

9    that Mr. Buncher conducted.

10   Q.    In your opinion, how important is the '194 patented

11   feature to Websense's products as a whole?

12   A.    The accused functionality, which is the RTSS,

13   Real-Time Security Scanning, is a relatively small component

14   of the Websense's products.  There are a number of analytics

15   that are used by Websense and their Web Security labs, and

16   the Buncher survey also demonstrates that the contribution

17   of RTSS is relatively small.

18   Q.    And did you see Mr. Buncher's testimony here in court?

19   A.    Yes, I did.

20   Q.    And did you see Mr. Buncher's slides?

21   A.    I did.

22   Q.    What were your takeaways from Mr. Buncher's surveys as

23   far as your work in this matter is concerned?

24   A.    I think there two takeaways.  One is RTSS is not a

25   primary driver of demand for the accused Web Security

Sullivan - direct

1    products here, Web Security Gateway and its other variants,

2    and the other is that the largest contributor is URL

3    filtering.

4    Q.    Can I get Slide 36, Mr. Grimm.  So this goes back to

5    summary of your methods.

6          Can you describe for the ladies and gentlemen of

7    the jury what you are reflecting on Slide 36, Dr. Sullivan?

8    A.    Certainly.  So I utilized four separate questions from

9    Mr. Buncher's survey, and I took the data on the responses

10   from Websense's customers and I converted those into royalty

11   rates.  I utilized revenue data, profit data, and the

12   relative bargaining positions between the parties to

13   calculate the royalty rates that you see here that range

14   from 1.1 percent up to 3.8 percent.

15         Now, I should clarify that these rates are

16   applicable to what is referred to as an "apportioned royalty

17   base."  So if you think about a particular royalty formula,

18   you have a royalty rate, you multiply it by a royalty base

19   to get the overall lump sum royalty.

20         Here, I am utilizing an apportioned royalty base

21   that is the difference in price between the non-accused Web

22   Security product and the accused Web Security Gateway

23   product, so there is a price difference between those two

24   products, and that reflects RTSS, the accused functionality,

25   as well as other functionalities, and this royalty rate is

1    applicable to that upgrade price or that price difference

2    between those two products.

3    Q.    And just to be clear, this results from before Buncher

4    survey questions that you relied on relates to Finjan and

5    Websense and what you discovered from Buncher's survey of

6    Websense products.  Correct?

7    A.    That is correct.

8    Q.    Let's take a look at Slide 107-1, please.

9          What does Slides 107-1 reflect, Dr. Sullivan?

10   A.    These are 19 separate purchasing factors or features

11   of the Web Security Gateway product, which is the accused

12   product.

13         You can see at No. 18 is Real-Time Security

14   Scanning, that's the RTSS, which is the accused

15   functionality within Web Security Gateway.

16   Q.    Let's take a look at Slide 107-2.  And what does this

17   reflect, Dr. Sullivan?

18   A.    Well, this is the same slide with a few of the items

19   grayed out.  What I am trying to convey is the difference

20   between the non-accused Web Security product and the accused

21   Web Security Gateway product.

22         So all of the grayed out items here, those are

23   all functionalities that are within the non-accused Web

24   Security product.

25         And the four items that I have left open here,

1    Antivirus, Real-Time Content Classification, RTSS, and SSL

2    Inspection, those are the four functionalities that

3    distinguish Web Security Gateway.

4              In essence, they were added to the preexisting

5    Web Security product to get Web Security Gateway.  And both

6    of those products are still being sold today, so we can

7    utilize kind of that difference between those products to be

8    able to get a measure of the contribution of RTSS.

9    Q.   And DX6356, please, Mr. Grimm.

10             What's reflected on DX6356, Dr. Sullivan?

11   A.   This was a document that was displayed previously.

12   You can see in the middle, the Web Security Gateway product.

13   It shows that that lists for roughly $40.  And then the

14   non-accused Web Security product, which is a URL filtering

15   product, is roughly $30 per year.  There is an upgrade that

16   can be paid by customers of roughly $10 to go from the

17   non-accused Web Security to the accused Web Security

18   Gateway.

19   Q.   So let's dig into that just a little more deeply.  I

20   am going to get Slide 48, please, Mr. Grimm.  And what's the

21   calculation that you are doing on Slide 48, Dr. Sullivan?

22   A.   So, I dug deeper into the actual sales data and

23   pricing data for Websense, and the -- this is very similar

24   in nature, just a bit more refined and drilled down number

25   what we were looking at.

Sullivan - direct

1                So the non-accused Web Security product is at

2      about $33.75.  The Web Security Gateway product, which is

3      accused, is $42.  So that difference is $8.25.  And the

4      price difference, that $8.25, is 19.6 percent of the accused

5      Web Security Gateway price.

6                So, another way to say that is roughly

7      20 percent of the price of Web Security Gateway is

8      attributed to features and functionality that are unique to

9      Web Security Gateway that are not in the preexisting

10     non-accused Web Security product.  And this 19.6 percent

11     price difference factors into the analysis to get to the

12     appropriate royalty amount.

13     Q.    Let's take a look at those four questions from Mr.

14     Buncher's survey that you used to arrive at those royalty

15     rates.  Can I get 97-01.

16                What's reflected on 97-01?

17     A.    This is the question that asked Websense's customers

18     what they perceived the price difference to be between a

19     product with the RTSS feature and without the feature.

20                The weighted average response is that there

21     would be a price increase of 4.2 percent.  And that

22     4.2 percent is less than the actual product difference of

23     19.6 percent.

24                Now, if we recall, there is four different

25     features or functionalities that distinguish Web Security

Sullivan - direct

1    and Web Security Gateway, and RTSS is one of them.  And this

2    is telling us that 4.2 percent of that price difference is

3    attributable to RTSS.

4    Q.    Can I get Slide 97-02, Mr. Grimm.

5    Q.    Slide 9702, Mr. Grimm.

6          Take that 4.2-percent price difference.  How do

7    you carry that through the calculation, Dr. Sullivan?

8    A.    That implies that 21.5 percent of the difference

9    between Web Security and Web Security Gateway is

10   attributable to RTSS.  For the mathematically inclined, that

11   is simply calculated as 4.2 percent divided by 19.6 percent,

12   gives us 21.5 percent.

13   Q.    Let's go on to figure out the royalty rate.  Can I get

14   the next slide, 3801.

15         If you take that 21.5 percent as reflected on

16   Slide 3801, can you walk the jury through the calculation

17   that you performed, Dr. Sullivan?

18   A.    Certainly.  Again, for the mathematically inclined,

19   the formula is at the bottom of my slide here.

20         But I take that 21.5 percent attribution to

21   RTSS, that is the portion of the price difference

22   attributable to RTSS, yet that's on a revenues basis.  For

23   something to have contribution, we would want to convert

24   that to a profit basis.

25         Here is where I take that ten-percent profit

 1    margin, and I multiply the 21.5 percent times the

 2    ten-percent profit margin.  That converts it to 2.2 percent,

 3    which you can see in the middle circle of my chart.

 4               That is the overall profit amount that is

 5    attributable to RTSS.  In a real-world negotiation, as well

 6    as the hypothetical negotiation, that amount would be split.

 7    In fact, economic principles tell us that if the bargaining

 8    positions of the two parties is identical, if they are at

 9    equal bargaining positions, then they would split that

10    amount 50-50.  50 percent would go to one party, 50 percent

11    to the other.

12               Here, as I have indicated, Finjan would be in a

13    weaker bargaining position compared to Websense.  That means

14    an upper bound or at most Finjan would receive 50 percent of

15    that 2.2 percent.

16               So I divide it in half or multiply it by 50

17    percent, same thing.  That gives us a royalty of 1.1

18    percent.  And, again, that royalty rate of 1.1 percent would

19    be applicable to the revenues of that price difference

20    between Web Security and Web Security Gateway.

21               We would do that for revenues across all time to

22    give us the lump-sum one-time royalty payment.

23    Q.    Let's move on to the second methodology you used to

24    calculate a royalty rate.  That was based on Buncher Survey

25    Question 9.

1          Can I get Slide 9801, Mr. Grimm.

2          What are you reflecting on Slide 9801, Dr.

3    Sullivan?

4    A.    This is relating to the question in Mr. Buncher's

5    survey that asked customers to rate the essential features

6    within Web Security Gateway.

7          Here, this reveals that RTSS, the accused

8    feature, represents 34.9 percent of the difference between

9    Web Security and Web Security Gateway.

10   Q.    Slide 3802.

11         You took that 34.9 percent on Slide 3802 and

12   plugged it in.  Can you walk the jury through this

13   calculation?

14   A.    Sure.  This is going to look very similar to what I

15   just walked through.  It is the same methodology.

16         So I took that 34.9 percent, again, that is on a

17   revenues basis, to convert that to a profit basis, so we

18   could get the profit attributable to RTSS, I multiplied it

19   by a 10-percent profit margin.  That takes 34.9 to

20   approximately 3.5 percent.  And then again, recognizing the

21   relative bargaining positions, that amount would be split,

22   such that at most half of it would go to Finjan.

23         So dividing 3.5 percent in half yields a royalty

24   rate of 1.7 percent.

25   Q.    Let's move on to the third royalty rate that you

Sullivan - direct

1    calculated, which is based on Buncher Survey Question 8.

2                Can I get Slide 3803, Mr. Grimm.

3                Now you have an accused share price difference

4    of 68.3 percent.  How did you derive that?

5    A.    This is based upon the question from Mr. Buncher's

6    survey that asks for the single most important feature.

7    Among the four features, it distinguished Web Security

8    Gateway.  Here RTSS would receive an allocation of 68.3

9    percent.  I used the same methodology and calculations, and

10   convert that to a royalty rate of 3.4 percent.

11   Q.    Your last rate calculation was based on Buncher Survey

12   Question 10.

13                Can I get Slide 3804, Mr. Grimm.

14                You now start with an accused share difference

15   of 76.6 percent.  Can you walk the jury through how you got

16   that?

17   A.    This is based upon the question from Mr. Buncher's

18   survey that asked customers to rank essential features.

19   According to these data, RTSS reflects 76.6 percent

20   allocation for the four features that distinguish Web

21   Security Gateway from Web Security.

22                Going through the same methodology and the same

23   calculations as before, that converts to a royalty rate of

24   3.8 percent.

25   Q.    Next slide, Mr. Grimm.

Sullivan - direct

1           What are you reflecting on this slide on

2    lump-sum royalties, Dr. Sullivan?

3    A.     These are the four questions from Mr. Buncher's survey

4    that I utilized, and the royalty rates that derive from

5    those data range from 1.1 percent to 3.8 percent.

6           Clearly, the next step in this process is to

7    determine what the royalty base is, what the accuses sales

8    are.  So we will fill that in to be able to multiply the

9    royalty rate by the accused sales to get different estimates

10   of the lump-sum royalty.

11          Again, the royalty base or the accused sales

12   that we will be looking at is the revenue difference or

13   price difference between the accused Web Security Gateway

14   product and the nonaccused web Security product, and the

15   upgraded price and the revenues associated with that price

16   difference is what serves as what's called the apportioned

17   royalty base here.

18   Q.     Let's get on to that royalty base calculation, that

19   apportioned royalty base calculation.

20          First of all, before we get there, you

21   understand that Mr. Parr applied, says he applied the entire

22   market value rule to his opinions as to Websense?

23   A.     Yes.  That is my understanding.

24   Q.     Do you agree with Mr. Parr?  And if not, why not?

25   A.     No.  I think there is abundant evidence that the

Sullivan - direct

1    accused feature and functionality, RTSS realtime security

2    scanning, RTSS, is not a primary driver of demand for the

3    accused products here, the Web Security Gateway products.

4    Q.    Is Mr. Buncher's survey part of that evidence?

5    A.    Mr. Buncher's survey, consumer data, looking at price

6    data, looking at profitability of Finjan's products.  I

7    mean, for example, one can simply look at the fact that

8    Finjan had the technology, the '194 patent, starting in

9    1997.  And here we were as of 2008, a decade later, and they

10   are still unable to make a profit utilizing that technology.

11         There is clear evidence that this particular

12   technology is not a primary driver of demand and that which

13   would be generating profit and value.

14   Q.    Mr. Grimm, can I get Slide 3501.

15         What is the calculation that you are reflecting

16   on Slide 3501, Dr. Sullivan?

17   A.    The key take-away here is up towards the top left,

18   where the present value of revenues going from the third

19   quarter of 2008 out through November 2017 is approximately

20   30 million dollars, more specifically, it is $29,939,193.

21         This is calculated going from third quarter

22   2008 -- you can see the columns here for sales revenue for

23   each and every year.  I used actual sales revenue where

24   available from 2008 through 2011.  And then, just as the

25   parties would in the hypothetical negotiation, I have

Sullivan - direct

1    projected forward what the sales revenue would be for the

2    accused products here.

3                I have utilized a growth rate of 6.9 percent.

4    That comes straight from Websense's internal financial

5    analysis, in terms of what they were projecting going

6    forward.  And I corroborated that with eight separate

7    analysts' reports from eight different investment banks

8    where their growth rates that they were projecting for

9    Websense was actually lower than 6.9 percent.

10                So if anything, the 6.9 percent growth rate

11   would have been considered an overestimate to yield a higher

12   sales base.

13                And then, due to the principle of the time value

14   of money, it is necessary to discount those to present

15   value.  And there is really two reasons for that.  One is

16   recognizing that one dollar received one year from now is

17   worth less than one dollar received today, and the further

18   out in time that that dollar is received, the less valuable

19   it is as of today.

20                Additionally, the future revenues are uncertain.

21   We don't have a crystal ball that tells us exactly what

22   those sales are going to be in the future.  They could be

23   actually higher.  They could be actually lower.

24                Because of that uncertainty, the standard

25   process that economists undertake is applying a known

1    discount rate to be able to bring that to what's known as

2    present value.  Here the discount rate that I applied is an

3    annual discount of 12.4 percent.

4             This comes from an industry standard publication

5    known as EBITDA.  And I corroborated that with analysts'

6    reports from investment banks that showed that the discount

7    rates would, if anything, be higher than 12.4 percent, such

8    that if anything the overall revenue base or apportioned

9    royalty base would be even lower than what I projected here.

10   Q.    So you and Mr. Parr differ on the appropriate royalty

11   base.  Right?

12   A.    We do.  And a primary difference is that I have

13   structured this as a one-time lump-sum royalty payment that

14   does account for the revenues that would be received from

15   the time of the hypothetical negotiation all the way out to

16   the expiration of the patent in November 2017.

17            Mr. Parr, on the other hand, is only looking at

18   historical sales, and not performing a lump-sum calculation,

19   the way I have done here.

20   Q.    So let's take a look at Slide 4001 and see if we can

21   sum all of this stuff up.  What is reflected on Slide 4001,

22   Dr. Sullivan?

23   A.    These are the calculations of lump-sum royalties under

24   each of these methods.  For the sake of completeness I will

25   read these in here.

Sullivan - direct

1               Under Survey Question 11 the lump-sum royalty is

2    estimated to be 322,555.

3               For Question 9 the lump-sum royalty is 523,549.

4               For Question 8 the lump-sum royalty is

5    $1,023,740.

6               And under Question 10 the lump-sum royalty is

7    $1,148,858.

8    Q.    So now let's go to those factors that we started

9    considering with respect to the hypothetical negotiation and

10   go to the licensing factor.  Are you with me?

11   A.    I am.

12   Q.    So what licenses of Finjan and Websense -- strike

13   that.

14               What patent licenses of Finjan and Websense did

15   you review in forming your opinions in this matter?

16   A.    There were a number of agreements that I reviewed.

17   For Finjan, there is the Microsoft M86 and Trustwave

18   agreements.  For Websense there is a number of agreements.

19   The key take-aways here from my perspective is that all of

20   these agreements are structured as one-time lump-sum

21   payments for the life of the patents.  And that demonstrates

22   or reveals the preferences of the parties here, that they,

23   too, would want to have one-time lump-sum payments for the

24   life of the patent.

25               That structure in a royalty is very common for

1    software companies, because they want to be able to have the

2    ability to utilize the technology as much or as little as

3    they see fit without the need to try to track how that

4    technology is being used from one product to the next, as

5    they evolve their products to meet changing marketplace

6    demands.

7    Q.    So let's turn to some agreements that you mentioned

8    corroborated what we are showing here on this slide.

9          Turn, first, to the Microsoft agreement.  Did

10   you review Mr. Gunderson's testimony regarding the Microsoft

11   agreement?

12   A.    Yes, I did.

13   Q.    Were you in court to hear Mr. Napper testify regarding

14   the Microsoft agreement?

15   A.    Yes.

16   Q.    Do you concur with their analyses of the Microsoft

17   agreement?

18   A.    Yes, I do.

19   Q.    Let's go to Slide 22, Mr. Grimm.

20         What were your key take-aways as far as your

21   analysis with respect to the Microsoft agreement, Dr.

22   Sullivan?

23   A.    Here again, the license agreement is structured as a

24   one-time lump-sum payment.  It was for 8 million dollars.

25   It reveals that Finjan had a willingness to license not only

1    the '194 patent but their entire patent portfolio to a

2    competitor.

3              The agreement included eight U.S. patents, 19

4    U.S. patent applications, 14 foreign patent applications.

5    So I think one simple and reasonable way to look at the

6    Microsoft agreement is to take the 8 million dollars, divide

7    by each of the eight U.S. patents, and that would be one

8    million dollars per patent.

9    Q.    You also reviewed the Trustwave agreement in your

10   work?

11   A.    Yes, I did.

12   Q.    Were you in court -- did you review Mr. Gunderson's

13   testimony with respect to the Trustwave agreement?

14   A.    Yes.

15   Q.    Were you in court to hear Mr. Napper testify with

16   respect to the Trustwave agreement?

17   A.    Yes.

18   Q.    Do you concur with their analyses of the Trustwave

19   agreement?

20   A.    Yes, I did.

21   Q.    Can I get Slide 4201, Mr. Grimm.

22              What were your key take-aways as far as your

23   work goes and your opinions in this matter from the

24   Trustwave agreement, Dr. Sullivan?

25   A.    Here again, the Trustwave agreement, structured as a

Sullivan - direct

1    one-time lump-sum payment for the life of the patents, there

2    were a total of six U.S. patents and three foreign patents,

3    so the entire patent portfolio of Finjan at that point in

4    time.

5              So this is not what would be considered a bare

6    patent license for just a single patent, which is what we

7    are hypothesizing in the negotiation between Finjan and

8    Websense for the '194 patent, because that is just one

9    patent.

10             The payment that was made here was in privately

11   held company stock.  And, notably, there is no running

12   royalty in the Trustwave agreement.  There is no six-percent

13   rate that was specified within the agreement.  And,

14   interestingly, the six-percent rate that is used by Mr. Parr

15   in his analysis is the result of a fictional tax adjustment

16   that inflates the rate.  The actual underlying rate is 3.9

17   percent.

18   Q.    You said at the outset that the Trustwave agreement

19   corroborated your opinions.  Can I get Slide 1051.

20             How so?

21   A.    So this is a slide I prepared to show a couple

22   calculations.  Recognizing that the Trustwave payment was

23   4.2 million dollars, that was made in company stock, Finjan

24   indicated that their products practiced at least the two

25   patents that have been discussed throughout the trial here,

1   the '194 and the '962 patent.  So there is at least two

2   practiced patents.  So we can divide the 4.2 million in

3   half.

4           In addition, because the 4.2 million is in

5   privately held company stock, it is considered illiquid.

6   That means it cannot be readily converted into cash.  An

7   economist would perform a liquidity discount to recognize

8   the actual value of that privately held company stock.

9           According to basic economic literature, an

10  appropriate discount here for the liquidity would be 40

11  percent.  So I took the 2.1 million, which is half of the

12  total amount paid, and subtracted off a 40-percent discount.

13  And that would result in then a single lump-sum payment for

14  the life of those patents of 1.26 million.

15  Q.   Switching gears now to another agreement, the M86

16  agreement.  You understand that Mr. Parr relied for his

17  opinions in part on the M86 license agreement?

18  A.   Yes.

19  Q.   And you reviewed Mr. Gunderson's testimony with

20  respect to the M86 agreement?

21  A.   Yes, I did.

22  Q.   And you were in court to hear Mr. Napper testify with

23  respect to the M86 agreement?

24  A.   Yes.

25  Q.   And do you concur with the analyses of Mr. Gunderson

Sullivan - direct

1    and Mr. Napper?

2    A.    Yes, I do.

3    Q.    Can I get Slide 4202, Mr. Grimm.

4          What were your key take-aways from the M86

5    agreement as far as your opinions in this matter, Dr.

6    Sullivan?

7    A.    This was part of an overall asset acquisition wherein

8    M86 was acquiring all of the assets of Finjan, including

9    intellectual property.  It, too, is a lump-sum payment.

10   There is no running royalty specified.  And it was a payment

11   made here again in company stock, not in cash.

12         And perhaps most importantly, there is no

13   running royalty specified in the agreement.  The parties did

14   not agree to a running royalty of 7.5 percent.  That is not

15   an amount that was transacted or agreed upon by the parties.

16   And there have been no payments made at a 7.5 percent

17   royalty rate.

18   Q.    So what is your understanding of where Mr. Parr got

19   the 7.5 percent rate?

20   A.    He took that from a tax report that was prepared by a

21   mid-tier accounting firm known as Grant Thornton.

22   Q.    And you considered that report as well?

23   A.    Yes, I did.

24   Q.    Did you review Mr. Gunderson's testimony regarding the

25   Grant Thornton report?

Sullivan - direct

1    A.    Yes, I did.

2    Q.    Were you in court to hear Mr. Napper testify with

3    respect to the Grant Thornton report?

4    A.    Yes.

5    Q.    Do you agree with their analyses?

6    A.    Yes, I do.

7    Q.    Can I get Slide 1401, Mr. Grimm.

8          What are your key take-aways of the Grant

9    Thornton report as far as it formed your analysis in this

10   case, Dr. Sullivan?

11   A.    Grant Thornton prepared a report that was an

12   after-the-fact attribution of value for tax purposes.  One

13   of the analogies that I heard used earlier was that of the

14   purchase of a house.  And Grant Thornton's analysis was

15   similar to taking the purchase price of the house and

16   allocating it separately to each room of the house, how much

17   of the value attributable to the kitchen, how much to the

18   family room, how much to each of the bedrooms.

19         And the parties did not agree to those separate

20   amounts.  It's just simply an allocation.  And the

21   allocation is being performed under a very different

22   standard than that for a reasonable royalty that we need to

23   do here for the purchases of the patent.  I think it's

24   notable that actually in the report Grant Thornton even says

25   their report is invalid for other purposes, which would

3009

Sullivan - direct

1    include the purposes here.

2              So the 7.5 percent rate that they utilized in

3    that agreement I do not see as relevant to the interests

4    here.

5    Q.    And you say relied on 22 irrelevant licenses on the

6    bottom of this slide.

7              Can I get Slide 50-01.  What do you mean by

8    "relied on 22 irrelevant licenses"?

9    A.    Well, there is 22 agreements that served as the basis

10   for coming up with 7.5 percent that Grant Thornton found.

11   And these are all agreements that are not comparable at all

12   to the '194 patent or the accused technology.

13             And these are software technologies, such as a

14   children's Internet browser, religious software, and other

15   things that are very different from Real-Time Security

16   Scanning, as is implemented by Websense.

17             In fact, there is no evidence that any of these

18   agreements related to patented technology.  There is no

19   reference to any patents whatsoever.

20   Q.    Let's wrap up everything.  50-01, please.

21             Can you summarize for the jury what your

22   ultimate opinions are with respect to the hypothetical

23   negotiation between Websense and Finjan?

24   A.    The hypothetical negotiation would have occurred upon

25   the launch of the accused Web Security Gateway product in

1    the third quarter of 2008.

2                 On the one hand, Websense would look at the

3    situation and see that the real-time security feature is one

4    among many different analytics that they are using and that

5    they were in a good position financially with respect to

6    their other products and services that did not utilize that

7    technology.  You know, the accused functionality and the

8    accused products is a small part of their overall Web

9    Security portfolio.

10                On the other hand, Finjan would recognize that

11   they were in dire need of cash and that they would want to

12   be able to solidify a deal as quickly as possible to be able

13   to secure those funds.

14   Q.    Slide 33-01.

15                What is your ultimate opinion with respect to

16   the lump sum one-time royalty in this matter?

17   A.    As I have walked through, I have used a total of six

18   different methods to calculate different estimates of what

19   the lump sum royalty payment would be.  These range from a

20   low of $322,000 to a high of 1.26 million.  Based upon the

21   totality of the economic research and analysis that I have

22   performed throughout the case and all of the data that I

23   have reviewed, it's my opinion that in the event the '194

24   patent is found to be valid and infringed, then the

25   appropriate royalty is a one-time lump sum payment for the

Sullivan - direct

1    life of the '194 patent in the amount of $1 million.

2    Q.    And Dr. Sullivan, how much would Websense owe if the

3    '194 patent was found to be not infringed or invalid?

4    A.    Well, then the amount would be zero.

5              MR. KYLE:  Nothing further.

6              THE COURT:  Thank you, Mr. Kyle.

7              Mr. Rovner.

8              MR. ROVNER:  Thank you, Your Honor.  May we pass

9    out the binders?

10             THE COURT:  Sure.

11             (Binders passed up.)

12             MR. ROVNER:  Your Honor, may I proceed?

13             THE COURT:  Yes, you may.

14             CROSS-EXAMINATION

15   BY MR. ROVNER:

16   Q.    Good morning, Dr. Sullivan.  My name is Phil Rovner.

17   I am one of the attorneys for Finjan.  We met at another

18   deposition, as I recall.

19   A.    Yes.  That's right.  Good morning.

20   Q.    Good morning.  First off, I am glad that they didn't

21   teach math in law school because that was a lot of math to

22   follow.

23             Let me get down to some sort of overall

24   conclusions here.

25             You don't agree with Mr. Parr about a lot of

1   things.  Correct?

2   A.    I believe that's fair.

3   Q.    And you don't think -- you question a lot of what went

4   into his forming his conclusions.  Correct?

5   A.    I believe his conclusions in the end are incorrect.

6   Q.    And you don't agree with the methodology that he used?

7   You found quite a lot of fault with it.  Right?

8   A.    That is true.

9   Q.    What's the difference in the numbers between you and

10  Mr. Parr at this time?

11  A.    As I recall, Mr. Parr has specified a running royalty

12  and a royalty amount of 1.2 to 1.5 million, and that covers

13  the historical period of time; whereas, the amount that I

14  have specified, and I have said multiple times, is one

15  million, and that covers the life of the '194 patent.

16  Q.    So just so I can summarize and we can summarize for

17  the jury, you are at one million and Mr. Parr is at between

18  1.2 and 1.5 million?

19  A.    That's right, recognizing the distinctions I just

20  made.

21  Q.    So for all the criticisms that you had of Mr. Parr,

22  the range between the two of you is pretty small.  Correct?

23  A.    On a relative basis, it is reasonably small.

24  Q.    Well, let's not talk in relative terms.  It's one

25  million versus 1.2 to 1.5, right?  We are very close?

Sullivan - cross

1    A.    Well, to me, that's still a lot of money.

2    Q.    It's a lot of money to me as well.  We spent an hour

3    and a half going through -- your attorneys for Websense

4    spent an hour and a half going through your testimony and

5    you two were very close.  Yes or no?

6    A.    The numbers are what they are, I think especially

7    compared to some of the other numbers I have seen floating

8    around, yes we are much closer than others.

9    Q.    There was something that struck me.  You showed your

10   slides, about 29 of them -- I should be honest, I counted,

11   they were 29.  You had a profit, something that went into

12   your calculations was the 10 percent profit margin.  Right?

13   A.    Yes, I do utilize that.

14   Q.    And that profit margin that you got, that 10 percent,

15   that's not from the accused products?  That's the

16   company-wide profit margin?

17   A.    That's correct.

18   Q.    What's the profit margin for the product at issue

19   here, the accused technology?

20   A.    The 10 percent profit margin that I utilized is a

21   reasonable proxy for the profit margin associated with the

22   products at issue here.

23   Q.    Why would you use a company-wide profit margin of

24   10 percent?  Why didn't you get right down to the accused

25   products at issue here?

Sullivan - cross

1    A.    Well, quite simply, Websense, similar to many software

2    companies, does not track, report, or attempt to quantify

3    the costs or profitability on an individual product basis.

4    Q.    So you didn't have that information available to you,

5    did you, the profit margin of the accused products.

6    Correct?

7    A.    There is not data at the level of the product, itself,

8    and the overall profit margin for Websense is viewed, in my

9    opinion, as a reasonable proxy.

10   Q.    Just so we understand, a "reasonable proxy," what does

11   that mean?

12   A.    A reasonable estimate.  I suppose "proxy" is an

13   economist term.

14   Q.    So you are using company-wide numbers, but you don't

15   know, sitting here today, you don't have the numbers for

16   profitability of the products that you mentioned accuse,

17   infringe the '194 patent.  Yes or no?

18   A.    We don't have those separate data, so we utilize

19   reasonable estimates.

20   Q.    Mr. Sayers, could you go to Slide 037, and hopefully

21   we have matched these up.  Okay.

22           And that's the 10 percent number that we just

23   talked about.  Right?  That's company-wide?

24   A.    Yes.  That's right.

25   Q.    Could you turn to the next slide, Mr. Sayers.  And

Sullivan - cross

1    these are the Georgia-Pacific Factors -- I am sorry.

2                These are the profit margins that you say

3    Mr. Parr relied on.  That's his slide.  Right?

4    A.    This is Mr. Parr's slide.

5    Q.    You have 87.3 percent, 11.9 percent, 27.4 percent,

6    19.56 percent.  Those are all Mr. Parr's profitability

7    numbers.  Right?

8    A.    Well, these are numbers that Mr. Parr presented.  They

9    are all based upon Websense's filings with the SEC, the

10   Securities and Exchange Commission, and they are

11   company-wide profit margins aggregated for the period from

12   2004 out through 2011.

13   Q.    And you don't think those numbers are appropriate at

14   all?  They are wildly different.  87.3 is quite different

15   than 1.9 percent?

16                THE COURT:  You have asked two questions.

17                MR. ROVNER:  Thank you, Your Honor.

18   BY MR. ROVNER:

19   Q.    87.3, large number, right?  Large percentage?

20   A.    It is a large number compared to 11.9 percent or

21   10 percent.  It's represents a different type of profit

22   margin, called a gross margin.

23   Q.    But you have -- you admit that it is vastly different

24   than 10 percent.  Correct?

25   A.    Yes, it is.

1    Q.    So Mr. Parr's profit margins, you seem to think, are

2    way too high, correct, that he is using?

3    A.    The 87.3 percent is way too high.  The two numbers on

4    the right are too high, the 27.4 and 19.65, because those

5    only account for either half or none of the research and the

6    development.  The 11.9 percent is very similar to my

7    10 percent.  It's the same measure.  Both an operating

8    margin.  And the difference is the time period that's

9    covered.

10             So whether one wants to look at the actual

11    damages period here, in which case you get 10 percent, or if

12    you want to look at a more expansive period, I don't think

13    that would be appropriate, but the overall number is not all

14    that different.

15    Q.    That's correct.  The two numbers -- all the numbers

16    that Mr. Parr used, that you find fault with, the

17    difference, again, in your conclusions, are very small.

18    Right?

19    A.    The numbers are what they are.

20    Q.    Well, tell us what the numbers are.  It's 1 million

21    that you have, and he has 1.2 to 1.5.  Right?

22    A.    So to clarify --

23             THE COURT:  Do we have to keep going over that?

24             MR. ROVNER:  I am just trying establish --

25             THE COURT:  It's been established.  Come on.

Sullivan - cross

1          MR. ROVNER:  Thank you.

2     BY MR. ROVNER:

3     Q.    Let's go to the next-to-the-last slide, Mr. Sayers,

4     050-01, I believe.

5                 This is your slide.  Right?

6     A.    Yes, it is.

7     Q.    These are two individuals, one from Websense, one from

8     Finjan, and this is supposed to simulate the hypothetical

9     negotiation.  Right?

10    A.    Well, it's an illustration that I was hoping would be

11    helpful in explaining the overall analysis that I performed.

12    Q.    Well, you spent some time on your direct going through

13    a lot of numbers, and, when it comes down to it, what would

14    these two individuals believe at the date of the

15    hypothetical negotiation, right?  What would their goals be

16    on the third quarter of 2008.  Right?

17    A.    Not exactly.

18                 So, there is two entities.  It's not

19    individuals, although there would be individual

20    representatives from the company that would be in the

21    hypothetical negotiation.  It's the corporate entity,

22    Websense, and the corporate entity, Finjan, they would meet

23    for a hypothetical negotiation, wherein they would come to a

24    reasonable agreement on what the appropriate royalty would

25    be.

Sullivan - cross

1   Q.    As of 2008?

2   A.    Yes, third quarter 2008.

3   Q.    So what the parties thought in that third quarter of

4   2008.

5         So we have got Mr. Finjan here on the right, and

6   he says, "Financially distressed, need money."  So that's

7   your characterization.  Right?  No one from Finjan ever said

8   that, right, that you know of?

9   A.    Actually, there is a number of documents from Finjan

10  that say that in principle, some of which were the Board of

11  Directors documents that I displayed, at least in summary

12  form.

13  Q.    But you don't know of anybody -- this is all

14  hypothetical, so we don't know -- that was never

15  communicated directly in the third quarter of 2008 to

16  someone from Websense.  Right?

17  A.    It's hypothetical in terms of the negotiation between

18  Finjan and Websense because they did not have the

19  negotiation at that point in time for the '194 patent.

20        However, it's not hypothetical with regards to

21  what Finjan's position was in Finjan's own view of its

22  financial position.  There is document after document after

23  document that was created by Finjan that reflects these very

24  issues regarding its distressed financial position.

25  Q.    And as evidence of that, you would -- you, I think,

1    testified, and correct me if I am wrong, you said that what

2    the result of that would be, a Finjan that was in distress,

3    would take less money because they needed cash.  Right?

4    A.    It would put them in a relatively weaker bargaining

5    position, and it would also be another factor that would

6    influence the structure of the royalty, and it's another

7    reason why the royalty would be structured as a one-time

8    lump sum payment for the life of the patent.

9    Q.    Is it fair to say that a distressed company would take

10   less for its technology because it needed cash.  Right?

11   Isn't that the analogy you used with the Hope Diamond, that

12   a bum on the street would take less?

13   A.    That is Mr. Parr's analogy, but to the point, the

14   financial position of the parties and their relative

15   bargaining positions can very much influence what the

16   outcome would be of a hypothetical negotiation just as it

17   would a real world negotiation.

18   Q.    So a cash distressed company would probably take less

19   -- would take less -- they would want cash up front, I think

20   you said, and they probably would take less?

21   A.    Well, all else equal, and based upon the slew of

22   documents from Finjan that reports upon their financial

23   condition to their Board of Directors, I think there is very

24   clear information as to how that would influence the

25   hypothetical negotiation here.

Sullivan - cross

1   Q.    Is that a yes to my question?

2   A.    Largely speaking, with the clarifications I provided,

3   that hopefully clarifies.

4   Q.    Let's look at what really happened.

5         In 2009 Finjan was acquired by M86.  Right?

6   A.    Yes.  November 2009.

7   Q.    And they didn't take cash, did they?

8   A.    No.  They were not able to garner cash through the

9   shopping process to the 33 potential purchasers.  And

10  ultimately, they were acquired by M86 and payment was made

11  in company stock, in equity.

12  Q.    As you said, that stock can't be converted into cash?

13  Those were your words.  I think I wrote them down correctly

14  when you testified?

15  A.    I believe you are referring to my discussion of

16  Trustwave.

17  Q.    I was going to get to that.

18        Both M86 in 2009 and Trustwave more recently

19  were stock deals.  Right?

20  A.    Yes.  They were asset acquisitions, where the entire

21  company was acquired.

22  Q.    Would you put that back up, Mr. Sayer.

23        What you are saying here is financially

24  distressed, need money.  Yet what really happened, Finjan

25  didn't take money for their company.  Finjan took stock

Sullivan - cross

1    instead.  Right?

2    A.    That is what they ultimately had to do.

3    Q.    Well, you said they had to do.  Are you referring to

4    something that -- are you referring to something in

5    particular that they had to do?  Did they have to sell?

6    A.    Looking again at all of those board of director

7    presentations and all of the actual information that was

8    generated by Finjan throughout this time indicated that they

9    were financially distressed, they were rapidly running out

10   of cash, and they were seeking purchasers for their assets

11   so that they could become and stay in a solvent position and

12   remain a going concern rather than the alternative.

13   Q.    But no cash was exchanged, correct, in either of those

14   two deals?

15   A.    There was a very small amount of cash in the M86 deal.

16   Q.    So we are looking again at the third quarter of 2008.

17   And on the Finjan side, you have that bit -- that blurb,

18   financial distressed, need money.

19            Let's look at the Websense side.  One lesser

20   feature among many.  You are basing that on the survey.

21   Correct?  Surveys?

22   A.    In part.  There is a variety of information that goes

23   towards it.  There is various Websense documents.  There is

24   third-party market research.  There is deposition testimony.

25   And the survey that was performed by Mr. Buncher.

Sullivan - cross

1   Q.    2008, why didn't you just use a 2008 survey?

2   A.    There was not a survey available as of that point in

3   time that was at Websense's customers that would provide us

4   with the ability to scientifically measure the contribution

5   of realtime security scanning to the Web Security Gateway

6   product relative to the nonaccused Web Security product.

7   Q.    So Websense in 2008 didn't conduct surveys of its

8   customers to determine what its customers wanted.  Is that

9   correct?

10  A.    I would not put it that way.  I would say that there

11  was not a survey available that would permit the measurement

12  of the accused functionality of realtime security scanning.

13  Q.    What surveys were able available that you decided not

14  to consider here?

15  A.    I considered them and I looked at the surveys.  But,

16  again, even though there were surveys that were conducted by

17  Websense, there were not surveys that would focus in on the

18  realtime security scanning feature, and thus be able to

19  numerically quantify what the contribution is of RTSS.

20  Q.    What surveys did they have in 2008 then?

21  A.    There were a variety of surveys.  I don't have all of

22  them memorized or at my fingertips.  But there were surveys

23  that have been performed by Websense over time that go

24  towards evaluating customer satisfaction.

25  Q.    Which ones in 2008 are you referring to?  I don't need

Sullivan - cross

1    you to tell me them all.  Just give me one or two examples

2    of surveys you looked at and decided not to use here.

3    A.    They would fall under the category I just mentioned.

4    I would be happy to take a look at one.  Perhaps there are

5    some in here.

6    Q.    There are none in there because I didn't find any.

7    What surveys did you see that Websense conducted in 2008?

8    A.    Again, I can't point you to an exact survey sitting

9    here.  I have not tried to memorize the gazillion of

10   documents that are out there.  But I do recall looking at

11   various types of survey information.

12   Q.    Can you just be more specific?  What type of

13   information was in those surveys that you haven't used here

14   today?

15   A.    I don't know that there is any such information.

16   Q.    So there are no surveys in 2008?

17   A.    I would not put it that way.

18   Q.    Okay.  How about in 2009?

19   A.    The answers really are the same.  Throughout the time

20   period -- Websense has conducted various surveys, yet those

21   surveys, based upon my review and my recollection, do not

22   focus in on RTSS or the realtime security scanning feature.

23   I don't have those memorized back from when I did my

24   analysis earlier this year to be able to say there was a

25   survey that was conducted at this date with these customers

Sullivan - cross

1    and so forth.  But I do recall looking at documents in that

2    regard.  They were not satisfactory for being able to

3    measure what is RTSS.  They were general, because those

4    surveys were conducted for a different purpose.

5              Here I looked at a scientifically valid survey

6    in my view that was conducted by Mr. Buncher.  And that

7    survey provided valid information for me to in part develop

8    my analysis and my conclusions.

9    Q.    Generally speaking, would a survey that was done at

10   the time of the hypothetical negotiation, assuming you had

11   one, be more reliable than one that was done years later for

12   litigation purposes?

13   A.    No.

14   Q.    The one that would be begun three years later for

15   litigation purposes would be more reliable?

16   A.    It very well could be.  Here I would say the answer is

17   yes, because it actually addresses the specific issues of

18   RTSS in looking at what it is that is driving customer

19   demand, recognizing that it is not RTSS.

20             Notably, the survey that is being performed by

21   Mr. Buncher is historical.  It is looking at actual

22   customers that actually purchased Web Security Gateway, the

23   accused product.

24             So it is looking at the real actual contribution

25   that the customers viewed as to RTSS and what it provided in

1    terms of their purchasing decision.

2    Q.    In 2008, Websense is off to our meeting, that I know

3    is hypothetical.  Shouldn't you have asked Websense

4    executives as to what their view of the importance of the

5    technology was?  Wouldn't that have been something that they

6    might want to consider?

7    A.    I did not follow that question.

8    Q.    No doubt.

9          Would it be relevant for the person in your

10   example here, your hypothetical, to consider what Websense

11   executives thought about the accused technology?

12   A.    There is a variety of factors that could be

13   considered.  And I at least attempted to encapsulate within

14   my testimony the relevant and key factors that would

15   influence the outcome of the hypothetical negotiation.

16   Q.    What you concluded was one lesser feature among many.

17   Correct?

18   A.    That is one of the items that I have considered.

19   Again, this is intended to be an illustration of the

20   hypothetical negotiation that hopefully helps articulate

21   what my analysis and my opinions are.

22   Q.    Could you go over to JTX-392, Mr. Sayer.  I want to

23   show you an e-mail from John McCormack.  Do you know who

24   John McCormack is?

25   A.    Yes, I do.

Sullivan - cross

1    Q.    Were you here for his testimony last week?

2    A.    Yes.

3    Q.    Do you recognize this document?

4    A.    Yes, I do.

5    Q.    If I recall correctly, you were utilizing this during

6    his cross-examination?

7    A.    I was not.

8    Q.    Someone from your team.

9    A.    Okay.

10   Q.    Have you reviewed this document previously?

11   A.    I could not say for certain.

12   Q.    But you were here when he did.

13         What is the date of it?  It's from John

14   McCormack.  And it's sent to a number of individuals.  Do

15   you know who those individuals are?

16   A.    I recognize some of the names.

17   Q.    They are Websense people.  Correct?

18   A.    The names that I recognize are individuals I associate

19   with Websense.

20   Q.    What is the date?

21   A.    It reads August 27, 2008.

22   Q.    That is third quarter 2008.  Right?

23   A.    Yes, that's right.

24   Q.    Right dead-on on the date of the hypothetical

25   negotiation.  Right?

1    A.    Generally speaking.

2    Q.    And it says, Folks, attached are the slides we

3    reviewed last week.  I expect this context of what we have

4    to accomplish in 2009 is used to share with your teams to

5    help them understand the context for the decisions we are

6    making.

7              Did I read that correctly?

8    A.    I believe you did, yes.

9    Q.    Let's turn to Page 5 of that document, Mr. Sayer.

10             Can you read that, Dr. Sullivan?  It says,

11   Realtime security (aka WSG), on premise and on demand, is

12   our most important offensive weapon and our most important

13   defensive weapon.

14             Do you see that?

15   A.    Loosely speaking, yes.

16   Q.    Do you have any reason to disagree with that?

17   A.    No.

18   Q.    That was Mr. McCormack's view at the time of the

19   hypothetical negotiation.  Right?

20   A.    I would let Mr. McCormack speak to exactly his view.

21   But, you know, my understanding, my take-away is that they

22   did and do view Web Security Gateway as a primary component

23   of their business.  It's something that they want to

24   continue to grow and develop.  It's fair to okay and it's

25   doing well, as I have indicated in my financial analysis.

Sullivan - cross

1    Q.    And that's the accused technology.   Correct?

2    A.    No.   That is Web Security Gateway.   That is the

3    accused product.   But --

4    Q.    Nothing to do -- go ahead, I am sorry.

5    A.    But Web Security Gateway includes all of the features

6    that are in Web Security that are not accused as well as the

7    four additional features that distinguish Web Security from

8    Web Security Gateway.

9             One of those four features is realtime security

10   scanning.   So, as I understand that slide and the

11   presentation, is Websense's view of the role of Web Security

12   Gateway.   I mean, naturally, Web Security Gateway is priced

13   higher than Web Filter and Web Security.   So naturally, they

14   want to try to escalate their customers from the

15   lower-priced product to the higher-priced products.

16            That is not rocket science.

17   Q.    So in 2008, what accused technology were they adding?

18   What technology were they adding in 2008?

19   A.    The distinction between Web Security and Web Security

20   Gateway has at least four functionalities.   One is the

21   realtime security scanning, RTSS.   The other three are

22   realtime content classification for the social web, SSL

23   inspection, which is security socket layer inspection, and

24   antivirus.

25   Q.    What was new in 2008?

Sullivan - cross

1    A.    A global economic recession.

2    Q.    The hypothetical negotiation is what?  That is the

3    date that the accused technology is first used.  Correct?

4    A.    It is based upon the launch of the Web Security

5    Gateway product, which, of course, is third quarter 2008.

6    Q.    Could we go to JTX-480.

7          Do you recognize this document, Dr. Sullivan?

8    A.    I believe so.  I would have to take a closer look to

9    refresh my memory.

10   Q.    Why don't you go ahead, if you would like.  It's in

11   your binder as well.

12         (Pause.)

13   A.    Okay.

14   Q.    The date of this is June 10, 2008.  Correct?

15   A.    Yes.  I see that.

16   Q.    That is third quarter of 2008?

17   A.    Almost.  It's second quarter 2008.

18   Q.    True.  Why don't you go down to the third paragraph.

19   Why don't you take a look at that.

20         Have you looked at that?

21   A.    Yes, I have.

22   Q.    It says, The fundamental shift of web content created

23   from trusted sources to anonymous and user driven

24   collaborations such as wikis, blogs and social networking

25   has changed the threat landscape.

3030

Sullivan - cross

1        **Do you see that?**
2    A.    **Yes, I do.**
3    Q.    **And that is written by a research director for**
4    **Gartner.  Correct?**
5    A.    **It appears it was stated by the research director for**
6    **Gartner.**
7    Q.    **Gartner is what?**
8    A.    **A third-party market research firm.**
9    Q.    **Gartner is a source of information that you have**
10   **relied on.  Correct?**
11   A.    **Yes, I have utilized information from Gartner.**
12   Q.    **It says, Attackers are targeting trusted websites with**
13   **good reputations to circumvent traditional security measures**
14   **and maximize attack effectiveness.**
15          **You have no reason to disagree with that, do**
16   **you?**
17   A.    **No, I don't.  In fact, when I look at this with**
18   **regards to social networking sites, that to me emphasizes,**
19   **at least from an economic point of view, the RTCC**
20   **functionality, realtime content classification for the**
21   **social web, which is not accused here and it is one of the**
22   **distinguishing features between Web Security and Web**
23   **Security Gateway.**
24   Q.    **Let's read the next sentence:  To enable legitimate**
25   **business use of these sites while still protecting against**

Sullivan - cross

1    inbound and outbound malware, organizations are increasingly

2    demanding secure web gateway solutions that go beyond

3    traditional URL filtering to provide realtime inspection of

4    malicious web content and granular web application control.

5              Do you see that?

6    A.    Yes, I do.

7    Q.    Do you understand what that means?

8    A.    From an economic perspective, especially as it relates

9    to Websense, wherein they were developing the web security

10   labs and they developed a number of different analytics to

11   help them in the detection of malware and to prevent the

12   execution of malware.  My understanding is that one of those

13   analytics is the accused functionality, RTSS, and there are

14   a variety of other analytics that are utilized as well.

15   Q.    Now, the URL filtering is more of the traditional

16   based antivirus.  Correct?

17   A.    No.

18   Q.    No, it's not.  URL filtering is not more of the

19   traditional type of web security?

20   A.    It is a traditional form of web security.  I would not

21   lump it into antivirus, but, rather, it utilizes the uniform

22   resource locator, the URL, and does classification based

23   upon the URL.  And that is, as we saw from Mr. Buncher's

24   survey, it is part of what is really underlying the primary

25   purchase decisions for consumers for web security products.

3032

Sullivan - cross

1   Q.     In 2008, what was Websense saying about its URL

2   filtering?

3   A.     Well, this isn't a Websense press release.  It's from

4   Gartner.  I am not sure if you are trying to make a

5   distinction between Gartner and Websense or just what is up

6   on the screen.

7   Q.     What is on the screen.

8   A.     This is saying that they are looking for secure web

9   gateway solutions that go beyond traditional URL filtering.

10  Q.     So in 2008, at the time of the hypothetical

11  negotiation, an organization like Gartner thought that

12  security needed to move past URL filtering.  Right?

13  A.     I think there has been a desire and a wish to move

14  beyond URL filtering.  Websense is attempting to do that.

15  It's been observed by Gartner as well as others.  That is

16  part of the reason to have a web security gateway product

17  that has additional analytics.

18  Q.     And that's exactly what Websense did in 2008.  Right?

19  A.     In the third quarter they launched Web Security

20  Gateway with the additional functionality, one of which is

21  the accused realtime security scanning.

22  Q.     Let me see if I can put this in terms that at least I

23  will understand.

24         In a business like Websense is in, they need to

25  stay current.  Correct?

Sullivan - cross

1    A.    I am not sure what you mean by that.

2    Q.    If a competitor has proactive security, would a

3    company like Websense feel it needed to get something like

4    that, realtime security?

5    A.    I think that's just too broad of a question.

6    Proactive security could mean a whole host of different

7    things.  You know, clearly, Websense did introduce certain

8    types of analytics and functionality that are based on their

9    web security labs as of the time of the introduction of Web

10   Security Gateway.

11   Q.    So it's true, then, that a company like Websense or

12   any company in this particular business would need to

13   continually upgrade its capabilities of detecting malware.

14   Correct?

15   A.    Well, I think Websense along with other companies in

16   the securities space are always looking to innovate and

17   develop and come up with new ideas, new products, and new

18   ways to secure their clients.

19   Q.    And one of those, at least, you will admit, is the

20   accused functionality here.  Right?

21   A.    As I understand it, realtime security scanning, which

22   is the accused functionality, is one of the analytics that

23   is utilized by Websense.

24              MR. ROVNER:  Your Honor, I am going to briefly

25   move into the financial information and the 10-K's.  This

Sullivan - cross

1    might be a good time to break.  Then I will only have a few

2    minutes after that.

3                    THE COURT:  Let's take our morning break.

4                    (Jury leaves courtroom at 10:55 a.m.)

5                    (Recess taken.)

6                    THE COURT:  All right.

7                    Ms. Walker.

8                    (The jury enters the courtroom at 11:22 a.m. )

9                    THE COURT:  Okay, members of the jury, we will

10   continue.  Please take your seats.

11                   Mr. Rovner.

12                   MR. ROVNER:  Thank you, Your Honor.

13   BY MR. ROVNER:

14   Q.    What's a 10-K report?

15   A.    A 10-K report is a filing that public companies make

16   with the Securities and Exchange Commission so that they can

17   convey to shareholders information about their company.

18   Q.    And Websense filed 10-Ks.  Correct?

19   A.    Yes, that's right.

20   Q.    Could you tell me what are the -- are you familiar

21   with the term "Triton" with respect to Websense?

22   A.    Yes, I am.

23   Q.    And what is Triton?

24   A.    In essence, Triton is a reporting consult that

25   consolidates some of the security and management of Websense

Sullivan - cross

1    Security products.

2    Q.    Where do the accused products fall within?

3    A.    There are accused products, the lowest, or the primary

4    level of the accused product is Web Security Gateway, and

5    there are various flavors of that, including Hosted Web

6    Security Gateway, Web Security Gateway Anywhere, and then

7    there is the Triton version or Triton flavor of Web Security

8    Gateway.

9    Q.    Where would we find the accused products?

10   A.    Those would be, you know, contained as software on a

11   server that holds the software, where the signatures that

12   are developed from the Web Security labs are pushed to those

13   servers on a very frequent basis, typically every five to

14   15 minutes, as I understand it.

15   Q.    Well, would the accused products be within the Triton

16   package?

17   A.    In some instances.  Not always.

18   Q.    But you wouldn't find the accused products in any

19   non-Triton products, would you?

20   A.    Yes.

21   Q.    You would find it in other non-Triton products?

22   A.    Well, I am not sure the distinction you are trying to

23   draw, but Web Security Gateway is sold as Web Security

24   Gateway, not part of the Triton package, and then it is also

25   sold in other instances as part of the Triton package.  So

1    you can get it with Triton or without Triton.

2    Q.    Now, what would you consider to be a Websense Web

3    Filtering product?

4    A.    That is the product that is based predominantly on a

5    URL filtering technology.

6    Q.    Now, in your direct testimony, you said that based on

7    what you understood from the survey, the URL technology is

8    continuing to show growth.  Right?

9    A.    The Web Security product, which is based upon URL

10   filtering, is continuing to show growth.  So there is a

11   little bit of distinction between Web Filter and Web

12   Security.  They are both predominantly based on URL

13   filtering, yet Web Security has some different

14   classifications to it as well, in that Web Security product

15   is continuing to show growth.  Websense is attempting to

16   migrate customers away from Web Filter to Web Security.

17   Q.    Why is that?

18   A.    Simply put, Web Security product is priced higher, so,

19   again, it's common practice to try to migrate customers to

20   more expansive products that cost more, just like trying to

21   upgrade auto purchasers to take all the options.

22   Q.    Are you saying that the only reason that Websense

23   tries to shift customers away from WebFiltering products is

24   because they can make more money off the other products?

25   A.    I wouldn't say that's the only reason.  These are --

1    you know, as you move up the food chain, if you will, across

2    the products, those are enhanced products with enhanced

3    functionalities and enhanced technologies.  That's part of

4    what underlies the very basis of my reasonable royalty

5    analysis that compares Web Security to Security Gateway and

6    the additional functionalities that are contained within

7    those products.

8    Q.    Are the WebFiltering products considered a commodity

9    by Websense at this point?

10   A.    I don't know if I'd use the term "commodity," but

11   largely speaking.  It's not as differentiated as Web

12   Security that adds on the other element classification and

13   not as distinguished as Web Security Gateway, which, you

14   know, then there is other flavors of that that, you know,

15   adds on Triton, for example.

16   Q.    Well, my question is just very specific:  Does

17   Websense consider its WebFiltering products as having become

18   a commodity?

19   A.    I would defer to my previous answer.

20   Q.    Which was?  Yes or no is what I am really looking for.

21   Do you know if Websense considers its WebFiltering products

22   as having been a commodity?

23   A.    It is relatively commoditized compared to the other

24   products.  I wouldn't necessarily use that word one way or

25   the other.  Perhaps Websense does.

Sullivan - cross

1    Q.    And what is a commodity?

2    A.    A commodity is a product that is not differentiated,

3    so you can think of products that are virtually identical so

4    they do not garner much of a profit.

5    Q.    Okay.

6    A.    I mean, the typical examples are things like orange

7    juice and cocoa and pork bellies and things of that nature.

8    Q.    Could you turn to Exhibit JTX-479.

9           Do you recognize this document, Dr. Sullivan?

10    A.    This is a Form 10-K filed by Websense, and I don't

11    know that I -- oh, there we go -- for the fiscal year ending

12    December 31, 2011, which means it would have been filed in

13    the early part of 2012.

14    Q.    And you have seen this document before.  Correct?

15    A.    Yes, I have.

16    Q.    And you considered it in offering your opinions today?

17    A.    Yes, I have.

18    Q.    Mr. Sayers, could you turn to Page 15 of the annual

19    report.

20           Could you go to the second full paragraph.

21           I am going to read the non-italicized language.

22    It says, "Our ability to generate revenue growth depends on

23    our ability to continue to diversify our offerings by

24    successfully developing, introducing, and gaining customer

25    acceptance of our new products and services, particularly

1    our Security Gateway offerings, as our WebFiltering products

2    have become more of a commodity."

3                Do you see that?

4    A.    Yes, I do.

5    Q.    And Websense regards it as a commodity.  Right?  You

6    have no reason to disagree with that?

7    A.    I do not disagree.

8    Q.    And would you go to the last line of that, the last

9    two lines, the last three, I should say, the last sentence,

10   "If we fail."

11               Reading from that same paragraph, "If we fail to

12   continue to upgrade and diversify our products, we could

13   lose revenues from renewal subscriptions from our

14   WebFiltering products as those products continue to suffer

15   from commoditization."  Do you see that?

16   A.    Yes.  The Web Filter product is the lowest in the Web

17   Security products.  As we have seen from some of the charts

18   before, it goes Web Filter, then Web Security, then Web

19   Security Gateway, which is the accused product, and then

20   there is the Triton versions of Web Security Gateway.

21   Q.    You can take that down.

22               Dr. Sullivan, you also, in addition to the

23   information -- the information we have gone through so far,

24   you have also mentioned the Microsoft license.  Correct?

25   A.    Yes, I have.

3040

Sullivan - cross

1   Q.   And you have referred to it as eight licenses that

2   Microsoft acquired from Finjan.  Right?

3   A.   No.  I would not put it that way.

4   Q.   Did you not -- how many licenses were in the Microsoft

5   agreement?

6   A.   I believe generally, there is one license for a

7   portfolio of patents that includes eight U.S. Patents, 19

8   U.S. Patent applications, 14 foreign applications.

9   Q.   In listening to your answer, I realized I misspoke.

10          I meant there was eight patents in the license

11   agreement?

12   A.   Eight patents and a number of applications.

13   Q.   Now, of the eight patents, you said, if you just did

14   sort of simple math, you divided it by eight, you come up

15   with one million per patent?

16   A.   Eight million divided by eight is one million.

17   Q.   You used one of your slides to show that the Microsoft

18   license was worth a million dollars.  Right?

19   A.   No.  That license is $8 million, but when converting

20   that onto a per-patent basis, because on the hypothetical

21   negotiation, there is only one patent, the '194 patent, that

22   puts it at $1 million per patent.

23   Q.   Have you talked to anyone at Microsoft to see how they

24   valued the patents that they acquired?

25   A.   They did not acquire the patents.  They obtained a

Sullivan - cross

1   license to the patent, and no, I have not spoken with anyone

2   at Microsoft in this regard.

3   Q.    Do you have any idea how Microsoft valued each of the

4   patents that it got a license for?

5   A.    No.   That would be an allocated process.   What they

6   did is provided that single, one-time lump sum payment of

7   $8 million for the basket of patents, including the eight

8   patents in the U.S. and U.S. applications and foreign

9   applications.

10  Q.    So for all you know, Microsoft could have valued the

11  '194 patent for 4 million?

12  A.    I don't think Microsoft tried to separate it out and

13  break it out on a per-patent basis.   That's not what I would

14  expect.   If they were to do so, they could have valued each

15  patent individually at varying values, and I am not

16  suggesting that they agreed to 4 million or one million or

17  zero.

18  Q.    You have no idea.   Correct?

19  A.    I would defer to my previous answer.

20          MR. ROVNER:   I have no further questions.

21          THE COURT:   Mr. Kyle, redirect.

22  REDIRECT EXAMINATION

23  BY MR. KYLE:

24  Q.    It's still morning.   Good morning, Dr. Sullivan.   May

25  it please the Court.

Sullivan - redirect

1           So Mr. Rovner asked you some questions about the

2     differences between your analysis and Mr. Parr's analysis.

3     Do you recall that?

4     A.     Yes, I do.

5     Q.     And one of those differences that your bottom line

6     conclusion for a reasonable lump sum one-time royalty in

7     this matter is $1 million for the entire life of the '194

8     patent out to November 2017.  Right?

9     A.     That's right.  I have attempted to be clear on that.

10    Q.     And Mr. Parr, on the other hand, comes to numbers of

11    1.2 to 1.5 million, but he limits his analysis to the period

12    2008 through 2012.  Isn't that right?

13    A.     That's right.  He goes from third quarter 2008 out

14    through August of this year, 2012.

15    Q.     And can you tell the ladies and gentlemen of the jury

16    why that difference is meaningful to your analysis?

17    A.     Certainly.  It's utilizing a different royalty base.

18    The royalty base for the historical sales on an

19    un-discounted basis used by Mr. Parr is $20 million.  As I

20    demonstrated, a reasonable estimate for the hypothetical

21    negotiation for the present value of sales going out through

22    the life of the patent is approximately $30 million.  So

23    there is a difference in that time period and a difference

24    in the sales, and accordingly, there is a difference in the

25    overall amount.

1              So the $1 million that I have calculated covers

2    the life of the patent, whereas his is just historical.

3    Q.     Two final questions.  Mr. Parr gets to 1.2 to 1.5

4    based on a lower royalty base.  How does he get to a higher

5    number with a lower base?

6    A.     I am sorry.  Can you say that again?  I did not follow

7    it.

8    Q.     Mr. Parr gets to 1.2 to 1.5 but he gets there using a

9    lower royalty base than you used.  Right?

10   A.     That's right.

11   Q.     How does he get there?

12   A.     He uses higher royalty rates.

13   Q.     What is your opinion of the higher royalty rates that

14   Mr. Parr used to get his 1.2 to 1.5?

15   A.     His rates are based upon six percent to seven and a

16   half percent.  Six percent, he believes, comes from the

17   Trustwave agreement.  Seven and a half percent, he believes,

18   comes from the M86 agreement.

19              There is a variety of reasons to believe that

20   those amounts are overstated.  Now, I went through a variety

21   of analyses utilizing data from Mr. Buncher's survey, which

22   reflects what customers for Websense actually viewed with

23   respect to RTSS.  And that shows that the appropriate

24   royalty rates are considerably lower than that amount.

25   Q.     Again, what is your lump-sum one-time royalty for the

Sullivan - redirect

1    life of the patent in this case?

2    A.    In the event the '194 patent is founded to be valid

3    and infringed, then the appropriate royalty would be a

4    one-time lump-sum payment for the life of the patent that is

5    one million dollars.

6              MR. KYLE:  Thank you.  I have nothing further.

7              THE COURT:  Thank you, Dr. Sullivan.  You are

8    excused.

9              THE WITNESS:  Thank you.

10             (Witness excused.)

11             MR. STIEGLER:  Your Honor, at this time Websense

12   calls Mr. Dan Hubbard.

13             ... DANIEL HUBBARD, having been duly sworn

14   as a witness, was examined and testified as follows ...

15             MR. STIEGLER:  Your Honor, we have one document

16   for Mr. Hubbard.

17             May it please the Court, the jury...

18             THE COURT:  Yes, sir.

19                   DIRECT EXAMINATION

20   BY MR. STIEGLER:

21   Q.    Good morning, Mr. Hubbard.

22             The first question for you:  Is Websense's

23   Gateway product signature based?

24             MS. KOBIALKA:  Objection, Your Honor.  He is a

25   fact witness.

Hubbard - direct

 1          MR. STIEGLER:  He is the CTO of the company.  I

 2    can run through that foundation.

 3          THE COURT:  Why don't you.

 4    BY MR. STIEGLER:

 5    Q.   Mr. Hubbard, please tell the ladies and gentlemen of

 6    the jury who you are?

 7    A.   Dan Hubbard.

 8    Q.   What positions have you held at Websense?

 9    A.   I started at Websense as an engineer, then I was

10    engineering manager, then promoted to director, senior

11    director, then vice president.  And I was promoted to CTO in

12    2008.

13    Q.   We have heard about the Websense Security Labs --

14          THE COURT:  CTO stands for?

15          THE WITNESS:  Sorry.  Chief technology officer.

16    BY MR. STIEGLER:

17    Q.   Thank you.

18          We have heard about the Websense Security Labs

19    at a high level.  Can you tell us what it is again?

20    A.   Yes.  Security Labs was a group of scientists that

21    were distributed around the world in predominantly three

22    different locations whose job it was to analyze and classify

23    content on the Internet.

24    Q.   During your time at Websense, who did you report to?

25    A.   I reported to John McCormack, who was the president.

1    Q.    Who do you work for now?

2    A.    I work for a company called Open DNS, which is located

3    in San Francisco.

4    Q.    When did you leave Websense?

5    A.    Ten months ago.

6    Q.    Why did you leave?

7    A.    I wanted to get back to a smaller company.  The

8    company I am at now is less than a hundred people.  I also

9    wanted to move to the Bay area.  I moved my family to the

10   Bay area for a different opportunity.  I also was at

11   Websense for 13 years, which is a long time in our industry.

12   Q.    Did you leave on good terms?

13   A.    Absolutely.

14   Q.    Before we get to the Gateway product -- and we will

15   come back to that -- tell us about your role and

16   responsibility for developing the Web Filter product?

17   A.    The Web Filter was mostly designed by the engineers on

18   the non-security side of things.  I had some responsibility

19   for Web Filter, but not a lot, minus the security

20   components.

21   Q.    What is the Web Filter product?

22   A.    The Web Filter product was kind of the main product

23   that Websense sold, which allowed companies to protect -- or

24   enabled their employees to be more productive in protecting

25   its legal liability issues.

Hubbard - direct

1   Q.   What is the Web Security Gateway product?

2   A.   The Web Security Gateway was an additional product

3   that customers could add onto the Web Filter for better

4   analysis in the core categories and better security.

5   Q.   When did Websense begin the development of the

6   Gateway, Web Security Gateway product?

7   A.   2007.

8   Q.   What responsibility did you have for that?

9   A.   I was intimately familiar with the building of that.

10  I was involved from the beginning, and managed the team of

11  people that had the design, the creation, the testing of the

12  product.

13  Q.   What size is the source code for the Web Security

14  Gateway product?

15  A.   It's huge.  There is probably about 40,000-plus

16  directories, half a million files, literally millions of

17  lines of source code.

18  Q.   How would you describe your overall responsibility for

19  that product?

20  A.   I was directly responsible for it.

21  Q.   Did everybody report to you who worked on it?

22  A.   The majority of people, especially within the security

23  department and the analytics department, reported to me,

24  yes.

25  Q.   What role did you have in conceptualizing the vision

1    for it?

2    A.    I was the main person who created the product and came

3    up with the idea.

4    Q.    Are you familiar with RTSS, the realtime security

5    scanning analytic?

6    A.    Intimately.

7    Q.    Is the RTSS analytic signature based?

8    A.    Yes, absolutely.

9    Q.    Does the Websense Security Gateway and the RTSS

10    analytic ever extract a list of suspicious operations at the

11    gateway?

12              MS. KOBIALKA:  Objection.  Calling for expert

13    opinion.

14              MR. STIEGLER:  He is a fact witness.  He

15    designed it and developed it.

16              THE COURT:  Counsel.

17              (The following took place at sidebar.)

18              THE COURT:  I understand that you have called

19    him as a fact witness.  But you have asked him for opinion

20    testimony, haven't you?

21              MR. STIEGLER:  I have asked him for a fact

22    question here, whether it is extracts a list of suspicious

23    operations.  He knows whether it does or it doesn't as a

24    matter of fact.

25              THE COURT:  Has this not been the subject of

1    expert testimony?

2                    MR. STIEGLER:  It has been an opinion offered by

3    opposing experts.  And I will have my expert opine on it.

4                    THE COURT:  So their experts have opined on

5    whether there is a list extracted and your expert is going

6    to opine.

7                    MR. STIEGLER:  Yes.

8                    THE COURT:  Aren't you walking a really fine

9    line, if at all, between fact testimony and opinion

10   testimony?

11                   MR. STIEGLER:  I would agree that there is a

12   line there.  I think I am on the right side of the line.  He

13   designed it and understands -- and developed it and knows

14   what operations it carries out, what functionalities.

15                   THE COURT:  Here is my question:  Does this

16   question that is subject to a factual statement -- the

17   reason I am a little at sea on it is because we are hearing

18   opinions about this, I think everyone will agree on that.

19                   That is what is causing me difficulty with Ms.

20   Kobialka's objection.

21                   MR. STIEGLER:  Let me see if I can rephrase it

22   as a matter of fact.

23                   THE COURT:  Let's try to do that.

24                   MS. KOBIALKA:  He is reading right on the claim

25   language.  So he is calling for some legal conclusions on

Hubbard - direct

1    top of everything else.  It's one thing if he was just to

2    say this is what the technology is, this is how it works.

3    He is reading directly from the claim language.

4              THE COURT:  Point taken.  Mr. Stiegler is going

5    to rephrase.  I think you have given him some guidance as to

6    how he should do that.

7              (End of sidebar conference.)

8              THE COURT:  I am going to sustain that

9    objection.

10             Excuse me.  We have to take a quick recess.

11             (Recess taken.)

12             THE COURT:  I apologize for that.

13             MR. STIEGLER:  May it please the Court, ladies

14   and gentlemen...

15   BY MR. STIEGLER:

16   Q.   Mr. Hubbard, does the realtime security scanning

17   analytic identify any operations at the gateway?

18   A.   No, it does not.

19   Q.   Does the RTSS, realtime security scanning analytic,

20   generate a list of any operations at the gateway?

21             MS. KOBIALKA:  Objection.  Same basis.

22             THE COURT:  Could you rephrase?  You understand

23   the objection.

24   BY MR. STIEGLER:

25   Q.   What is an operation, as you understand it?

Hubbard - direct

1    A.     An operation is something that a piece of software is

2    going to do or perform at a point in time.

3    Q.     Does the realtime security scanning analytic use a

4    list of operations in any way?

5               MS. KOBIALKA:  Objection.  Same objection as

6    before.

7               THE COURT:  If we could refrain from eliciting

8    what appear to be opinions and get the gentleman to explain

9    how the product works.

10              MR. STIEGLER:  We will do it that way.  I will

11   go that route, thank you.

12              THE COURT:  Ladies and gentlemen, for your

13   edification, Mr. Hubbard has been called by the defendant

14   Websense as a fact witness.  You have heard plenty from

15   opinion witnesses, and it's not over.  So we are trying to

16   distinguish between facts and opinions.

17              We will talk more about that in my final

18   instructions to you as well.

19   BY MR. STIEGLER:

20   Q.     Let's do it this way, Mr. Hubbard.

21              First tell us about the Websense Security Labs.

22   Did I ask you that already?

23   A.     Yes.

24   Q.     Okay.  So where are these labs situated?

25   A.     The labs are in four locations, in San Diego, in

1    Redding in the U.K., in Israel, and in Beijing, China.

2    Q.    Describe for us factually what these laboratories do?

3    A.    The labs are comprised of Ph.D.'s and mathematics and

4    computer scientists whose goal it is to research the latest

5    threats on the Internet and discover what's happening on the

6    Internet, and then update the product based off of their

7    findings.

8    Q.    How do they acquire their data?

9    A.    The majority of the data they acquire is something

10   called the ThreatSeeker Network.

11   Q.    What is the ThreatSeeker Network?

12   A.    The ThreatSeeker Network was a -- well, is a very

13   large bank of machines that is designed to crawl the

14   Internet.  You can think of Google crawls the Internet to

15   find popular websites.  ThreatSeeker was designed to crawl

16   the Internet to find bad sites, ones that attackers or

17   criminals had broken into.

18   Q.    Was one of your mantras at Websense "Data, data,

19   data"?

20   A.    Yes.

21   Q.    What did you mean by that?

22   A.    In security, the ability to collect intelligence about

23   how threats are working and how the attackers are working is

24   critical to staying up to date on the threats.

25   Q.    We have heard the term Honey Pots.  Can you tell us

1    how Honey Pots fit into this ThreatSeeker Network?

2    A.    ThreatSeeker Network used Honey Pots and Honey

3    Clients, which are machines that are on the Internet which

4    pretend to be real machines that the attackers attack.  And

5    then they stick.  Thus, the name Honey Pot.

6              The researchers analyze what is happening to

7    those machines in order to learn how the criminals network.

8    Q.    What does the phrase sandboxing mean in this context?

9    A.    Sandboxing is a process of unpacking some code or a

10   set of code, and then looking at the behavior and analyzing

11   what happens when that code runs within a machine.

12   Q.    Where does this sandboxing occur?

13   A.    The sandboxing all occurred within the Websense Labs

14   and within the ThreatSeeker Network.

15   Q.    Is that considered to be offline or online?

16   A.    In our terms, that is considered to be offline.

17   Q.    What do you mean by offline?

18   A.    Offline, what that means is, this was on computers

19   that were owned and operated by the labs.  It was not within

20   the Gateway or any of the products.  These operations didn't

21   happen online at the point of someone connected to the site.

22   Q.    We have seen references that this ThreatSeeker Network

23   is proactive.  What does Websense mean by that?

24             MS. KOBIALKA:  Objection.  Leading.

25             THE COURT:  Sustained.

1    BY MR. STIEGLER:

2    Q.    What does "proactive" mean in the Websense language?

3    A.    The main way that we talked about how we are proactive

4    is we were connecting to the websites at a faster rate than

5    our customers were, and if we connected to a site and

6    discovered something was bad on it, we would update the

7    product before the customer actually connected and

8    potentially got infected.

9    Q.    Are you familiar with the phrase "reactive" in the

10   context of computer security?

11   A.    Yes.

12   Q.    What does it mean at Websense?

13   A.    Reactive would be if you are kind of sitting around

14   waiting for something to happen.  In reality, our approach

15   was, with ThreatSeeker Network, was reactive kind of in a

16   technical way, whereas, we had to find something and then

17   publish an update.

18   Q.    We have heard the term "ACE."  What is" ACE"?

19   A.    "ACE" was an acronym for "Advanced Classification

20   Engine" that our marketing department came up with.

21   Q.    What is included in ACE?

22   A.    ACE was comprised with six different analytics.  There

23   is the URL database, AV, AD, AR, RTSS, and RTC.

24   Q.    We are only going to focus on RTSS, the Real-Time

25   Security Scanning, but before we do that, tell us what an

1   analytic means in Websense language.

2   A.     An analytic is something that analyzes a file or a web

3   page and compares it to an engine for output of a category.

4   Q.     Is the Real-Time Security Scanning function an

5   analytic in Websense language?

6   A.     Yes, it is.

7   Q.     What is this Real-Time Security Scanning analytic?

8   A.     The Real-Time Security Scanning analytic is designed

9   to work with the gateway where it pulls down pages on the

10  Internet, and then it takes the text from a page and

11  compares it to a database of signatures.

12  Q.     What database of signatures?

13  A.     It's a database of signatures that were created by the

14  Websense Security labs, the scientists at the labs.

15  Q.     Tell us how these signatures are created.

16  A.     Well, predominantly, when you get a sample, either

17  from a partner or from a customer, or when ThreatSeeker

18  Network is connecting and grabbing pages and analyzing them,

19  the researchers would then look at the output of that and

20  then design a signature to make sure that the page is

21  uniquely identified and then push that signature out through

22  the product in RTSS.

23  Q.     What is a signature comprised of?

24  A.     A signature is comprised of byte patterns, so patterns

25  of text within a page or a file.

1    Q.    When you say byte patterns of text, what does that

2    mean?

3    A.    It's usually an exact match of a set of string, of

4    characters, usually, alphanumeric.

5    Q.    So you are still being more technical than perhaps I

6    would always understand.  A character of strings of what?

7    A.    A character of strings of text.

8    Q.    Letters?  Numbers?

9    A.    Letters and numbers.

10   Q.    We have seen the word "sub-signature."  What is a

11   sub-signature in Websense language?

12   A.    A sub-signature was just an addition of a regular

13   signature which allowed us to match more things above and

14   beyond the main signature to get better coverage and

15   accuracy.

16   Q.    So, when a signature or a sub-signature is pushed out

17   to your subscribers, what happens?

18   A.    When it -- when a researcher adds a signature -- you

19   have to have a signature first and then a sub-signature

20   could be added.  It gets pushed out to the gateway.  Then

21   when a page is analyzed, it checks against those sets of

22   signatures.

23   Q.    What is RTSS looking for at the gateway?

24   A.    It's looking for matches within the signature

25   database.

3057

Hubbard - direct

1    Q.    Is it looking for any operations?

2    A.    No, it's not.

3    Q.    What does Websense know about a file that is

4    identified by this Real-Time Security Scanning analytic?

5    A.    It knows whether or not it matched against the

6    signature database.

7    Q.    Can you tell from a signature match whether a

8    particular file will implement any particular operation?

9    A.    No.

10   Q.    Why not?

11   A.    Because it's just actually a gateway, it's just

12   looking at the gateway.

13   Q.    Change subjects on you a little bit here.

14         What are categories in this Websense language?

15   A.    Okay.  Websense had 90 plus categories that lived

16   within WebFilter that comprised names of essentially content

17   categories that people would visit.

18   Q.    Why did you use these categories?

19   A.    We used them because the customers wanted to apply

20   policies to these categories and report where people were

21   going.

22   Q.    Can you give us an example of what you mean?

23   A.    A good example would be sports, gambling.

24   Q.    How would this apply to the product?  What gets used?

25   A.    So, what would happen when someone visited one of

1    those websites, the policy, based off of the company's

2    policy, would either log that they went to a sports or a

3    gambling website or potentially block it.

4    Q.    What are reason codes in this Websense architecture or

5    language?

6    A.    Reason codes are a descriptive piece of text that a

7    researcher can add as to why something was categorized as it

8    was.

9    Q.    Are the categories or reason codes specific to any

10   particular file?

11   A.    No, they are not.

12   Q.    How are they used?

13   A.    They are used by the scientists when they -- when they

14   add a signature, they put them into one of the buckets, or

15   they type in what the reason was that something was added.

16   Q.    So how many files might be categorized at any

17   particular one category?

18   A.    There could be tens of thousands.

19   Q.    How many reason codes are there?

20   A.    Less than a couple dozen.

21   Q.    Are the -- does the Real-Time Security Scanning

22   analytic also use these category and reason codes?

23   A.    Yeah.  The Real-Time Security Scanning analytic

24   plugged into the same filtering policy and categories that

25   existed previous.

Hubbard - direct

1    Q.    Are these the same categories and reasons that came

2    from the URL filtering product?

3    A.    Yes, they are.

4    Q.    Another new subject for you.

5          Let's talk about the architecture and the design

6    of the gateway product.

7          Are you familiar with that?

8    A.    Yes.

9    Q.    How?

10   A.    Very familiar.

11   Q.    How are you so familiar with it?

12   A.    Because I designed and oversaw the team that built a

13   lot of the code and even wrote some of the code as part of

14   it.

15   Q.    If I could ask you to take a look at DX6246, please --

16   I am sorry.  No.  DX677.

17   A.    Yes, I see it.

18   Q.    And if you could turn to Page 3 of 17, which has the

19   Bates No. of 444 -- or 644 at the bottom.  I am sorry.

20   A.    Okay.

21   Q.    And Mr. Grimm, if you could just blow up the

22   schematic.  Could you please walk us briefly through what

23   this is telling us?

24   A.    Yes.  So this is a -- a document which kind of

25   describes what happens when a user connects to a website.

1    Essentially, on the right-hand side, you have got a user.

2    When the user connects to the gateway here, it's called

3    "WTG."  With -- the gateway connects over to the WebFilter

4    via proprietary protocol that we created.  And then the

5    WebFilter checks the policy to see if the URL matches that

6    the user was going to, or the location.

7    Q.    Let me interrupt you there then.

8          What is the box that is marked "WTG"?

9    A.    That's the gateway.

10   Q.    And what is the box that's named "WebFilter"?

11   A.    That's Websense's WebFilter.

12   Q.    Is there a function within the WebFilter known as the

13   policy server?

14   A.    Yes.

15   Q.    What is the policy server?

16   A.    The policy server is the piece of code that analyzes

17   the categories and then decides whether or not someone

18   should be visiting that location or not.

19   Q.    Is that the same server that serves as the gateway

20   server?

21   A.    No.  They are separate servers.

22   Q.    Tell us what those two separate servers are, please.

23   A.    One is the Websense WebFilter and one is the Websense

24   Gateway.

25   Q.    Why do you use two servers at Websense for this

Hubbard - direct

1    Gateway product?

2    A.    All of our customers already had the Websense

3    WebFilter, so this was an additional product that you could

4    add on top of the Websense WebFilter to add this increased

5    functionality.

6    Q.    What did you have to do to integrate those two

7    servers?

8    A.    Well, the protocol already existed so all you need to

9    do is install those other servers and then it plugged right

10   into your current policy framework that you had already set

11   up.

12   Q.    What requirements did you have to satisfy for the

13   gateway server to be able to communicate with the Internet?

14   A.    The gateway server just simply needed to connect over

15   the web for the web protocol.

16   Q.    And what requirements did you have to satisfy to use

17   the policy server within the WebFilter?

18   A.    The main requirement was we wanted to be really easy

19   for customers to just drop in another server and have the

20   two work together without changing anything from a policy

21   and a reporting standpoint.

22   Q.    What is "WISP"?

23   A.    "WISP" is an acronym for "Websense Internet Service

24   Protocol."

25   Q.    What does that mean?

3062

Hubbard - direct

1    A.    It was a proprietary network protocol that was

2    designed for systems to connect to our policy engine and to

3    send information back and forth.

4    Q.    Thank you, Mr. Grimm.  You can take down that trial

5    exhibit.

6                Changing subjects on you again, Mr. Hubbard.  I

7    want to take you back to your knowledge of Finjan in around

8    the 2008 time frame and before.

9                What did you know about Finjan?

10   A.    Familiar with the company, somewhat familiar with

11   their marketing and their technology.

12   Q.    How did you acquire that familiarity?

13   A.    Research conferences, blogs, their website, from the

14   field, from our salespeople, from our engineers, sales

15   engineers in the field.

16   Q.    What did you know about the performance of Finjan's

17   products?

18   A.    That it wasn't performing very well.

19   Q.    What did you know, if anything?

20   A.    I just knew that we heard and our tests indicated that

21   it wasn't performing well, it wasn't scaling.

22   Q.    When is the first time that you read the '194 patent?

23   A.    As part of this suit.

24   Q.    And do you recall how you became aware of it?

25   A.    It was through our legal team at Websense at the time.

Hubbard - direct

1    Q.    I want you to take a look at Trial Exhibit 1367,

2    please.  Mr. Grimm, if you could bring that up.

3                Mr. Grimm, if you could blow up just, say, the

4    top half down to the signature, yes.

5                This email appears to be from a fellow named Joe

6    Jaroch.  Who is Joe Jaroch?

7    A.    I don't know Joe Jaroch.

8    Q.    Your name is on this email as receiving it.  Do you

9    know what this is?

10   A.    It looks like an email that was sent to a couple of

11   very large mailing lists that I was subscribed to.

12   Q.    Do you recall even receiving this email?

13   A.    No.

14   Q.    It was suggested in this trial that you knew about the

15   '194 patent based on this email.  Is that true?

16   A.    No.

17   Q.    Did you ever click on the links, to your

18   recollection --

19                THE COURT:  Mr. Stiegler, hold on one second.

20                (Recess taken.)

21                THE COURT:  Please, take your seats.

22   BY MR. STIEGLER:

23   Q.    Mr. Hubbard, I believe I had just asked you whether

24   you had ever opened the links on this e-mail, to your

25   recollection?

Hubbard - direct

```
 1   A.    No.

 2   Q.    Mr. Grimm, you can take that down.

 3              To your knowledge, did Finjan ever give you any

 4   notice before they sued you, Websense?

 5   A.    Not that I was aware of.

 6   Q.    When you first read the '194 patent, did you have any

 7   reason to believe that you were using that technology?

 8              MS. KOBIALKA:  Objection.  It is calling for

 9   opinion again.

10              THE COURT:  No.  Overruled.

11              THE WITNESS:  No.

12   BY MR. STIEGLER:

13   Q.    Why not?

14   A.    Because it was fundamentally a very different approach

15   from what we were taking with our Gateway product.

16   Q.    I would now like to take you to another e-mail that

17   was used by the plaintiffs in this case, which is PTX-1397.

18              Mr. Grimm, if you could bring that up, please.

19              First of all, Mr. Grimm, if you could blow up

20   just the bottom half of this document.

21              Do you recall this string of e-mails from about

22   the late December 2007 time frame?

23   A.    Yes, I do.

24   Q.    And you wrote a subsequent e-mail responding.  But

25   before we get to that, can you give us the context of what
```

Hubbard - direct

1   you were responding to?

2   A.     Yes.   The CEO, Gene Hodges, was solicited by a company

3   called BigFix to be on their board of directors.   And he was

4   asking the feedback of some people in the company whether or

5   not they thought that was a good idea or if there were other

6   boards that we thought would be a good idea for him to go on

7   to.

8   Q.     Mr. Grimm, if you could take that down and bring up

9   Mr. Hubbard's response.

10           The first sentence of your response says, I like

11   the idea of Finjan mostly for patent protection and future

12   IP.

13           Tell us first what you meant by that?

14   A.     Well, I believe it was John McCormack mentioned Finjan

15   as one of the companies.   And as far as patent protection, I

16   knew we were beating Finjan in the field.   We had heard they

17   had performance and efficacy or coverage, false positive

18   issues.   And always the first or second slide in every

19   presentation they had was all about patents.   And the future

20   IP was that the idea of doing what they talked about in the

21   gateway was novel and perhaps in the future may be something

22   that may be viable in the market.

23   Q.     The second sentence of your e-mail says, I believe

24   there is a strong chance they could come after us post

25   Dorado release.

Hubbard - direct

1          **What were you referring to?**

2    A.    I was referring to that we were continually beating

3    them in the field, in the gateway business.

4    Q.    Why did you think there was a strong chance they could

5    come after you?

6    A.    Because we had seen, they always were talking about

7    their patents, and they weren't doing well.

8    Q.    Then you say, I also believe that if the time ever

9    comes when virtualization and CPU/memory requirements can

10   handle it behavior-based gateway scanning could become a

11   reality and a very good one at that.

12         **What did you mean by that?**

13   A.    What I meant at the time was that the ability to do

14   this behavior approach in a gateway was actually a sound

15   approach, assuming that it works.  However, at the time,

16   computers weren't fast enough, CPUs, being processors and

17   memories, weren't there, virtualization wasn't good enough

18   in order to do this.  Maybe in the future this would be a

19   good way to do it.

20         MR. STIEGLER:  Thank you very much.  Nothing

21   further.

22         THE COURT:  Ms. Kobialka.

23         MS. KOBIALKA:  Thank you, Your Honor.  We do

24   have some binders as well we would like to hand up.

25         May I approach?

1          THE COURT:  Yes, you may.

2          CROSS-EXAMINATION

3  BY MS. KOBIALKA:

4  Q.    Good afternoon, Mr. Hubbard.  I am Lisa Kobialka.  We

5  have met before.  I want to ask you a few questions.

6          You currently don't work for Websense.  Correct?

7  A.    That's correct.

8  Q.    Are you being compensated for your time here today to

9  testify?

10 A.    Yes.

11 Q.    Do you have any kind of interest in the outcome of the

12 litigation?

13 A.    No, I don't.

14 Q.    You don't have any stock options or anything in the

15 company?

16 A.    No, I do not.

17 Q.    You were involved with testing of the RTSS analytic.

18 Is that correct?

19 A.    I oversaw everything in the engineering side, from

20 testing to building, engineering, you name it.

21 Q.    And I believe you were looking at DX-6777, which is in

22 the binders there, which is entitled RTSS Feature Test Plan.

23 Correct?  Do you recall you looked at some pages from this

24 particular document?

25 A.    When are you referring to?

Hubbard - cross

1    Q.    On your direct testimony with Mr. Stiegler.

2    A.    Yes.

3    Q.    I believe he referred you to some pages in this

4    particular document.  If you need to look at it -- is that

5    correct?

6    A.    I am not sure what pages you are referring to here.

7    Q.    He referred you to --

8    A.    Page 3 of 17?

9    Q.    I believe that's correct.

10   A.    Yes.

11   Q.    Does that look familiar?

12   A.    Yes.

13   Q.    This test plan was something you oversaw while you

14   were at Websense?

15   A.    I did look at the test plan.  QA for this particular

16   piece was not directly underneath me.  But, yes, I looked at

17   the test plans.

18   Q.    And the testing was done in the United States?

19   A.    This testing, I know the person that wrote this was in

20   the U.S.  I don't recall where all the specifics of the

21   testing were.  Probably a combination of Beijing and the

22   U.S.

23   Q.    As a general matter, not specifically to this test

24   plan, testing of RTSS was done also in the United States.

25   Is that correct?

Hubbard - cross

1   A.    It was done in all of our offices.

2   Q.    Including the United States?

3   A.    Including the United States.

4   Q.    If we could turn to Page 14 of DX-6777, which is Page

5   14 of 17, and I would like to point out a couple things and

6   make sure this is accurate.  If you could take a look at the

7   third sentence of the second paragraph, it states, The

8   Dorado release will include features that can provide

9   realtime site threat detection and site classification.

10            Do you see that?

11  A.    Yes.

12  Q.    Is that a correct statement?

13  A.    Yes.  We did -- we did site classification.

14  Q.    And the Dorado release, that includes the RTSS

15  feature.  Correct?

16  A.    That's correct.

17  Q.    If we could go to the next paragraph, the two

18  sentences, it says, Websense content gateway will be in line

19  with the data stream to allow Websense to analyze content.

20  The data that passes through this component will be sent to

21  smaller components, called analytics, that will be used to

22  determine such things as proper categorization and

23  determination of security threats.

24            Do you see that?

25  A.    Yes.

3070

Hubbard - cross

1    Q.    Is that a correct and accurate statement?

2    A.    Yeah.  The web gateway looked at the text and then

3    passed it to RTSS and the other analytics to analyze it.

4    Q.    The next part, under, What is Analytics, states, These

5    are specialized, individually packaged components that

6    generally consume a stream of data to categorize its

7    contents.

8              Do you see that?

9    A.    Yes.

10   Q.    Is that a true and accurate statement?

11   A.    They weren't always necessarily individually packaged.

12   But they generally would take a page, or a file, and then

13   analyze it.

14   Q.    Do you disagree with that statement in the document?

15   A.    Yes.

16   Q.    You do?

17   A.    Yes.  They weren't always individually packaged.

18   Q.    That's your only disagreement with that statement?

19   A.    Yes.

20   Q.    Then, if we could go to, underneath Realtime Security

21   Scanning, RTSS, I am going to highlight, it states, It uses

22   signatures and heuristic method to classify content in

23   realtime on the threat gateway (WTG).  RTSS applies

24   signatures detecting threats, which are mapped into various

25   threat type categories.

Hubbard - cross

1              The main focus is around classifying content for

2    blocking threats.

3              Do you see that?

4    A.    Yes.

5    Q.    Do you agree with those statements?

6    A.    Yes.

7    Q.    Now, if we could turn back to Page 3 of this

8    particular document, when we were looking at the figure, we

9    see that RTSS is one box over at one end and the Web Filter

10   is in another box.  Right?

11   A.    Yes.

12   Q.    Does RTSS just on its own block threats?

13   A.    No, it does not.

14   Q.    It needs something else in order for that to work?

15   A.    Yes.

16   Q.    And so it would need at least a Web Filter.  Is that

17   right?

18   A.    It needs the Gateway and the Web Filter.

19   Q.    You oversaw the Websense Security Labs, I believe you

20   had mentioned?

21   A.    That's correct.

22   Q.    And the Websense Security Labs, they prepared white

23   papers?

24   A.    Sometimes, yes.

25   Q.    I would like to show you a white paper, a Websense

Hubbard - cross

1    white paper entitled 2010 Threat Report.  It's marked as

2    JTX-431.

3                  If you turn to the last page of this, which is

4    Page 29, the second sentence starts, Our research

5    underscores how running standalone antivirus products

6    against today's content-focused threats is ineffective as

7    are threat signatures and URL filtering.

8                  Do you see that?

9    A.    Can you highlight it?

10   Q.    You know, I believe it's actually the second-to-last

11   page.  My apologies.

12                 Page 29 of JTX-431.

13                 It's the very first sentence of the second

14   paragraph, it says, Our research underscores?

15   A.    Yes, I see that.

16   Q.    Is that a true statement?

17   A.    I mean, we did find that our effectiveness was better

18   than just using antivirus, yes.

19   Q.    Now, you testified about knowledge of Finjan?

20   A.    Yes.

21   Q.    At least from the Websense perspective.  Right?

22   A.    Yes.

23   Q.    On behalf of Websense you, as the former chief

24   technical officer, you were talking about what Websense knew

25   about Finjan.  Right?

3073

Hubbard - cross

1    A.    Yes.

2    Q.    And you mentioned that you had looked up Finjan's

3    websites and other materials, right, to become familiar with

4    it?

5    A.    Yes, we saw, they posted blogs, they were at

6    conferences, presentations and we got material from the

7    field.

8    Q.    In fact, Websense tested Finjan's products, didn't it?

9    A.    Yes, we did.  We did competitive testing.

10   Q.    I would like to show you what we have marked as

11   PTX-12.  It is also in the binder that I have handed to you.

12   A.    Yes.

13   Q.    On Finjan's website they had these Finjan's white

14   papers.  Are you familiar with these kinds of documents that

15   you saw while you were chief technical officer at Websense?

16   A.    Not specifically, no.

17   Q.    Would this be the type of material you reviewed as

18   part of your duties while you were at Websense?

19   A.    Yes.  We looked at white papers frequently.

20   Q.    I would like to point you to the second page of this

21   white paper.  Do you see in the second paragraph, it states,

22   The Finjan software technology and/or products and/or

23   software described and/or referenced to in this material are

24   protected by registered and/or pending patents including

25   U.S. Patents No. 6,092,194, then it lists a number of other

Hubbard - cross

1    patents.

2            Do you see that?

3    A.    I see that, yes.

4    Q.    Do you recall ever seeing this particular information

5    on the Finjan products when you were doing that testing?

6    A.    No.

7    Q.    But you don't dispute that, in fact, the patent that

8    we are talking about is there?

9    A.    I see it now, yes.

10   Q.    So while you were at Websense you agree that Websense

11   was well aware of Finjan, the company itself.  Right?

12   A.    We were aware of the company, yes.

13   Q.    You were well aware that it had gateway products that

14   were competing with Websense?

15   A.    Yes.

16   Q.    And that Finjan also had patents?  Websense was well

17   aware of that as well?

18   A.    They talked about patents a lot.  Yes.

19   Q.    Websense was concerned about Finjan's patents, weren't

20   they?

21   A.    Not particularly, no.

22   Q.    It's your testimony that leading up to the release of

23   the Websense Web Security Gateway in June 2008 Websense was

24   not concerned about Finjan patent rights?

25   A.    I wouldn't say overly concerned, no.

Hubbard - cross

1    Q.    Isn't it accurate to say that Websense actually

2    considered taking a cross-license to Finjan's patents?

3    A.    I am not aware of that.

4    Q.    You are not aware of any internal discussions about

5    taking a cross-license to Finjan's patents?

6    A.    Not that I can recall, no.

7    Q.    I would like to show you what has been marked as

8    JTX-375.  It is contained in your binder.

9          This is a document, it says Variation of

10   Agreement - Proposal Brief.

11         It discusses that Websense will license to

12   Finjan an OEM database, and continues on.

13         Do you see the document?

14   A.    Yes.

15   Q.    And take your time.  If you need to read the document,

16   that is fine.  But I would like to point you to the second

17   page, the very last sentence.  It says, Patent

18   Cross-Licensing.  Websense will agree to cross-license its

19   patents with Finjan for web filtering in exchange for Finjan

20   cross-licensing its patents on realtime content scanning to

21   Websense.

22         Do you see that?

23   A.    I do see that.  But I was not familiar with that.

24   Q.    And this is an internal Websense document, isn't it?

25   A.    Sorry.  I don't know.

Hubbard - cross

1    Q.    I can represent to you this is a document that was

2    provided to us from Websense.

3    A.    Okay.

4    Q.    So we have looked at previously, your counsel had

5    pointed out to you, a document with PTX-1367, if we could

6    show that on the screen.

7              You recognize this e-mail chain?

8    A.    I know that I sent the e-mail.  I don't recognize the

9    chain.

10   Q.    The e-mail initiated from you, which says, First AV,

11   then spyware, now behaviors.  What's next?

12             Then it has a link, which seems to be about

13   Finjan licensing its patents to Microsoft.  Right?

14   A.    Yes.

15   Q.    Do you recall who you sent this e-mail to?

16   A.    Yes.  I sent it to two very large mailing lists.  One

17   was called MWP and the other was called TH.

18   Q.    If we could look at PTX-1316, I believe that will

19   actually show the mailing list.  You can see that the

20   mailing list and the actual subject is Off Topic, Finjan

21   gets MS investment/licensing.

22             Do you see that?

23   A.    Yes.

24   Q.    That was in the 2005 time frame?

25   A.    It looks like it, yes.

Hubbard - cross

1    Q.    Who was on this mailing list?

2    A.    Probably 4 or 5,000 people.

3    Q.    Engineers?  People in industry?  Who were they?

4    A.    Mostly security researchers.  People involved in

5    security.

6    Q.    These are people with technical backgrounds?

7    A.    Anyone that's involved in security.  Yes, lots of

8    technical backgrounds.

9    Q.    So this was back in the July 20, 2005 time frame.

10   Correct?

11   A.    Yes.

12   Q.    So the response that Mr. Girard gave that we saw in

13   the previous e-mail was in response to you forwarding on

14   this information.  Correct?

15   A.    That's what it looks like, yes.

16   Q.    Then I would like to show you what is PTX-1335.  After

17   that 2005 e-mail there was more discussion about Finjan and

18   its patents, correct, internally at Websense?  Correct?

19   A.    There was discussions about them on the board.  There

20   was also discussions about them licensing some of our

21   technology.

22   Q.    Let's take a look specifically at the e-mail from you

23   dated July 4th, 2006.  In the last two paragraphs, there is

24   a discussion about cross-licensing, or OEM and AV vendors'

25   database to get around patent issues or have a more in-depth

Hubbard - cross

1    solution.

2            In the next paragraph you make a reference that

3    one option is to offer strategic investment and to CP Secure

4    to get their patent rights for stream scanning to get around

5    the Micro Trend patent.  This is what Microsoft and Cisco

6    are doing with Finjan to get around their patent.

7            Do you see that?

8    A.    Yes.

9    Q.    You were well aware of what was going on with Finjan

10   and its patent portfolio at this time.  Correct?

11   A.    Just reading from the Microsoft and subsequent Cisco

12   articles.

13   Q.    This is in reference to a July 2006 board of directors

14   presentation draft.  Right?

15   A.    Yes.

16   Q.    I would like to show you that draft presentation.

17   It's been marked as DX-6059.  It's in the binder there if

18   you would like to see it.

19   A.    I think I can see it.

20   Q.    It says, "Gene Hodges July 18, 2006."  Do you see

21   that?

22   A.    Yes.

23   Q.    And Gene Hodges was the CEO at that time, is that

24   right, of Websense?

25   A.    Yes.

Hubbard - cross

1    Q.     Was he also the president at that time?

2    A.     I am sorry.  I don't remember.  Maybe.

3    Q.     I'd like to turn you to Page 8 of this document --

4    excuse me, Page 10 of this document, which I believe you

5    referred to specifically in PTX-1335 earlier.  If you need

6    to look at it, we can.

7              In this document, under, "Too much waiting," the

8    draft says, "Traditional the signature solutions have to

9    wait for the attack before they can move (sample).  Then,

10   even the fastest solutions have to wait for analysis to be

11   complete before moving to protection (signature).  Then, the

12   customers have to wait for the update itself as well as

13   their ability to implement the update."

14             Do you see that?

15   A.     Yes.

16   Q.     Is that a true and accurate statement?

17   A.     Yes.  What this was referring to was the antivirus was

18   primarily based off of gathering samples from other people

19   within the industry.  Then they took a long time to analyze

20   those samples and then update them, which was a problem.

21   Q.     So, and this says traditional signatures?

22   A.     Yes.  "Traditional" meaning binary signatures on file.

23   Not web-based signatures.

24   Q.     That's not the same type of signatures that you were

25   talking about on your direct with respect to RTSS?

1   A.    No.  Our method was, although technically, they may be

2   the same signature, it was a different type of page.

3   Q.    It's something different.  Right?  It's not the

4   traditional signature that's being described here, is it?

5   A.    I don't know if it's fair to say that.  I'd say it's

6   the same idea and same type of signature but applied in a

7   different way.

8   Q.    Okay.  Let's go down to under, "Too much guessing."

9           It says, "The counter offering to this is to

10  rely on behavioral analysis to block the unknown (no

11  signature) threats."

12          It continues on, "The guesses are too extreme

13  and the good activity is blocked along with the bad.

14  Blocking the good stuff means more pain and disruption of

15  the organization."  Do you see that?

16  A.    Yes.

17  Q.    Was that a truthful statement prepared in this Board

18  of Director's presentation?

19  A.    Yeah.  Using the behavioral-based technologies in the

20  field was proving to not work.

21  Q.    And that was true in the 2006 time frame?

22  A.    Yes.

23  Q.    So you don't disagree with this particular statement

24  in this document?

25  A.    No.

Q.      Then starting in about August of 2006, Websense wanted

to try and take some pre-answered Web Security measures,

didn't it?

A.      Yes.

Q.      In fact, you drafted a presentation, entitled,

"Preemptive Web Security - Keeping Two Steps Ahead of the

Threats" in August of 2006.  Isn't that right?

A.      What page?

Q.      I will refer you to the document.  PTX-1323.

A.      Okay.

Q.      And if you turn to the last page of this, under "Next

steps," one of the things that you wrote was, "Patent

application.  More patent investigation on Trend and perhaps

Finjan."  Correct?

A.      Yes.

Q.      So once again, you were keeping watch on what Finjan

was doing in its patents.  Right?

A.      This was mostly about Trend but also Finjan, but this

was to pass on to our legal team to do more investigation.

Q.      At some point at Websense after that, about a month or

two, there was actually scheduled a meeting to discuss

Finjan, wasn't there?  I can refer you to PTX-1331.

A.      I am not sure.  Okay.

Q.      And do you remember this document?

A.      Sorry.  I do not remember this.  It looks like a

Hubbard - cross

1   calendar invite.

2   Q.   Well, you were -- you were deposed in this case,

3   weren't you?

4   A.   Yes.

5   Q.   And you were asked about this particular document?

6   A.   Yes.

7   Q.   And you didn't recall whether or not the meeting took

8   place?

9   A.   No.

10  Q.   But you don't dispute that, in fact, this is a

11  document in which the required attendees included yourself,

12  John McCormack, and some of the other key individuals at

13  Websense, and this is dated October 17, 2006.  Right?

14  A.   It looks like it was a meeting scheduled, yes.

15  Q.   And the agenda was to discuss Finjan, history,

16  capability, IP, and partnering prospects.  Right?

17  A.   That's what it says in the document.

18  Q.   You don't recall whether or not there was any kind of

19  a meeting?

20  A.   No, I don't.

21  Q.   I'd like to turn to your attention to PTX-1397.  So,

22  the discussions internally at Websense continued even

23  through December 2007 and January 2008.  Correct?

24  A.   The -- what do you mean by "the discussions"?

25  Q.   Discussions internally about what Finjan and its

Hubbard - cross

1    patents, what it was up to, those continued internally at

2    Websense, didn't they?

3    A.    We discussed all the time about all products and

4    technology.

5    Q.    But Finjan was part of that discussion, wasn't it?

6    A.    Yeah.

7    Q.    Okay.  And so, I'd like to have you take a look at

8    this PTX-1397.  You were deposed about this particular

9    document, weren't you?

10   A.    Yes.

11   Q.    And at the time, you didn't recall any of the things

12   that you talked about today during your deposition, did you?

13   A.    I am not sure what you mean.

14   Q.    Well, when you were asked about this document, in

15   particular, why a post Dorado release, that you were

16   concerned there was a strong chance they would come after a

17   post Dorado release.  This is on page 202 of your deposition

18   testimony.

19              Your response was, Post Dorado --

20              MR. STIEGLER:  Can he have a chance to see the

21   deposition testimony?

22              MS. KOBIALKA:  Sure.  The deposition is in your

23   binder.

24              THE WITNESS:  Sorry.  Which page?

25              THE COURT:  Direct him to a page and line.

3084

Hubbard - cross

```
 1                    MS. KOBIALKA:  It is Page 202.

 2                    THE COURT:  Line?

 3                    MS. KOBIALKA:  Starting at Line 5.

 4                    THE COURT:  Through what?

 5                    MS. KOBIALKA:  Through 203, Line 4.

 6                    THE WITNESS:  Say that again.  Page?

 7     BY MS. KOBIALKA:

 8     Q.   Page 202.

 9     A.   Okay.

10     Q.   Starting on Line 4, through 203, Line 4.

11     A.   Yes.

12     Q.   We actually can display it.  We have it teed up.

13                    THE COURT:  Let him read it first.

14                    MR. STIEGLER:  I don't know if this is for

15     impeachment?

16                    THE COURT:  I don't either.

17                    MS. KOBIALKA:  I am sorry.  It's 201, Line 8.  I

18     just found my excerpt -- through.

19                    MR. STIEGLER:  What line, counselor?

20                    MS. KOBIALKA:  201, Line 8.

21                    MR. STIEGLER:  That's beginning halfway through

22     the question.

23                    MS. KOBIALKA:  You can start 201, Line 7, this

24     is in connection with this document, through 202, Line 4.

25     BY MS. KOBIALKA:
```

3085

Hubbard - cross

1    Q.    Have you had a chance to read it?

2              MR. STIEGLER:  I still object.

3              THE COURT:  I will sustain the objection.

4    BY MS. KOBIALKA:

5    Q.    In this email that we are looking at here, PTX-1397,

6    do you see in the second email from John McCormack, there is

7    a line that says, "Future investment opportunities for

8    Websense, Israel startups and web control and access

9    policies, security guys, perhaps Finjan."  Do you see that?

10   A.    Yes.

11   Q.    At that time, Mr. McCormack was actually considering a

12   future investment opportunity in Finjan.  Is that correct?

13   A.    He was saying one of the things we could -- I can only

14   speculate on what exactly he meant, but future investments

15   and opportunities.

16   Q.    You don't dispute that Websense knew of the '194

17   patent by June of 2008, do you?

18   A.    I was not familiar with it, no.

19   Q.    You don't know -- you can't speak on behalf of

20   Websense on this?

21   A.    That I knew about the patent?

22   Q.    No.  That Websense knew about the patent as of June of

23   2008?

24   A.    I am not sure about the timing on the lawsuit, but no,

25   not that I am aware of.  I was not familiar with the '194

Hubbard - cross

1    patent.

2    Q.    Websense, I am asking about Websense as a whole.   I

3    think this is part of a stipulation.   You don't dispute that

4    Websense knew about the '194 patent as of June of 2008, do

5    you?

6    A.    Yeah.   I am not sure that we did know about the

7    specifics of the '194 patent in June of 2008.

8    Q.    You are saying, "the specifics of the '194."   I am

9    talking about the existence of the '194 patent.

10   A.    I mean, I knew that Websense knew that Finjan had a

11   lot of patents, but I am not sure we knew the details of

12   those patents.

13   Q.    But you were aware that there was this '194 patent

14   that was out there in the marketplace?

15   A.    I was aware that they had a lot of different patents.

16   Q.    As of June of 2008, Websense was well aware that

17   Finjan had the '194 patent.   Isn't that correct?

18   A.    I am not sure about that.

19   Q.    Well, you were monitoring what Finjan was doing in the

20   marketplace with respect to your competitors, weren't you?

21   A.    Yes.   But that typically doesn't go into patent

22   numbers.

23   Q.    You were actually monitoring what Finjan was doing

24   with respect to the '194 patent, weren't you, in June of

25   2008?

Hubbard - cross

1    A.    No.

2                MS. KOBIALKA:  Your Honor, I'd like to request a

3    side bar.

4                THE COURT:  Yes.

5                (The following took place at sidebar.)

6                MS. KOBIALKA:  So I made this request because I

7    wanted to address this before we go there.  They filed the

8    reexamination request in June of 2008, and we have a

9    stipulation that they knew of the patents at least in 2008.

10               He actually -- I have documentation where he was

11   monitoring the Secure Computing litigation and the

12   infringement and everything back in 2006, but since I am

13   precluded from talking about that, I have an issue here

14   because he is sitting here saying that Websense didn't know

15   of the patent until the lawsuit, but that's completely

16   inaccurate.  They filed the actual reexamination request.

17               MR. STIEGLER:  Couple things.  Number one,

18   that's not what he is saying.  He is saying he doesn't have

19   personal recollection now.  They have got a stipulated fact.

20   That's something that the Court will read if they ask for

21   it, whenever they do.  Presumably at the end of the case.

22   Her question is whether he knew or whether Websense knows,

23   and he is saying now he doesn't know.  So I don't think also

24   that he had knowledge.

25               The Secure Computing, we have already addressed

1    that in a motion in limine.  That's been stricken and

2    excluded from the case.  The reexamination is absolutely

3    excluded from the case.

4                She is asking the question that he's answered,

5    and if they have a stipulated fact that they want to have

6    read, that's their prerogative.

7                THE COURT:  So the stipulation isn't sufficient?

8    You are concerned about -- this goes to the issue of

9    willfulness?

10               MS. KOBIALKA:  Yes.  This goes the issue, in

11   part --

12               THE COURT:  In part what?  Go ahead.

13               MS. KOBIALKA:  So in part, this goes to their

14   knowledge on what they were doing, so for the purposes of

15   willfulness -- there is a number of other things he said in

16   there that are not accurate with regard to the

17   reexamination.

18               THE COURT:  I am not -- that's not why you asked

19   for the sidebar.  You are concerned about his statement that

20   he wasn't aware of the patent.

21               MS. KOBIALKA:  I am concerned that Websense is

22   now taking the position that they didn't know of the patent.

23               THE COURT:  This gentleman just simply doesn't

24   have a recollection.  I don't think they are walking away

25   from the stipulation.

```
 1                    MR. ANDRE:  Your Honor --

 2                    THE COURT:  I am not getting off on the re-exam,

 3       Mr. Andre.  Stay out of it.

 4                    MS. KOBIALKA:  If the stipulation is going

 5       stand, this won't be an issue.

 6                    THE COURT:  The stipulation is going to stand.

 7                    MS. KOBIALKA:  With respect to the

 8       reexamination, we excluded a discussion about the

 9       reexamination, but not to the weight of prior art.

10                    THE COURT:  Why do we need to get into a

11       discussion here of reexamination?

12                    MS. KOBIALKA:  Only because he said it was

13       excluded.

14                    MR. STIEGLER:  It's been filed.

15                    MS. KOBIALKA:  I just want to make sure we are

16       clear on this and I have preserved all of my appropriate --

17                    THE COURT:  I don't know what it is you are

18       attempting to preserve.  You have got a stipulation.  From

19       what I hear you saying, this goes to one issue, and that

20       goes to the issue of their knowledge, which has relevance to

21       the willfulness question.  They are not going away on JMOL

22       willfulness.  Its going to be up to the jury to decide that.

23                    MS. KOBIALKA:  Thank you, Your Honor.

24                    (End of sidebar discussion.)

25       BY MS. KOBIALKA:
```

Hubbard - cross

1    Q.      Mr. Hubbard, Websense didn't make any efforts to

2    design around '194 that you are aware of once it became

3    aware of the patent.  Correct?

4    A.      No.

5                    MS. KOBIALKA:  I have no further questions.

6                    THE COURT:  Mr. Stiegler.

7                    MR. STIEGLER:  I have nothing further, Your

8    Honor.

9                    THE COURT:  Sir, you are excused.

10                   (Witness excused.)

11                   THE COURT:  Are we going into opinion evidence?

12                   MR. STIEGLER:  Yes, we are.

13                   THE COURT:  Why don't we take an early lunch.

14   Come back in an hour.

15                   (Jury leaves courtroom at 12:47 p.m.)

16                   (Luncheon recess taken.)

17                   THE COURT:  Ready for the jury?  Close that

18   door, please.

19                   MR. STIEGLER:  Two points before we are ready

20   for Barbara Frederiksen.  Number one, I just wanted to make

21   clear that on behalf of Websense, we were likewise offering

22   the testimony of Dr. Spafford as part of our invalidity

23   case.  In case there is ever a question of a JMOL issue, he

24   was on behalf of Websense and Symantec.

25                   THE COURT:  I am glad you made that clear.

Hubbard - cross

1        MR. STIEGLER:  The second point is I am

2    intending to ask Ms. Frederiksen what she reviewed in the

3    file history, and I am intending to use four pages from the

4    file history, which inform her opinions about the scope of

5    the claims and how to interpret them.

6            Under this Court's prior -- in the prior case,

7    in Shelbyzyme, the jury instructions usually that they are

8    to be informed of the meaning of the terms based on the

9    patent and the specification and the file history.

10            Likewise, that is the standard in the AIPLA

11    model jury instructions, and so we have got an objection to

12    me doing that and that is what needs to be resolved now.

13            THE COURT:  Yeah.  Okay.  I notice that there is

14    a disagreement in the jury instruction on that point.

15    What's the problem, Mr. Hannah?

16            MR. HANNAH:  Thank you, Your Honor.  There is

17    actually -- we have three objections to three different

18    pieces of evidence.

19            THE COURT:  Could we talk about the one he just

20    mentioned because I don't need the other detail.  Let's keep

21    focused.

22            MR. HANNAH:  Sure.  With regard to the

23    demonstratives that they want to show Ms. Frederiksen, it

24    talks about the prosecution history and about how the

25    examiner limited the claims of the prosecution history.

Hubbard - cross

1                The only reason that this should come in for an

2       infringement expert is for DOE, and as Your Honor knows, DOE

3       is no longer in the case so there is no prosecution estoppel

4       argument anymore, and that was precisely the reason that it

5       was used during the openings in this case.  It's the same

6       exact slides.  So we believe that since that issue has now

7       been set aside, that there is no reason for this

8       infringement expert to talk about any type of prosecution

9       history estoppel or even look at the file history because

10      there is no --

11                THE COURT:  Let's get a response.

12                MR. STIEGLER:  It goes to more than DOE.  I am

13      not offering it for DOE.  It goes to the witness'

14      understanding of the terms of the claim.  So the specific

15      example is that the claims require, in our view of the

16      world, a single server.

17                That is something that is made explicitly clear

18      in the prosecution history in the claim amendment that was

19      filed by Finjan in an examiner's notice of allowance.

20      Likewise, the language, a list of suspicious computer

21      operations was required to be added, so that's something

22      which informs Ms. Frederiksen's opinions about what the

23      claims mean and what she will use to offer her opinions

24      about whether there is infringement or not.

25                THE COURT:  So you resist the notion that the

1    evidence is thus far and the comments in openings have

2    directed the jury's attention to DOE in this regard?

3              MR. STIEGLER:  I think it was more than just

4    DOE.  It's what do the claims mean?

5              MR. HANNAH:  Now he's blended two different

6    issues.  We were trying to be focused.  Focus on the first

7    issue is this list of suspicious operations which is brought

8    up in the prosecution history.

9              The single server is another issue that I want

10   to discuss.  I want to be focused on the list of suspicious

11   operations.  That has no bearing for an infringement expert

12   to talk about the prosecution history.  Your Honor construed

13   this term, this was in dispute, plain and ordinary meaning.

14   There is no reason to bring in limitation through the

15   prosecution history for an infringement expert.

16             Validity expert, fair enough, we let their

17   validity experts get up and talk about the prosecution

18   history, we think that's completely valid, but for an

19   infringement expert, there is no reason to do it except for

20   prosecution history --

21             THE COURT:  Estoppel?

22             MR. HANNAH:  Estoppel, sorry.

23             THE COURT:  Doesn't he have a point?

24             MR. STIEGLER:  No.  I think he does not.  I

25   think what this Court has said before, and the AIPLA

```
 1      instructions directly address it, you said before, in

 2      Shelbyzyme, you should give the rest of the words in their

 3      claims their ordinary meaning in the context of the patent

 4      specification and the prosecution history.  And that's

 5      exactly the language of the AIPLA instructions.

 6                  So the jury will be instructed that the ordinary

 7      meaning is the meaning, but that should be informed by what

 8      the file history says.

 9                  THE COURT:  Well, that's an issue that's yet to

10      be resolved as to whether they will be instructed in that

11      way because there is a difference of view.  I am not sure

12      that it's all that clear-cut.  We know that the

13      specification informs any analysis of claim construction,

14      which Phillips told us that and many cases before Phillips

15      told us that.

16                  I am not sure that this is all that critical,

17      Mr. Hannah.  What's the prejudice that you suffer?

18                  MR. HANNAH:  I just don't want this jury to be

19      prejudiced -- this kind of blends into the second argument.

20      I just don't want this jury to be focusing on the file

21      history for infringement purposes and trying to take the

22      Court's claim construction, which is plain and ordinary

23      meaning, and try to read limitations from the prosecution

24      history, or the specification, for that matter, into it.

25                  The infringement expert has no bearing on --
```

Hubbard - cross

1           THE COURT:  That would take a lot of

2   sophistication, wouldn't it?

3           MR. HANNAH:  If they are going to bring in the

4   examiner's reasoning during the prosecution history and why

5   they added limitation --

6           THE COURT:  All he is saying is it helps inform

7   this witness.  I think they are going to focus on the

8   witness' testimony, and I am going to let him do it.

9           MR. HANNAH:  The second issue, Your Honor, is

10  the single server, and I have got cases for this one.

11          THE COURT:  I am sure you do.  Okay.

12          MR. HANNAH:  I have got a lot of cases.

13          MR. STIEGLER:  We haven't been provided with any

14  of his case law, so I am not sure what he is about to argue.

15          THE COURT:  Can we start on the witness?  Is

16  this going to come up on direct examination of the witness?

17          MR. HANNAH:  It is, Your Honor.  The issue is

18  the defendants here have tried to impose a limitation into

19  the claims, which says, "a single server" into the claims,

20  and this witness is going to testify that the claims require

21  a single server.

22          Now, there is a litany of cases which says, if

23  you use the word comprising in the claim, "a" means one or

24  more.  So the cross-examination I am going to do of this

25  witness, if this is allowed in, is, Have you read the case

3096

Hubbard - cross

1    law?, which I know it's completely improper, but this is an

2    issue for Your Honor because "a" is one or more, and that's

3    how it's always been decided, and here is the case.  I can

4    read into it the record.

5              THE COURT:  Go ahead.

6              MR. HANNAH:  So one of the first cases that I

7    found is -- I have a whole stack of them.

8              THE COURT:  I am sure.

9              MR. HANNAH:   KCJ Corporation vs. Kinetic

10   Concepts.  The Court was very clear --

11             THE COURT:  This is Federal Circuit?

12             MR. HANNAH:  Yes.  223 F F3d 1351.  It says, The

13   Court has repeatedly emphasized that an indefinite Article A

14   or and in patent parlance carries the meaning one or more in

15   open ended claims containing the transitional phrase

16   "comprising."

17             THE COURT:  You guys can't agree on the meaning

18   of the word "comprising."  But go ahead.

19             MR. HANNAH:  So that's the black letter law of

20   the case.

21             THE COURT:  I don't think Mr. Stiegler can

22   seriously disagree with that, but for -- I don't think you

23   do, do you, Mr. Stiegler?

24             MR. STIEGLER:  Number one, I would note that

25   there is contrary case law, but he is missing the point to

Hubbard - cross

1    what my argument is.

2              THE COURT:  Okay.

3              MR. STIEGLER:  The argument is there has to be a

4    single server that accomplishes two functions.  The claim

5    language says that there has to be a server that acts as the

6    gateway, and that that same server also satisfied the

7    comparison function, so two functionalities that must be

8    accomplished by a single server, not that the claim language

9    says that A must mean one or two.  So it's two different

10   functions --

11             THE COURT:  So --

12             MR. STIEGLER: -- accomplished by the same

13   server.

14             THE COURT:  There is your target, Mr. Hannah.

15             MR. HANNAH:  Your Honor, he is saying that "a"

16   requires one or more servers.  If that is how the claim

17   language shall be read, it is a server requires this

18   functionality.  When you refer back to the server, the case

19   law is very clear that if you refer to "the" in regard to a

20   comprising claim, that refers to still one or more servers.

21             So if the defense is willing to tell the witness

22   and this jury that "a" means one or more in the claims, then

23   we have no problem.  If they are going to try and limit this

24   to a single server, which is not proper under the litany of

25   cases...

Hubbard - cross

```
1              THE COURT:  Did you just state that?

2              MR. STIEGLER:  No.  The functions are

3    accomplished by one server, the same server.

4              THE COURT:  He is saying one server accomplishes

5    two functions.

6              MR. HANNAH:  If we had the claim language, it

7    would read, say, one or more servers does this function.

8              THE COURT:  Was this a Markman issue that I

9    addressed?

10             MR. HANNAH:  This was never brought up in

11   Markman.

12             THE COURT:  It's beginning to sound like an

13   issue of claim construction.  No?

14             MR. HANNAH:  That is exactly our point, Your

15   Honor.  These two points are claim construction issues that

16   they are trying to impose at this point in the litigation,

17   which we believe is completely improper.  We would have been

18   able to cite all these cases if they came up to show that

19   "a" means one or more.

20             There hasn't been any type of explicit

21   disclaimer of these type of embodiments or anything like

22   that.  We would have fully briefed this issue.  You can't

23   come in the minute before your infringement expert gets up

24   and try to change the claim construction here at this late

25   hour.
```

Hubbard - cross

1              THE COURT:  Why isn't this claim construction?

2              MR. STIEGLER:  Two points, Your Honor.  First,

3    this was all in the expert reports.  The witnesses had been

4    deposed on the issue.  It has been around for a long time.

5    No. 2, this is exactly why the prosecution history is

6    important, because that informs -- the ordinary meaning is

7    what we have used.  But the prosecution history, where this

8    requirement was added, is informative to the witness'

9    opinion and should be something that the jury is able to

10   consider.

11             THE COURT:  It sounds like you have a difference

12   of view on the meaning of a term in a claim.  What is it,

13   the Micro 02 case, that tells me that I have to resolve that

14   difference, not the jury?

15             MR. STIEGLER:  I think claim construction

16   absolutely is for you.  But the terms are what they are in

17   the claim language.  It is up to the expert witness to help

18   inform with what her understanding is of those terms based

19   on the Court's construction.

20             THE COURT:  Right.

21             MR. STIEGLER:  She will just offer that she has

22   read the prosecution history and that informed her

23   understanding of the ordinary meaning of those terms.

24             THE COURT:  That is an interesting argument.

25             MR. HANNAH:  Your Honor, that is completely

1    improper.  That is not a question for the jury to decide.

2    The jury cannot decide what "a" means.  That is the province

3    of the Court.

4              THE COURT:  The jury can't, Mr. Stiegler, decide

5    the meaning of the article "a."

6              MR. STIEGLER:  I am not saying that the jury

7    should construe the claims.  But the jury will have to

8    decide whether there is infringement based on the Court's

9    construction.

10             THE COURT:  And the expert, of course, has to

11   apply the Court's construction.  But you differ over a term,

12   as I am understanding the arguments that both of you are

13   making.

14             MR. STIEGLER:  We are accepting the language

15   that is in the --

16             THE COURT:  You don't accept that "a" means one

17   thing, one computer.

18             MR. STIEGLER:  What we say is that there are two

19   functionalities that are required under the claim language.

20   There has to be a comparison step and there has to be a

21   receipt of a downloadable at the gateway, and that the claim

22   language requires that that be accomplished by one.

23             THE COURT:  Computer.

24             MR. STIEGLER:  Correct.

25             THE COURT:  For that proposition, you reference

1    the term, the article "a."   Right?

2              MR. STIEGLER:   "A" and not "the."

3              THE COURT:   Mr. Hannah says that could mean one

4    or more.

5              MR. HANNAH:   Your Honor, another case is Free

6    Motion Fitness v. Cybex International.   This addresses the

7    article "a" and "the."   And I want to read the report,

8    because that is also in the claim here.   It says, like the

9    words "a" and "an," the word "the" is afforded the same

10   presumptive meaning of one or more when used with the

11   transitional phrase comprising.

12             It is clear as a bell in these cases that that

13   is what "a" and "the" is supposed to mean, one or more.   It

14   is not the province of the expert to come in and tell this

15   jury that "a" means a single, or "one," especially when the

16   case law is directly against them.

17             MR. STIEGLER:   There is contrary case law.   If

18   there is any concern --

19             THE COURT:   It is of concern, because I would

20   have thought you two could have agreed on the statements

21   read into the record from the cases Mr. Hannah has cited.

22             I don't discount your assertion that there may

23   be contrary case law in this area.   That is why I am willing

24   to let you cite it to me.   And I will take a look.   But we

25   are going to need to avoid the area in the examination until

```
 1    this can be resolved.  I don't know how you do that.

 2              MR. STIEGLER:  This witness should be off by the

 3    end of the afternoon.

 4              THE COURT:  So you need to get it to me while I

 5    am sitting here, like you do on other things.

 6              MR. STIEGLER:  Do we have a case?

 7              MR. GRIMM:  We do.

 8              THE COURT:  What is the cite?

 9              MR. STIEGLER:  I believe our counsel has a

10    citation.

11              THE COURT:  I think we should exclude

12    smartphones from the courthouse.

13                  (Laughter.)

14              MR. GRIMM:  Your Honor, Tom Grimm for Websense.

15    It looks like 656 F3d. 1331.

16              THE COURT:  We will take a look at that, Mr.

17    Grimm.

18              MR. HANNAH:  Your Honor, may I approach to hand

19    you these two cases?

20              THE COURT:  Why don't you hand them to Ms.

21    Sullivan there.

22              MR. STIEGLER:  Your Honor, I would just add here

23    that I think the plaintiff has waived this entirely.  This

24    was raised in expert reports.  The witnesses were deposed on

25    it.  They said nothing about it in the pretrial.
```

```
 1              THE COURT:  Here is my concern, Mr. Stiegler.
 2    My concern is folks later coming back, or going down to the
 3    CAFC, and say, the Judge clearly had a dispute of claim
 4    construction, in the nature of a claim construction dispute,
 5    and he didn't resolve it.  And you know what they do with
 6    that?  They are going to punt.  It is going to come right
 7    back here on remand.  You all don't want to do this again.
 8    I don't.
 9              I am not meaning to be facetious.  I think I can
10    see that happening at that some point.
11              Let us take a look.
12              Let's get the witness on and off.  This is your
13    last witness.  Right?
14              MR. STIEGLER:  This is.
15              THE COURT:  This is the last witness for the
16    defense?
17              MR. STIEGLER:  Yes.
18              THE COURT:  Are we going to have some rebuttal?
19    How long is your rebuttal going to take?
20              MR. ANDRE:  Your Honor, what we talked about, I
21    along with lead counsel last night, was we would put on our
22    validity expert, Dr. Vignoux, tomorrow morning, hopefully be
23    done by the lunch break or thereabouts.  Then I don't know
24    if we want -- I don't know if we have our jury instructions
25    done at that point.
```

Hubbard - cross

1          THE COURT:  I want to talk to you about that at

2     the end of the day, because I think a lot more work needs to

3     be done.  I got halfway through, when I saw DOE was still in

4     here, I threw up my hands.  I came in on Sunday.  I came in

5     expecting to resolve some disputes.  Some I have.  But

6     clearly, more works can be done.

7          MR. ANDRE:  Ms. Kobialka and Ms. Kash and others

8     are working as we speak.

9          THE COURT:  Thank you.  For that reason, I

10     elected not to proceed forward, hoping that that would be

11     the case.  I am glad to hear that it is.  So that is not

12     time wasted for me.

13          MR. ANDRE:  The idea would be, on Wednesday, all

14     the witnesses would be done, we would do closing arguments.

15     The jury would have it by Wednesday afternoon.  We are good

16     on time.  Like I said, tomorrow, we have a short deposition

17     clip and then a single witness, that is objected to by the

18     other side.  But we will deal with that later.  That is the

19     timing of things.

20          THE COURT:  Mr. Stiegler, go ahead.

21          MR. STIEGLER:  One question on clarification

22     about what I am about to do with Ms. Frederiksen-Cross.  Can

23     she state her opinion that two servers are required?

24          THE COURT:  Can we avoid that for the time

25     being, and you can come back to that?

1           MR. STIEGLER:  It's hard, because the slides are

2    prepared and her opinions are staged.

3           THE COURT:  We are going to have to sort of skip

4    over that.  I understand, this is why you get paid the big

5    bucks, Mr. Stiegler, to figure it out on the fly, because I

6    do want to take a look at the cases.

7           MR. STIEGLER:  Understood.

8           THE COURT:  Let's bring in the jury.

9           MR. HANNAH:  Your Honor, the third issue.  I

10   just got their exhibit binder for Ms. Frederiksen-Cross.

11   They have in here DX-6173, which is a hearing transcript

12   with Your Honor about some discovery dispute.  And we don't

13   think that is proper, for it to be in front of the witness

14   or in front of the jury.  We would completely object to the

15   introduction of this exhibit.

16           It's DX-6173.

17           THE COURT:  Mr. Stiegler.

18           MR. STIEGLER:  I don't need to introduce it, as

19   long as the plaintiff agrees that they waived an argument

20   that Claim 66 doesn't require a gateway.  This was an issue

21   that was brought up.  You ruled.  They lost.

22           She is going to state her opinion, it is her

23   understanding that the Court has ruled that Claim 66 also

24   requires a gateway limitation.

25           MR. HANNAH:  Your Honor, first of all, she

Hubbard - cross

1      should not say what the Court has ruled.

2                  THE COURT:  She won't.

3                  MR. HANNAH:  And what the Court has not ruled.

4                  There are no -- I think the issue he is trying

5      to bring -- remember, there was the client-side products

6      that we were asserting with Claim 66.  During the hearing

7      Your Honor said, okay, you can't use client-side products

8      with Claim 66.  Websense has no client-side products, so

9      this is a moot issue.  I don't know why this would come up

10     at all.

11                 MR. STIEGLER:  As long as the plaintiff is not

12     arguing that we still infringe Claim 66 even though it is

13     not practiced at a gateway, if they are not making that

14     contention, I don't need to bring it up.

15                 THE COURT:  Mr. Hannah.

16                 MR. HANNAH:  We are not asserting infringement

17     of the gateway products.

18                 THE COURT:  You are not making that contention.

19                 MR. HANNAH:  I think it would be impossible to

20     do that.

21                 THE COURT:  Then that is a good thing.

22                 All right.

23                 MR. HANNAH:  At this point I wanted to make sure

24     we didn't waive our arguments that we made at the hearing.

25                 THE COURT:  Tough to remember all the arguments.

```
 1              MR. HANNAH:  I just wanted to make it clear for

 2    the record, Your Honor.

 3              THE COURT:  While we are waiting, this is the --

 4    I can't even pronounce it.

 5              (Jury enters courtroom at 2:10 p.m.)

 6              THE COURT:  Ladies and gentlemen of the jury,

 7    welcome back.  Please, take your seats.

 8              Mr. Stiegler.

 9              MR. STIEGLER:  At this point Websense calls Barb

10    Frederiksen-Cross.

11              ... BARBARA ANNE FREDERIKSEN-CROSS, having been

12    duly sworn as a witness, was examined and testified as

13    follows ...

14                        DIRECT EXAMINATION

15    BY MR. STIEGLER:

16    Q.    Good afternoon, Ms. Frederiksen-Cross.

17              Could you please tell us who you are?

18    A.    I am an expert who has been brought here today to

19    explain to you the operation of the Websense products and to

20    provide my opinions about whether or not those products

21    infringe the '194 patent.

22    Q.    First question:  Do details matter?

23    A.    Absolutely.

24    Q.    Can you tell us a little bit about your education and

25    your technical experience?
```

Frederiksen-Cross - direct

1   A.      I received an associate in science degree in 1974.

2   That's when I began programming for a living.  I had been

3   programming for a couple years before that.

4           Since then I have been involved in software

5   development, mostly for very large companies, mostly

6   involving online secure systems, for 38 years.  In the

7   context of that development, I have assisted clients like

8   banks, telephone companies, insurance companies,

9   manufacturing companies, both in the development of software

10  that they use in the course of their business and also help

11  them instrument detection capabilities into their software

12  in order to detect intrusions into their systems or in order

13  to track behavioral patterns and/or data patterns that

14  suggested that something inappropriate had happened in their

15  system, whether it was an internal employee who might be

16  doing some fraud or some outside agency.

17  Q.      Did we prepare a couple of slides, Websense 200-03 and

18  04, that would help you summarize that?

19  A.      Yes, we did.

20  Q.      You may have already hit some of those points.

21          Mr. Grimm, if you could bring up 200-3.

22          Does this first slide, 200-3, summarize

23  everything you have said so far?  You haven't talked about

24  your experience with business and the FBI and government

25  agencies.  What have you done there?

Frederiksen-Cross - direct

1    A.    I have served as a consultant to the FBI in cases

2    involving computer intrusion detection, computer sabotage

3    and international theft of trade secrets.

4              I have also provided services to various state

5    government agencies, including the State of Alaska, the

6    State of Oregon, the State of Louisiana, and the State of

7    Washington with respect to various types of internal

8    investigations into security breaches.

9    Q.    Tell us about your experience with malware detection?

10   A.    That experience focuses in two primary areas.  One is

11   in action detecting the presence of malware systems that

12   have become infected, in tracking the effect of that malware

13   on the system, to understand, for instance, what information

14   may have been stolen, whether sensitive personal information

15   was taken, whether financial information was taken, whether

16   the systems were being used in some way for some nefarious

17   purpose unknown to the owners of the system.

18             And I have also, in the context of that work,

19   then been involved in the detection of malware via the use

20   of Honey Pots that you have already heard about, systems

21   that are deliberately intended to be infected, so that I can

22   take an infected system and then review the effect of the

23   malware in order to understand what it's done to the system

24   and how best to defend a system from that.

25             Then I help my clients both to remove the bad

Frederiksen-Cross - direct

1    effects and to harden their systems against future

2    intrusions.

3    Q.    What is your experience as a software developer and

4    coder?

5    A.    That experience started when I was about 14 years old

6    and continues to this day.

7              I have developed a business application

8    software, I have developed software for robotics

9    applications, software related, as I have already described,

10   to the detection of malware or tracing events within the

11   systems.  And I have also developed forensic software and

12   software used for robotic systems.

13   Q.    The last bullet point on this slide talks about eight

14   years as a police reserve specialist.  How does that relate

15   to your testimony here today?

16   A.    In Oregon we have what's called the Silicon Force

17   High-Tech Crime Team.  Starting in about 2002 I became a

18   part of that team, which was a pilot, partnering individuals

19   from the forensic community with police officers to

20   investigate crimes that had a computer-based element.

21   Either they were computer fraud or crimes like a missing

22   person or a murder where there might be some computer-based

23   content.

24   Q.    Mr. Grimm, if we could have Slide 200-04, please.

25              What else would you like to summarize about your

Frederiksen-Cross - direct

1   qualifications and experience?

2   A.    I focused primarily in the area of forensic work since

3   about 1997.  So during that time I have actually been

4   involved in about 160 or 70 cases, maybe a little more.  Of

5   those, about 85 were litigation matters related to

6   intellectual property, copyrights, trademarks, patents.  35

7   of those were patent matters.

8           I have previously been qualified as an expert in

9   state and Federal Court to discuss computer software, the

10  development of computer software and the operation of

11  computer software.

12          In five of those cases where I was qualified,

13  they were patent matters.

14          I also served for a number of years as the Court

15  Data Systems Advisor to the Honorable Judge Marvin Garvis,

16  in the District Court of Maryland.

17  Q.    Are you a published author?

18  A.    Yes, I am.

19  Q.    Approximately how many articles have you written in

20  the fields of computer science and source code and software

21  development?

22  A.    30 to 40 papers.

23  Q.    Are you a member of any organizations that are

24  relevant to your expertise here?

25  A.    I am a member of the IEEE and the ACM.

Frederiksen-Cross - direct

1         MR. STIEGLER:  Your Honor, we would tender Ms.

2    Frederiksen-Cross as an expert in computer science, source

3    code and software development.

4         MR. HANNAH:  No objection, Your Honor.

5         THE COURT:  She is accepted as an expert in

6    those fields.

7    BY MR. STIEGLER:

8    Q.   Ms. Frederiksen-Cross, were you here in court to hear

9    the testimony of Dr. Medvidovic?

10   A.   Yes, I was, for most of it.  And I have read the

11   remainder in the transcripts.

12   Q.   Before we go there, can you give us a high-level

13   summary of the opinions that you have in this case as an

14   outline?

15   A.   It is my opinion, based on the materials that I have

16   reviewed, that the '194 patent is not infringed by the

17   accused Websense products.

18   Q.   Without going into too much detail, can you explain

19   your opinion regarding the absence of a list of suspicious

20   operations?

21   A.   Yes.  All of the independent claims of the '194 patent

22   have a requirement for a downloadable security profile data

23   that includes a list of suspicious operations.  Having

24   reviewed the source code and the technical documents in this

25   matter, particularly the source code, it is my opinion that

Frederiksen-Cross - direct

1    Websense does not use or produce such a list.

2    Q.    Now, you were here to listen to Dr. Medvidovic's

3    testimony.  Are there some points on which you agree with

4    Dr. Medvidovic regarding this point about no infringement

5    based on a lack of a list of suspicious operations?

6    A.    Dr. Medvidovic and I both agree that the processing

7    that is relevant to the '194 patent requires the use of a

8    downloadable security profile data that is analyzed at the

9    gateway, not somewhere else, in order to determine whether

10   or not a particular downloadable should be blocked.

11   Q.    Do you agree with Dr. Medvidovic that the '194 patent

12   does not cover signature scanning?

13   A.    Yes.  He and I are in agreement on that point.

14   Q.    Do you agree with Dr. Medvidovic that the '194 patent

15   does not cover any processing that happens offline away from

16   the gateway?

17   A.    Absolutely.  That is another point that we agree upon.

18   Q.    Now, do you have some points of disagreement with Dr.

19   Medvidovic on other topics relating to this general opinion?

20   A.    Yes, I do.

21            One of those --

22   Q.    If I can ask you, or Mr. Grimm, to please bring up --

23   we can't use that slide.

24            Let me just run you through these opinions.  Do

25   you agree with Dr. Medvidovic that there is a downloadable

Frederiksen-Cross - direct

1    security profile data that includes a list of suspicious

2    computer operations in the Websense Gateway product?

3    A.    I do not agree with Dr. Medvidovic on that point.

4    Q.    Do you disagree, then, with Dr. Medvidovic about

5    whether this RTSS component decomposes a downloadable at the

6    gateway?

7    A.    Dr. Medvidovic said that it does, and I disagree with

8    that point.  I do not believe that it does.

9    Q.    Do you agree with Dr. Medvidovic's testimony about how

10   the RTSS analytic detects malware?

11   A.    No.  I believe that his analysis is incomplete with

12   respect to how the RTSS system operates, and that as a

13   result, he has formed some conclusions that are flawed and

14   incorrect with respect to how that RTSS system operates.

15   Q.    Do you disagree with Dr. Medvidovic regarding his

16   opinions about how processing is performed by this RTSS

17   analytic?

18   A.    I absolutely have some points of disagreement with Dr.

19   Medvidovic.

20   Q.    At a high level, can you tell us what the Websense

21   Gateway product does?

22   A.    The Websense Gateway product is designed to intercept

23   a customer's request for a downloadable, and at the gateway

24   to analyze that downloadable in order to be able to

25   determine whether or not it should be blocked.

1          We don't dispute that it does that.

2          The difference is that it does not do it, in my

3    opinion, using the same techniques are required of the '194

4    patent.

5    Q.   Can you summarize for us how the Websense Gateway

6    product works differently from the method that's claimed in

7    the '194?

8    A.   The primary difference is the fact that the '194

9    relies on this downloadable security profile data that

10   includes a list of suspicious operations and the evaluation

11   of that data against a policy in order to decide whether or

12   not the downloadable should be blocked.

13          In contrast, the Websense system actually uses a

14   more traditional signature-scanning approach.  It does not

15   contain the logic that is capable of identifying or

16   determining that a particular string of text is in

17   operation.  And it does not have the ability to evaluate any

18   aspect of the behavior.  It merely signature matches.

19   Q.   So let's focus on what you were asked to do in the

20   case.

21          Mr. Grimm, if you could bring up Slide 200-5.

22          Can you explain to us what you were asked to do?

23   A.   I was asked to come here today and, as I mentioned, to

24   provide you with an overview of how those products work and

25   to show you some evidence related to that; to provide an

1    overview of the '194 patent to the extent there are any

2    issues that I will be addressing specifically that you may

3    not have heard.

4              I have also been asked to analyze the Websense

5    source code, the technical documents, and the testimony of

6    Websense engineers in order to formulate an understanding of

7    how that source code works and to provide you with my

8    opinions about infringement based on that analysis.

9              Then finally, I was also asked to review the

10   reports that were prepared by Finjan's experts, and to

11   address any technical inaccuracies that I felt were present

12   in those reports or the testimony that they had provided to

13   you here in court today.

14   Q.   So, how do you know what the terms of the '194 patent

15   mean?

16   A.   It's typical in a patent case that some terms are

17   actually put before the Court and the Court provides what's

18   called "construction," where the Court gives us our guidance

19   for definition.

20             And then with respect to other terms, the Court

21   has directed that they be interpreted with respect to their

22   ordinary use as would be understood by a person of ordinary

23   skill in the art at the time of the invention who had

24   applied or who had read the patent specification, read the

25   patent in its entirety, and been familiar with the file

1    history.

2    Q.    Did you read the file history?

3    A.    Yes, I did.

4          MR. STIEGLER:  Your Honor, may I approach to put

5    up a board?

6          THE COURT:  Yes, you may.

7          MR. STIEGLER:  Can the ladies and gentlemen of

8    the jury see that?  Can it be seen?

9          (Jurors respond, "Yes.")

10   BY MR. STIEGLER:

11   Q.    I have presented you with a blow-up board of Claim 1

12   of the '194 patent, which is Trial Exhibit 6297.

13         Now, when Mr. Andre was presenting the claim

14   language of the '194, he had it broken down into three

15   elements.  Were you here for that?

16   A.    Yes, I was.

17   Q.    And you have it broken down here into six elements.

18         Why did you do that?

19   A.    Some of the claim elements are rather lengthy and

20   contain compound clauses, so this is exactly the same

21   language in the same order, but I have separated the

22   elements a little bit to make it easier for me to talk about

23   certain things with you so I can kind of take them one at a

24   time.

25         Of course, in a patent claim, every word

Frederiksen-Cross - direct

1    matters, and all of these requirements, whether you lump

2    them as two or three or four, must still be present

3    element-by-element in the accused invention for infringement

4    to occur.

5            This just lets me talk about chunks of it a

6    little bit more easily with you.

7    Q.    What is your understanding as to whether every element

8    as described in the language has to be satisfied in order

9    for there to be any infringement?

10   A.    It absolutely does.  If something is missing, the

11   accused device cannot infringe under the rule of

12   infringement.

13   Q.    Does it matter whether the language is broken into

14   three elements or six?

15   A.    No.  As I said, every piece of the language matters,

16   and we have to look at all of the language.  But there are

17   parts of it that Websense is not disputing, so by focusing

18   on what we do dispute, I can save you hopefully a little bit

19   of time here today.

20   Q.    Now, in addition to the patent and the file history

21   and the specification, what else did you review in this

22   case?

23   A.    I reviewed the source code, that is to say, the human

24   readable form of the programs.  It's the actual code that a

25   programmer writes in creating a program for the accused

1      products, specifically, for the Websense Security Gateway,

2      for the Web Filter, for the Websense Content Gateway.

3      Q.     And how big was that body of source code?

4      A.     The total production was about 450,000 files.  That

5      included a couple versions, so if I can just maybe point at

6      the current version, it was roughly 924,000 files, and I

7      think the current version was right around 26 million lines.

8      Q.     How much time did you invest to review Websense's

9      source code?

10     A.     I spent approximately 300 hours in that code.

11     Q.     You were here when Dr. Medvidovic testified that he

12     had only spent 30 hours.

13             What is your opinion about whether that was

14     enough?

15     A.     I think, based on the arguments that Dr. Medvidovic

16     had advanced and the evidence he has shown you, it's my

17     opinion that he did not spend sufficient time in that code

18     to form a full understanding of how it operated, and as a

19     result, he's made some leaps or some assumptions that I

20     think have caused portions of his analysis to be less than

21     fully accurate.

22     Q.     Let's take a look at the language of Claim 1 of the

23     '194.

24             Can you tell us what was important to you as you

25     were reaching your opinions in this case?

Frederiksen-Cross - direct

1    A.    Certainly.  I am going to start in the middle and work

2    my way out, if I may.

3               MR. STIEGLER:  Can the witness be allowed to

4    stand?

5               THE COURT:  Yes, absolutely.

6               THE WITNESS:  One of the most important things

7    in my opinion is this language, I mean with respect to the

8    differences, specifically, is this language about the

9    downloadable security profile data that includes a list of

10   suspicious computer operations that may be attempted by the

11   downloadable.

12              And then there is some other language that

13   informs us about what's being done with that downloadable

14   security profile.  So, for instance, it must be compared

15   against the security policy, comparing by the server that

16   downloadable security against the security policy.

17              And then, of course, the fact that this is a

18   computer-based method and that both the reception of the

19   downloadable and the comparing happen at the gateway there.

20   BY MR. STIEGLER:

21   Q.    I think it may be hard to hear you without the

22   microphone, so if I can ask you to take your seat.

23              Why was that language at Element D that says,

24   "The downloadable security profile data includes a list,"

25   and it says "a" "suspicious computer operations that may be

Frederiksen-Cross - direct

1    attempted by the downloadable," why was that significant to

2    you?

3    A.    Because that informs us about a very important

4    characteristic of the downloadable and tells us something

5    about it, about what must be there in that downloadable

6    security profile.

7    Q.    While we are on that word "a," did you understand that

8    that's a typographical error that should be "of," "the

9    downloadable security profile data includes a list of"?

10   A.    All the parties have been interpreting it in that

11   sense.  It's just a typo that slipped through in the editing

12   processing.

13   Q.    What is your understanding of what the downloadable

14   security profile data is?

15   A.    The downloadable security profile is information that

16   pertains to the specific downloadable in the specification.

17   And you heard Dr. Medvidovic say that, you know, it's

18   extracted from the downloadable.  So it's information that

19   comes right out of that downloadable, and that includes this

20   list of suspicious operations.

21              It can, of course, include other things

22   potentially like the I.D. of the downloadable that's

23   discussed in the specification.

24   Q.    What did Finjan's experts tell us, as you understood

25   it, about whether the '194 patent covers signature-based

Frederiksen-Cross - direct

1  methods?

2  A.      They both, Dr. Medvidovic and Dr. Vigna, said that the

3  '194 patent was not directed to signature-based scanning,

4  and that it did not rely on scanning byte-by-byte.  They

5  said the '194 did not rely on the byte-by-byte comparison.

6  Q.      You have used a term that we have heard before, but

7  what do you mean by a "byte-by-byte comparison"?

8  A.      In computerese, a byte, the specific ones and zeros

9  that represent a single character of data.  A byte-by-byte

10  comparison just means that you are taking one or more of

11  those characters, whether they are a printable character,

12  like an "A" or a "9" or a period, or a non-printable

13  character and just comparing that content.

14  Q.      So how does a signature-based method differ from one

15  that extracts a list of suspicious operations at the

16  gateway?

17  A.      Well, signature-based methods work by just doing a

18  comparison to see if a signature is matched.  So by

19  comparing some characters, a determination of match or no

20  match is made.

21          In contrast, something that identifies

22  operations obviously has to prepare some kind of, or some

23  kind of parsing or decomposition to locate an operation

24  within the stream that it's evaluating, and then make a

25  determination of whether or not that operation is

Frederiksen-Cross - direct

1    suspicious.

2              And in the terms of the '194 patent, then use

3    that determination or that data that's pulled out to be able

4    to, in some fashion, evaluate against the policy.

5    Q.    What is algorithmic signature scanning?

6    A.    In the very beginning, signatures were just a string

7    of characters that were reasonably unique to some program,

8    but in order to avoid false hits, it's sometimes desirable

9    to add a second string.  It's just like when you go to

10   Google and you might add multiple words to zero in on a

11   topic.  Well, by adding multiple strings, you get better

12   precision and you get fewer false hits.

13             Sometimes there are rules for how those

14   additional strings get combined.  So, for instance, you

15   might say string one and string two, but maybe that still

16   got too many false hits, so then you would analyze the false

17   hits and you would say, oh, and not string three, so that

18   those rules are the algorithmic part of algorithmic

19   signature scanning.

20   Q.    I take it you are familiar with this RTSS analytic?

21   A.    I am, yes.

22   Q.    Does the RTSS analytic use signature scanning?

23   A.    Yes.

24   Q.    What is signature scanning?

25   A.    Sometimes you can pick up characteristics of malware

3124

Frederiksen-Cross - direct

1    that are common to a family of malware, so maybe the same

2    engine has been used to develop multiple pieces of malware

3    but they all have some common signatures.

4              In that case, you have a signature, typically

5    it's an algorithmic signature also, that can be used to

6    detect a family rather than just a single piece of malware.

7    That technology has been around for a long.

8    Q.    Does this Real-Time Security Scanning analytic also

9    use generic signature scanning?

10   A.    Yes, it does, for precisely that reason, to detect

11   families or classes of malware that share a common known

12   trait.

13   Q.    Are both of these forms of signature scanning

14   algorithmic and generic?

15   A.    I am sorry?

16   Q.    Are both algorithmic signature scanning and general

17   signature scanning a form of signature scanning?

18   A.    Yes, they are.

19   Q.    And do either of them rely on extracting a list of

20   suspicious computer operations at the gateway?

21   A.    No, they do not.  The signatures are provided

22   externally and then just matched.

23   Q.    Now, we heard Dr. Medvidovic and Dr. Vigna use a new

24   term in this trial that was called, "Behavioral signatures."

25              Had you ever heard of that before last week?

1    A.    Not in this specific context, no.

2    Q.    What was your understanding of what Dr. Medvidovic and

3    Dr. Vigna said is a behavioral signature?

4    A.    They both confirmed pretty much the same thing, that

5    it's a signature that's not based -- a signature of some

6    sort that's not based on the byte-by-byte evaluation, but,

7    rather, on looking at the operations or the intended

8    behaviors, that is to say, the things that the actual

9    downloadable being evaluated will attempt to do.

10   Q.    So, what was your understanding of whether that was a

11   new term that they coined last week?

12   A.    I got the impression from Dr. Medvidovic's term --

13   testimony that he -- it was new to him, that he had first

14   heard it in the court here and wasn't too sure about it.  I

15   wasn't present for Vigna's testimony on that point, and so I

16   couldn't read much into the transcript.  I read the

17   transcript but it didn't really tell me if he felt he had

18   seen it before or not.

19   Q.    So the big question coming from that is:  Does

20   Websense's RTSS analytic use what the plaintiff's expert

21   explained to be a behavior signature?

22   A.    Not as they explained that term, because they said

23   that it doesn't depend on that inspection byte-by-byte of

24   the content.

25   Q.    Different topic.

1              You were here to listen to Mr. Hubbard's

2     testimony this morning.  Correct?

3     A.     Yes, I was.

4     Q.     And he explained what Websense means by the term

5     "ACE"?

6     A.     The Advanced Classification Engine, yes.

7     Q.     And do you agree with his explanation based on your

8     review of the technical documents in the source code?

9     A.     Yes, I do.

10    Q.     What does ACE include?

11    A.     ACE includes, or generally used to refer to those

12    analytics that run outside the Websense laboratories, so

13    that would include the analytics that run on the gateway

14    server, itself, the advanced detection AD, the advanced

15    recognition, the antivirus was added at one point in time,

16    the RTCC, the real-time content classification, and the

17    RTSS, the real-time scanning.  And it also typically

18    includes the URL filtering that's performed as a part of the

19    filter product on a separate server.

20    Q.     Did you prepare a graphic that will help us understand

21    where these analytics reside in the Websense Gateway

22    product?

23    A.     Yes.  We have a graphic for that.

24    Q.     Mr. Grimm, if you could bring up Websense 055-01.

25    Ms. Frederiksen, can you explain to us what we are seeing

1    here?

2    A.    Sure.  Over on the left-hand side, I have the Websense

3    Security Lab.  That's the offline processing that happens as

4    a part of Websense ThreatSeeker and laboratory processing.

5    That includes the sandboxing, the behavioral analysis, the

6    de-obfuscation, the de-compiling, all the things required to

7    understand that something is malware and to develop a

8    signature to detect it.

9    Q.    Let me stop you there.

10         You said "sandboxing" and "behavioral analysis"

11   offline.

12         Why is that significant to your opinions about

13   the '194 patent in Claim 1?

14   A.    We have spoken about Dr. Medvidovic and I agree that

15   what happens offline is not a part of this gateway directed

16   patent.

17         So we may see some references, especially in the

18   marketing documents, to things like sandboxing or behavior

19   analysis, but when they reference things that happen

20   offline, they are not related to what's going on in this

21   patent.

22   Q.    Tell us why that's your opinion based on the language

23   of the '194 patent, Claim 1.

24   A.    Well, for example, we see that this is a

25   computer-based method of doing things at a gateway,

1    receiving a downloadable by the server at the gateway, doing

2    some comparison by this server of the downloadable security

3    profile data that includes these suspicious operations

4    against a policy.

5              So this is all the -- the comparing, the

6    receiving are all happening at the server here.  They are

7    not happening someplace else.

8    Q.    Is that one of the points of agreement between you and

9    Dr. Medvidovic?

10   A.    Yes.  I believe it is.  And just to be clear, he and I

11   did not discuss this.  I am basing that understanding of the

12   agreement on the testimony that he provided to you here in

13   the courtroom.

14   Q.    If we work our way from left to right across this

15   diagram, 055-01, tell us what the external network is and

16   the gateway and the user, etc.?

17   A.    The external network up here, that would basically be

18   the Internet or some external computer on the other side of

19   the gateway.  This is the heart of what we are discussing in

20   the '194 patent.  This is the list of analytics that run at

21   that gateway that I just listed off a minute ago, Advanced

22   Recognition, Advanced Detection, and includes the RTSS

23   component that's been confused.  Just to be clear, RTSS is

24   the only component that had been accused by Finjan.

25              They don't accuse those other things, the AR,

Frederiksen-Cross - direct

1    AD, AV, RTCC.

2              Then over here, we have the URL filter and the

3    policy decision making.  That's a part of a legacy code.

4    Q.   Mr. Grimm, if you could take that graphic down.  Let's

5    take a look at Trial JTX-424, and tell us whether this

6    document helps explain how this Real-Time Security Scanning

7    detects and blocks malware?

8    A.   Yes.  This document is one of the early design

9    documents from the Gateway product.

10   Q.   And if you could, Mr. Grimm, turn to page 7, which is,

11   ends in Bates No. 190.

12              Ms. Frederiksen, please walk us through the

13   process used by Websense with the RTSS analytic?

14   A.   I am going to start down near the corner at the

15   Websense laboratory.  That's where all the information from

16   ThreatSeeker Network comes in, the Websense scientists

17   analyze it, and they develop the signatures.

18              Then the signatures are sent to download

19   analytic databases.  The signatures are downloaded actually

20   to the gateway but they are used by the analytic components

21   that run on the Gateway machine.

22              So here you have at the top, the Internet Cloud,

23   you have the gateway, you have the filter, and you have the

24   user's interaction.  When the user asks for a downloadable,

25   there is a little exchange to help identify whether or not

 1    that downloadable is already known.

 2              If it's not known, it can go the analytic, and

 3    then the analytic passes its results back up to the gateway

 4    server, which then asks the policy server, which is a part

 5    of Web Filter, to tell it what policy applies to the

 6    classifications that have been given by the analytics.

 7    Q.    So this is a schematic in a diagram, in a document.

 8    Did you confirm that that's the architecture for the source

 9    code?

10    A.    Yes.  I actually followed that path of logic from top

11    to bottom in the source code that I had available.

12    Q.    And then if we just briefly turn to Bates No. 194.

13    And Mr. Grimm, if you could blow that up so that we might

14    see it.

15              Can you tell us, Ms. Frederiksen, what this

16    represents?

17    A.    This is just another representation of that same back

18    and forth flow with respect to the exchanges between the

19    Gateway, the Web Filter, collecting the data from the

20    Internet, etc.

21              It shows exactly the same thing that that

22    previous diagram did, just a different way of visually

23    representing that.

24    Q.    Mr. Grimm, you can take that graphic down, please.

25              What did you do to confirm, in the source code,

1    that the RTSS analytic is signature-based?

2    A.    I actually studied the entire flow of logic from when

3    the analytics are first invoked, when RTSS is invoked,

4    traced through all the program logic, down to the point

5    where it makes a decision about whether or not a signature

6    has been violated, and traced all the way back.  I mean, I

7    traced the entire route of the software basically to

8    understand exactly what it did and didn't do and where

9    various things were performed.

10   Q.    Did you review Websense's marketing documents?

11   A.    I also looked at a number of documents.

12   Q.    Were there any inconsistencies between the marketing

13   documents and the technical documents or the source code?

14   A.    Quite a few, actually.  In part, it was because the

15   marketing documents seem to generally talk in, you know,

16   marketing terms, where they are trying to trump up the best

17   features of the product, so they were kind of imprecise

18   about what parts of the product did what.

19   Q.    What information did you place the most weight on?

20   A.    Well, the source code, of course, because that is

21   literally the instructions that are written and govern how

22   the program operates.

23   Q.    We have heard about, and I will just ask you briefly

24   now, about the ThreatSeeker Network, the security labs, and

25   the signatures.

Frederiksen-Cross - direct

1          What is your understanding of Dr. Medvidovic's

2     opinion about whether anything that happens offline in the

3     labs relates at all to the '194 patent?

4     A.    It's my opinion that he has stated very clearly that

5     it does not.  What's in the labs, what's in ThreatSeeker, is

6     not at issue here.  It's what's happening on this gateway.

7     Q.    Mr. Grimm, if you could bring up Websense 005-03.  We

8     have seen this before, but briefly tell us -- explain the

9     process that Websense uses.

10    A.    Well, in order to proactively collect information

11    about threats on the Internet, Websense uses this series of

12    honey pots and also machines that go out and crawl the

13    network looking for trouble, and they pull all that stuff

14    back to the laboratories, the offline laboratories where

15    it's analyzed for signatures.

16    Q.    And it says "sandbox" there in the left side.  What is

17    your understanding of that?

18    A.    The same as Mr. Hubbard's, that a sandbox is just a

19    safe environment where you can run something dangerous, or

20    potentially dangerous so that you can analyze it without

21    destroying your system but still see it in operation so you

22    can know what it's doing.

23    Q.    Mr. Grimm, if you can go to Websense 006-04.

24          Ms. Frederiksen, tell us what we are seeing

25    here.

1    A.    This sort of fills out some of the rest of the

2    processing.  So once it's collected and sent to the

3    laboratories, the programs run in those safe environments

4    where they can be studied and their actual behavior and

5    intent determined.

6              Once that's done, the laboratories contain a

7    signature by determining byte strings that represent fairly

8    uniquely this particular piece of malware so they can be

9    used kind of like that license plate on the car to identify

10   a vehicle, in this case, to identify malware.

11             Then the laboratories push those signatures 24

12   by 7 out to the customers every five to 15 minutes, so as

13   fast as they can identify a signature, they proactively push

14   that out to their customers to try to get that signature to

15   them before they encounter that particular piece of malware.

16   Q.    Thank you, Mr. Grimm.  You can take that down.

17             Now, Dr. Medvidovic used a document that was

18   PTX-1474.  Mr. Grimm, if you could bring that up.

19             Ms. Frederiksen, did you consider this trial

20   exhibit to reach your opinions?

21   A.    Could you show me the next page of it so I can see

22   what's attached to this email?

23   Q.    Yes.

24   A.    Yes, I did.

25   Q.    Okay.  Dr. Medvidovic said that this document helped

Frederiksen-Cross - direct

1    prove his opinion that Websense infringes the '194 patent.

2    Do you recall that?

3    A.     I recall his testimony about that, yes.

4    Q.     Do you agree?

5    A.     I do not agree with what this document used to prove

6    infringement, no.

7    Q.     First of all, let's look at what the document is, if

8    you can blow up the header of that e-mail.  Do you have an

9    understanding of who Stephan Chenette is?

10   A.     Yes, I do.

11   Q.     What was his role at Websense?

12   A.     He was one of the principals at Websense, on the

13   technical side.

14   Q.     What is your understanding of the document he is

15   attaching here?

16   A.     This document when I inspected the attachment is kind

17   of a quick start or quick reference that would be used, for

18   instance, by a scientist in the lab who is creating new

19   signatures.  It tells them how to enter the signature data

20   once they have identified it into the database system.

21   Q.     If we can turn to the next page, which ends in Bates

22   972.  Mr. Grimm, if you can blow up from Point E all the way

23   down through the table.

24          Ms. Frederiksen-Cross, please tell us what this

25   represents?

Frederiksen-Cross - direct

1    A.    This is where the Websense scientists would enter

2    their information into the system.  For instance, you see

3    it's got an ID for a particular threat.  It tells you the

4    kind of format that it applies to.  It tells you the

5    category and reason bucket that they are going to assign to

6    that particular signature.

7              It gives us some other information.  Gives you

8    the subsignatures.  Those are the actual character strings

9    that are going to be searched for.  Down at the bottom here,

10   if it is an algorithmic signature, it gives you the rules

11   that are going to be used to combine those subsignatures.

12   Q.    Now, Dr. Medvidovic offered the opinion that

13   subsignatures are precisely lists of suspicious computer

14   operations and nothing more.

15             Do you agree with that?

16   A.    I absolutely do not.  And this document actually

17   provides a definition for subsignature, if we go another

18   page into the document, if you could bring that up for me.

19             As you can see here, the document that is given

20   to the scientist says the subsystem is the actual partner to

21   be used in actual subsignature matching.  So it is that

22   character string.

23   Q.    What is your understanding of what is meant by the

24   actual pattern to be used?

25   A.    Internally in Websense's code and, in a lot of their

1    internal documents, not the external facing ones, they call

2    substrings or patterns, they use those two terms

3    interchangeably, and it is the actual string of characters,

4    the ones and zeroes or the hexadecimal recitation gets used

5    to search for strings in characters in the bytes of a piece

6    of malware that they are evaluating.

7    Q.    What did you do in the source code to confirm that

8    these subsignatures are just subsignatures of patterns?

9    A.    I actually, again, traced in the code to find out how

10   the subsignatures were being used and to look at the type of

11   inspection, the type of logic that they were used for.

12          And I was able to verify by that analysis that

13   all they were doing was comparing a string of characters

14   from the subsignature to a string of characters that was in

15   a context buffer.  So just that byte pattern matching that

16   is the traditional signature matching.

17   Q.    Mr. Grimm, you can take that document down, if you

18   would.

19          What kind of content does the realtime security

20   scanning analytic check?

21   A.    It only checks text-based content.  Other types of

22   content are routed to different analytics.  So RTSS just

23   does text based, like HTML or textual kinds of content, like

24   a document.

25   Q.    Does Websense use other names for signatures or

Frederiksen-Cross - direct

1   subsignatures?

2   A.      Yes to both of those questions.   For subsignatures

3   they are often called patterns internally in the

4   documentation and in the comments in the code.   Sometimes

5   they are still called subsignatures there.

6           With respect to the signature as a whole, the

7   multiple subsignatures and their rules and category reason,

8   those are sometimes called threats or threat IDs or threat

9   profiles or a CAT profile.   They tend to use the threat ID

10  terms internally in their documents and the threats attack

11  profiles, threat profiles in their marketing literature.

12          But it's all the same thing.

13  Q.      Were you here for Dr. Medvidovic's testimony and

14  opinion that threat profiles or attack profiles were nothing

15  more than a list of suspicious operations?

16  A.      I heard him express that opinion.

17  Q.      Do you agree?

18  A.      No, I don't.   I have studied some of these threat

19  profiles and it's very clear that they are not just lists of

20  suspicious operations.

21  Q.      Let me ask you to take a look at PTX-1322.   This is

22  one of the documents that Mr. Medvidovic, or Dr. Medvidovic,

23  referred us to.   Did you study this document?

24  A.      Yes, I did.

25  Q.      Is there anything significant to you, perhaps at Page

Frederiksen-Cross - direct

1  731, that informs your opinions?

2  A.    Yes.   If you could blow that up near the top there.

3            Here is a statement basically that web

4  signatures are the attack profiles for web-based attacks

5  that are updated every five minutes.  Just saying these

6  terms are essentially synonymous.

7  Q.    While we are on this document so we don't need to

8  return to it, if you could turn to Bates No. 740.  Mr.

9  Grimm, if you could blow that up.

10           Is there anything significant on this page that

11  has informed your opinions?

12  A.    Yes.   This page shows where various things happen.

13  And I don't know how easy it is for the jury, so I will read

14  it off the screen here.

15           This first column is the Web Security Gateway.

16  The middle column is e-mail security.  And then the

17  rightmost column is the ThreatSeeker labs.

18           And as you can see in the highlighted entry,

19  behavioral analysis is only performed at the labs.  That's

20  where they detect and analyze the behavior of malware in

21  order to determine whether it is malware, and then develop

22  the signature.

23  Q.    Did you confirm that in the source code?

24  A.    With respect to the fact that it doesn't happen in

25  RTSS, yes.  I didn't have the entire ThreatSeeker Network

Frederiksen-Cross - direct

1    because it wasn't accused.

2    Q.    If we could turn to Trial Exhibit 406, this is another

3    document that I believe Dr. Medvidovic used.  This is called

4    the Realtime Security Scanner Design Specification.

5           Did this document inform your opinion?

6    A.    This was another technical document I looked at, yes.

7    Q.    If we could turn to Bates No. 168, please.

8           Mr. Grimm, if you could blow up that first

9    paragraph.

10          What did you find significant in that language?

11   A.    Well, this is the first page of this document that

12   states the purpose, that it describes the realtime security

13   scanner.  And it says straight up in the very first

14   paragraph, RTSS uses a signature approach to determine

15   whether scanned data is malicious or not.

16   Q.    Mr. Grimm, if you could turn to Page 169, and blow up

17   the box where it says content scanning, the large box on the

18   left-hand side, it says scanner interface.

19          Ms. Frederiksen-Cross, what did you find

20   significant here?

21   A.    Well, again, this is talking about the patterns I

22   mentioned, you know, getting the patterns, doing the content

23   scan and passing back the results.

24          If we could go to -- this is for the RTSS

25   analytic, specifically.  If we go to the bottom of that page

Frederiksen-Cross - direct

1    also, there is a comment that I think is important.

2              The very last, if you could blow up this

3    section, please, Mr. Grimm.

4              So you see here, content scan compares data

5    stream with signatures and subsignatures.

6    Q.    Then if we could turn to the next -- actually, it's

7    Page 174, Mr. Grimm.  What was the significance to you of

8    this table?

9    A.    The property match table is a table of yes and no

10   values essentially that say which particular signature,

11   subsignature properties have been matched during the

12   processing analysis.

13   Q.    Mr. Grimm, if you could turn to Bates ending in 172.

14   A.    Just to be clear, this is used as a part of the

15   filtering that we are going to talk about in a minute.

16   Q.    First, please blow up the schematic.  What did you

17   find significant, Ms. Frederiksen-Cross, about Figure 4?

18   A.    This figure talks about something called a bloom

19   filter prescan.  If you recall, Dr. Medvidovic told you that

20   the parsing that takes place that's shown in this diagram is

21   the parsing or decomposing required for Claim 32.   I

22   disagree very strongly with that opinion.

23             The parsing that is taking place here is

24   breaking HTML content into various types of buffers that

25   will be scanned by specific groups of signatures.  But it is

1    not breaking them down to a list of suspicious operations.

2              The other thing is, he told you at one point

3    that the bloom filter creates the list of suspicious

4    operations or the downloadable security profile.  Again, I

5    can't agree with that.  A bloom filter is a filter that's

6    used basically to throw things away, not to ever include

7    anything or identify it as matching.

8              If we could blow up the bottom of that page...

9              It tells you right here that the bloom filter is

10   used as a filter to filter most traffic that never matches

11   any signatures.

12             I use bloom filters in my forensic work.  By

13   definition, a bloom filter can never prove a match.  It's

14   like the letters on the back of an encyclopedia.  If you are

15   looking for an article on penguins and you are holding the

16   D&E Encyclopedia, you know you don't need to bother there,

17   you can put it back, because it is not going to be in that

18   group.  And it directs you, if you are looking for an

19   article like Penguin that starts in P, it directs you to

20   which portion of the encyclopedia it will be worth

21   searching.  But it doesn't guarantee you there is an article

22   on penguins in there.  It just tells you, if you are going

23   to find it, it's going to be here.

24   Q.   What is your understanding of whether Dr. Medvidovic

25   confused the letters BF to mean binary file as opposed to

Frederiksen-Cross - direct

1    bloom filter?

2    A.    Yes.    There is another document that talks about the

3    bloom filter processing that we will see in a minute.    He

4    told you on that that BF stood for binary file.    In

5    actuality, if you look at that document and its surrounding

6    documents, it's very clear that on that document as well, BF

7    is talking about the bloom filter.

8    Q.    Did you confirm that in the source code?

9    A.    Yes, I have been all over that bloom filter code.

10    Q.    Finally, on this document, Page 12, ending in Bates

11    177, was there anything significant about this Figure 9 that

12    informed your opinions?

13    A.    This figure, the red boxes, many of them, at least the

14    red and yellow ones, are all about signature.    How to get a

15    signature.    How to match a signature.    How to say that you

16    have got a signature matched.

17            I followed this logic in the program in order to

18    confirm what was going on here as well, so I could

19    understand the entire process.    This is all within RTSS.

20    Q.    Let me switch to a different trial exhibit, which is

21    JTX--

22    A.    Could I make one point on this?

23            At one point Dr. Medvidovic told us that this

24    portion of this chart was comparing the signature against

25    the policy, that when it said, you know, if there are

1    threats -- he said this was essentially the same as parsing

2    the policy.  I don't want to misstate what he said.  In

3    fact, this is not.  This is all processing that happens

4    within RTSS.

5            RTSS never checks policy.  It just checks

6    categories and reason codes that are sent up to the gateway

7    server, which sends it to another server to evaluate.  So I

8    just wanted to point that out while we were talking about

9    this.

10           MR. STIEGLER:  Your Honor, I am about to change

11   to another trial exhibit.  I can continue or take a break.

12           THE COURT:  Let's continue.

13   BY MR. STIEGLER:

14   Q.    Trial Exhibit 473, Mr. Grimm.

15           Did you consider this document in forming your

16   opinions?

17   A.    I looked at this document as well, yes.

18   Q.    If we could turn to Page Bates 9952.  What did you

19   find significant about this page?

20   A.    Again, these are documents in this particular page

21   similar to those we have already seen that talk about

22   reading the pattern and using the pattern scan.

23   Q.    Those patterns are what?

24   A.    Those are the subsignature patterns, the actual

25   character strings that are used for matching.

Frederiksen-Cross - direct

1    Q.    Mr. Grimm, if you could turn to Page 953.

2          Did you find this important?

3    A.    Just more of the same.  It's another way of

4    representing some of the processing that goes on with

5    respect to scanning those patents.

6    Q.    And, Mr. Grimm, Page 956.

7          What was significant to you here?

8    A.    More discussion of the use of signatures.

9    Q.    And Page 958, please.

10         This refers to signature syntax.  What does that

11   mean?

12   A.    The actual signatures have a formal syntax so the

13   program knows how to read them and how to interpret what

14   part of the signature is a rule and what part is a little

15   scanning snippet -- a little byte code to match.

16   Q.    Page 959, tell us what you found significant here?

17   A.    Again, this is more data about the signature syntax.

18   Q.    What do you mean signature syntax in the context of

19   these segments?  What is that telling us?

20   A.    This particular signature is talking about one of the

21   types of rule-based signatures that is giving some

22   information about the context, if the word occurs once so

23   far of another word kind of thing.

24   Q.    Okay.  Now, another trial exhibit on which Dr.

25   Medvidovic relied, or one very similar to it, JTX-417,

Frederiksen-Cross - direct

1    please.

2                First, Mr. Grimm, if you could blow up the very

3    top, Change History.

4                What is this document?

5    A.    This is a document that was written early on in the

6    RTSS development and then kept updated.  It defines the

7    signature structure.  It talks about what a signature is,

8    what its anatomy is and what it can contain.

9    Q.    What is your understanding of how this document was

10   used in the Websense Security Labs?

11   A.    It was used as a teaching document to teach people how

12   to write properly formed signatures.

13   Q.    Mr. Grimm, if you could blow up the introduction

14   paragraph.

15               What did you find significant here?

16   A.    Again, this just confirms my understanding that this

17   is a document used to explain the analytic.

18   Q.    And, Mr. Grimm, if you could blow up Box No. 2, Sample

19   Definition Source, down to subsignature -- yes.  You have

20   got it.  You are ahead of me.

21               Would you please walk us, Ms. Frederiksen-Cross,

22   through what this information is telling us?

23   A.    First of all, it tells us that it is a signature to be

24   applied to HTML content.  It tells us the category and the

25   reason code that were assigned by the scientist to this

Frederiksen-Cross - direct

1    particular signature.  And it gives us three subsignatures,

2    subsignatures one, two, and three, that contain the search

3    strings that will be used in evaluating this signature.

4    Q.    So let's slow down just a little bit.  At the very top

5    it says Note the following is a sample definition source.

6          What is your understanding of what this is

7    communicating?

8    A.    Well, this is the format that a signature would look

9    like after it was written by one of the scientists, in order

10   to protect their treasure trove of signatures.  Websense

11   actually encrypts these and they are used encrypted on their

12   system.  But this is what it looks like before it's

13   encrypted.  That way nobody can steal them.

14   Q.    The first box that says category equals malicious

15   websites and reason Rule 3 equals reason ID, what are those?

16   A.    Those are the category and reason that will be

17   returned by an analytic that would use this signature.  In

18   this case it would be the RTSS.  So if this signature was

19   matched, that category and reason code that are hard-coded

20   in the signature get assigned to whatever it matches.

21   Q.    If we now move down to the next -- Mr. Grimm, go back

22   to where you are were.  The next yellow highlight where it

23   says subsignature and it has content script keyword and it

24   says "shallexecute."  What is that?

25   A.    This part is actually a comment, over on the other

3147

Frederiksen-Cross - direct

1    side here you have the actual computer byte pattern that

2    would be used to locate those particular characters.

3    Q.    What do you mean that that is the particular byte

4    pattern to locate those characters?

5    A.    In the memory of the computer, a period appears as a

6    2e, and an S appears as the numeric value 73.  This is the

7    code that is used inside the computer to represent

8    characters and numbers.

9          So each one of those sets of two letters or

10   numbers represents one character that's a part of the string

11   that is being searched for.  That's just how stuff looks

12   inside the computer.

13   Q.    Does that mean that this signature is looking for the

14   word shallexecute?

15   A.    It is something for that specific character string,

16   yes.

17   Q.    Could that character string spell out anything?

18   A.    It could be any kind of content.  It's just looking

19   for a pattern.

20   Q.    Is that an example of a list of suspicious operations?

21   A.    No.  This is an example of some specific characters

22   that a scientist had said might be relevant.  But this would

23   be matched if it occurred in a comment, this would be

24   matched if it occurred in an operation.  It would be matched

25   if it occurred in any kind of text, so long as it was in the

1    appropriate context that this is directed to.  So there is

2    no processing to say something is or isn't an operation.  It

3    can't tell an operation from a comment from just text.

4    Q.    While we are on this subject, Mr. Grimm, if you could

5    go to Bates number 915 at the bottom half of the page.

6    Please blow that up.

7                 There is some rather offensive language on the

8    right-hand side there.  What is your understanding of what

9    that is?

10   A.    Well, again, that is a comment with the human readable

11   content of what these characteristics refer to.  In this

12   particular case, this black scorpion malware leaves a

13   message on the system, "Bleep you, Systemadmin.  Black

14   Scorpion is in your system."  That happened to be the

15   signature that the scientists picked to identify this

16   particular malware, because it's not likely something benign

17   is going to leave that message in your system.

18   Q.    So when an RTSS signature like that is looking for a

19   match, what is it looking for?

20   A.    Same as the other one, just a string of characters.

21   Q.    That in this case would spell out those obscenities?

22   A.    Right.  The numbers and letters correspond, every two

23   corresponds to one of the characters you see on the other

24   side.

25   Q.    Mr. Grimm, if you could return to Bates No. 910 and go

Frederiksen-Cross - direct

1     down to the very bottom yellow highlight.  If you could

2     raise that up on the screen.  Thank you.

3              Here we see something called Constraint.  What

4     is that?

5     A.    This happens to be an algorithmic signature.  So these

6     are the rules, saying, you know, you need one and two and

7     three and four and you need to have at least two of them but

8     it could be any two of that set.  That is the particular

9     set.  If you have two of these strings from the

10    subsignatures, we are going to consider it a match.

11    Q.    So is that an example of an algorithmic signature?

12    A.    Yes.

13    Q.    And while we are on this document, to save some time,

14    Mr. Grimm, if you could please turn to Bates No. 911.  Blow

15    up the yellow highlighted box.

16              What is this, please, Ms. Frederiksen-Cross?

17    A.    This is the list of categories that the RTSS analytic

18    uses.  Now, these were all used in the earlier products, the

19    URL filtering product as well.  These are the specific ones

20    that RTSS would generate.

21    Q.    Does this represent a list of suspicious operations as

22    required under Claim 1 of the '194 patent?

23    A.    No.  Each of these categories is just a bucket that's

24    assigned to a group of signatures, where the scientist has

25    said, you know, if you find this kind of signature, it's

Frederiksen-Cross - direct

1    hacking or it's spyware.  But it's just a bucket for

2    recording and policy management purposes.

3    Q.    Mr. Grimm, if you could turn to Bates No. 912 and blow

4    up the yellow highlighted box.

5          What does this represent?

6    A.    This is 12 of the 15 reason codes.  The other three

7    were on the previous page.  But these are the reason codes

8    that RTSS generates out of all the possible reason codes

9    that the Websense product uses, these are the 15 that it

10   happens to use.

11   Q.    Now, is it possible for you to show us very briefly in

12   the actual source code where the RTSS signatures are used?

13   A.    Yes.  Where would you like to start?

14   Q.    I believe at RTSSScriptContentScan does.  Are you able

15   to bring that up?

16   A.    I think so.  I think I have that here.

17         We are getting out of hibernation, but we are

18   doing it slowly.  What you might want to do is go on to

19   other questions.  We can get that out of hibernation.

20   Q.    It is coming up.  What does RTSSScriptContentScan do?

21   A.    That is a function within the RTSS program that is

22   responsible for, as the name implies, scanning some of the

23   content that might be found within the HTML scripting

24   portion.  So it invokes various analytics.

25         You know, if I can check my cheat card, that

1    might be one we have.

2    Q.    We do have this in hard copy.

3    A.    If we could just do that in hard copy it would be

4    faster than waiting for this to wake up.  I am not sure what

5    has happened, but it's gone catatonic on me.

6    Q.    Mr. Grimm, if you could bring up JTX-478 at source

7    code Page 253.

8              And blow up the -- that's fine.

9    A.    Okay.  So first of all, I would like to point out,

10   this is in the RSS scan program.  That is the main program

11   for scanning routines for RTSS.

12             This particular routine, ScriptContentScan, is

13   used as kind of the driver for all of the various things

14   that that scanning needs to do.

15             It's sort of the high-level loop, if you will,

16   that drives the process.

17   Q.    If you turn to Websense source code document Page 256,

18   what does that tell us?

19   A.    Well, this is where at the end of the process the

20   results from the analytic, that category, and the reason

21   code, are being placed into the data structure where they

22   get passed back to the gateway program.

23   Q.    Finally, if you turn -- it looks like that's the last

24   one that I had printed out.  Is the machine still --

25   A.    On the break I will see what's going on.

Frederiksen-Cross - direct

1    Q.    Let me ask it to you this way:  Have you confirmed

2    everything that you have told us so far actually exists in

3    the source code for the realtime security scanning analytic?

4    A.    Yes.  We can actually see in there where the bloom

5    filter gets invoked and then assuming something gets past

6    that filter, where the actual scanning logic happens.  And

7    there is actually even comments in there that tells you

8    scanning signature one by one, for scanning signatures.  But

9    I have also followed -- read the code itself and followed

10   the logic and confirmed.

11   Q.    So once RTSS identifies a signature match, what

12   happens?

13   A.    Once the signature is matched, it goes back to check

14   the next signature.  And it does that until it has checked

15   all of the signatures for a particular buffer, for a

16   particular context.  And so it collects all of those

17   categories and IDs that are assigned, because it

18   potentially -- one downloadable could have more than one

19   category assigned.

20              And then it passes all of those back up to the

21   gateway, which then sends them over for policy comparison to

22   the policy server that is a part of Web Filter.

23   Q.    Did Dr. Medvidovic miss anything in the code regarding

24   a signature match logic?

25   A.    Yes.  He told you the bloom filter was where the

1    matching happened.  But all the bloom filter does, as I

2    mentioned, is prequalify it.  It allows you to throw away

3    things that have no possible signature match so you don't

4    waste computing cycles on them.

5              Then you go on and do the real match logic.  In

6    the real match logic, you are just stepping through each of

7    the subsignatures for each signature you are checking and

8    looking for that pattern match.

9              Then when you are all done doing that, you check

10   the conditions.  If it was an algorithmic signature, and if

11   the signature said it has to have A and B and not C, then it

12   checks to see if you had A and B and not C.

13   Q.    Can RTSS catch a malicious file that does not match a

14   signature?

15   A.    No.  It has no ability to catch anything unless it

16   matches a signature.

17   Q.    Some of Websense's marketing documents call this

18   proactive.  Is that correct?

19   A.    It's proactive in the sense that Websense goes out

20   there and sucks in contents from the network.  And this is

21   done in the labs, obviously, in ThreatSeeker, to identify

22   new malware and try to develop a signature and push it out

23   to its clients before the client ever encounters that

24   malware in the wild.

25              But the RTSS component itself is purely

1    reactive.  All it can do is check for signatures.  And if it

2    doesn't have a signature, it can't stop anything.  It only

3    can stop what it has signatures for.

4    Q.    What is your opinion regarding the way Websense uses

5    the phrase realtime?

6    A.    Based on what I have seen, that realtime phrase means

7    that they are out there seeking new threats in realtime and

8    they are pushing new signatures in realtime.  But the only

9    sense in which they perform realtime processing at the

10   gateway for RTSS is just the signature matching.

11   Q.    Let's change subjects --

12             MR. STIEGLER:  Is this a good time for a break?

13             THE COURT:  It probably is.  Let's take our

14   afternoon break.

15             (Jury leaves courtroom at 3:18 p.m.)

16             (Recess taken.)

17             THE COURT:  Why don't you take your seats for a

18   moment so we can chat a little bit further.

19             About this disagreement between the parties on

20   the article "a" and "the," those articles within the context

21   of an open-ended claim containing the transitional phrase

22   "comprising."

23             It is interesting to me that none of the other

24   defendants, Mr. Stiegler, have this issue.  It's also

25   interesting that it's coming up at the 11th hour.

Frederiksen-Cross - direct

1          That said, if there is a genuine dispute between

2     the parties as to the meaning, and I think we are talking

3     about the Independent Claim 1, the computer-based method

4     comprising the steps of receiving an incoming downloadable,

5     right, is that what we are talking about, Mr. Hannah?

6          MR. HANNAH:  Yes, by a server.  Yes.

7          THE COURT:  I can't discern whether, just from

8     the claim language alone -- Mr. Grimm, you can keep your

9     seat -- from the claim language alone, and I have got no

10    citation to any portion of the specification and/or the

11    prosecution -- or the prosecution history to guide me in

12    resolving what I very much believe, decidedly, is a

13    construction dispute, claim construction dispute, and I am

14    not going to punt that to the jury.  That's your burden.  I

15    am not going to get reversed on that at least.

16          So my question to you, Mr. Stiegler, is:  Do you

17    really want to go here?  Because if you want me to, at the

18    jury conference, I will construe the term, but it will have

19    to wait until then.

20          MR. STIEGLER:  Yeah.  I think we would like to

21    go there, and I may have miss phrased or described the

22    issue.  It's not so much the "a" versus "the."

23          THE COURT:  Okay.

24          MR. STIEGLER:  The real nub of it is that the

25    comparison step has to be accomplished by the same gateway

Frederiksen-Cross - direct

1    server.  So the language is that the --

2              THE COURT:  Discerned by the server?

3              MR. STIEGLER:  The comparison step has to be at

4    the gateway.  That's the essence of it.  It can't be

5    somewhere else.  The comparison has to be at the gateway.

6    And that's what is established in the file history in the

7    amendments that the plaintiff made, which is why I was

8    asking to use the file prosecution history, which makes it

9    clear, because they had to overcome prior art which had

10   already, two others had apparently invented the notion of

11   comparison somewhere outside the gateway.

12             THE COURT:  What's the element you are focusing

13   on?

14             MR. STIEGLER:  The element is a comparison step

15   which is down in my board at element C, comparing by the

16   server, which is at the gateway, the element B says, "By a

17   server that serves as a gateway."

18             And then the next piece of the element says that

19   that comparison has to be performed at the gateway, by the

20   same server at the gateway.  That's the essence of what the

21   plaintiff had to claim in order to get the patent allowed.

22   And that's what's in the prosecution history.

23             THE COURT:  You say, Mr. Hannah?

24             MR. HANNAH:  Well, it sounds like a stipulation

25   to me that "a" means one or more.  If he is going to

Frederiksen-Cross - direct

1     stipulate that "a" and "the" mean one or more, I am fine

2     with that.

3                THE COURT:  Say it again.

4                MR. HANNAH:  It sounds like, from counsel, that

5     he is stipulating, that, "a" server means one or more

6     servers, and then the reference to by "the" server refers to

7     one or more servers.  If he is making that stipulation --

8                MR. STIEGLER:  Not one or more.  The step is

9     that it has to just be the same server.  The comparison has

10    to happen by the gateway server.  And here is where they

11    gave it up in the prosecution.  Because McMannis teaches

12    examining digital signatures by the originating party, by

13    the compiling party, and by the executing party.

14               However, McMannis does not teach the step of

15    comparing a downloadable against a securities policy by a

16    server serving as a gateway.

17               And the same way -- and another reference,

18    Chang, also does not teach the step of comparing a

19    downloadable against a security policy by a server serving

20    as a gateway.

21               So what they had to give -- what they had to

22    claim to get this patent issued, that claim, was that the

23    server that acts as a -- as a gateway is also accomplishing

24    the comparison step.

25               THE COURT:  What's your reaction?

Frederiksen-Cross - direct

1              MR. HANNAH:  I have studied McMannis.  McMannis

2       uses a client side, so all they were doing was introducing

3       this to be at a -- you know, as a gateway server instead of

4       the client server, the distinction between the '194 and the

5       '962.  Again, we maintain, if counsel is going to say "by a

6       server" means -- "a" means "one or more," that's what it

7       sounds like he is saying --

8              THE COURT:  It sounds that way to me, Mr.

9       Stiegler, and I am not going to let you fudge it.  Is that

10      what you are saying?

11             MR. STIEGLER:  I think what I am saying is that

12      those two steps have to be at the same server.

13             MR. HANNAH:  Again, if he says "a" is one or

14      more --

15             THE COURT:  Can we get a straight answer?

16             MR. STIEGLER:  I am trying.

17             MR. HANNAH:  All we want, Your Honor, is what

18      the case law says, "a" means one or more, and then the

19      reference to "the," the article --

20             THE COURT:  The rule rather the than the

21      exception, are you amenable to that?  In other words, as the

22      Circuit has instructed, you are correct, the citation

23      clearly says there is situations where there is an

24      exception.  Are we in the rule or are we in the area of the

25      exception?

Frederiksen-Cross - direct

1                MR. STIEGLER:  Can I confer with my counsel for

2       just a moment?

3                THE COURT:  Please.

4                MR. STIEGLER:  We believe that we are in the

5       exception because that's what -- that's what requires that

6       you look at the specification and the prosecution history.

7                THE COURT:  Well then -- you heard him, Mr.

8       Hannah.

9                MR. HANNAH:  Yes.  I guess we have no

10      stipulation because that didn't sound like what he was

11      saying.

12               THE COURT:  It does appear that we have a

13      dispute over the meaning of this element.

14               MR. STIEGLER:  I think we do.

15               THE COURT:  I can't resolve that dispute at --

16      as this witness is on the stand.  That's not possible.  I

17      don't have -- the only thing I have is the claim language.

18      The claim language is not informative.  It's not dispositive

19      in this regard.  It's traditional language.  We have read

20      it.  It doesn't tell me what we need it to tell me.

21               So what's your suggestion?

22               MR. STIEGLER:  That I make at least an offer of

23      proof as to what the witness will testify to, and as soon as

24      the Court can make its decision, then perhaps based on that

25      decision, we read that proof, if allowable, to the jury.

1          THE COURT:  Mr. Hannah?  It seems reasonable.

2          MR. HANNAH:  The offer of proof is fine.

3          THE COURT:  And then we can --

4          MR. HANNAH:  I don't want to agree to what he is

5   going to read to the jury.  Obviously, we are going to have

6   to meet and confer.

7          THE COURT:  I didn't ask you that, Mr. Hannah.

8   That's fine, Mr. Stiegler, we will proceed in that way.

9          MR. STIEGLER:  If I can suggest, perhaps,

10  outside the presence of the jury at the end of the day,

11  perhaps I just ask some of the questions to the witness.

12         THE COURT:  Fair enough.

13         MR. HANNAH:  Thank you, Your Honor.

14         THE COURT:  Let's go.

15         MR. ANDRE:  Are we going to be able to

16  cross-examine her on the offer of proof?

17         THE COURT:  Sure.  We will let the jury go and

18  -- assuming my reporters can hang around.

19         (Jury enter the courtroom at 3:45 p.m.)

20         THE COURT:  All right, ladies and gentlemen.

21  Please take your seats.  We will continue.  Please continue,

22  Mr. Stiegler.

23         MR. STIEGLER:  Thank you, Your Honor.

24  BY MR. STIEGLER:

25  Q.    Are you familiar with the concept of literal

Frederiksen-Cross - direct

1    infringement in patent cases?

2    A.    Yes, I am.

3                MR. STIEGLER:  If I can approach and put the

4    board back up?

5                THE COURT:  Sure.

6                MR. STIEGLER:  Are you able to see?

7                THE WITNESS:  Can you move it back maybe two

8    feet?

9    BY MR. STIEGLER:

10   Q.    Mr. Grimm, if I can please have Websense 03-01.

11               First, Ms. Frederiksen, what is your

12   understanding of whether all of the claim elements have to

13   be present in order for their to be a finding of

14   infringement?

15   A.    It is -- all of the language in the claim matters in

16   every element must be present literally in order to find

17   infringement.

18   Q.    And Mr. Grimm, if you could go to Websense 030-02.

19               Does this help us identify which claims of the

20   '194 patent Finjan asserts against Websense?

21   A.    Yes.  The ones with the solid dots by them are the

22   independent claims.  They stand on their own two feet.

23               The others with the hollow dots are the ones

24   that are called "dependent claims," so they have all the

25   requirements of the independent that they depend from plus

1    whatever they add to the mix.

2    Q.    And do Websense accused products infringe any of these

3    asserted claims of the '194 patent?

4    A.    No, they do not.

5    Q.    Tell us why Websense doesn't infringe?  And if I can

6    turn you to -- we will do this without this slide -- tell us

7    why Websense doesn't infringe any of those claims based on

8    the absence of a list of suspicious operations?

9    A.    Well, all of the claims -- all of the independent

10   claims are very similar and they all have that requirement

11   for comparing, in one form or another, for comparing by the

12   server, the downloadable, security profile, pertaining to

13   the downloadable that includes a list of suspicious

14   operations.

15          Because Websense does not ever create or use

16   that list of suspicious operations, it's my opinion that it

17   does -- none of the accused products infringe any of the

18   four independent claims.  We will just focus on the

19   independents in a minute and then we will get to the

20   dependents.

21   Q.    What is significant to your opinion about whether the

22   category or reason codes constitute this list of suspicious

23   operations?

24   A.    It is my opinion that they do not.  In part because

25   there is no way you can determine from a category whether

1    any particular operation might be attempted or what that

2    operation might be.  The categories, again, are just those

3    very granular buckets that are used for policy management

4    and for reporting that are assigned for the signatures.

5    Q.    And what is the significance to your opinion that

6    Websense's RTSS analytic is signature-based?

7    A.    I am sorry?

8    Q.    What is the significance to your opinion that the RTSS

9    analytic is signature-based?

10   A.    Well, because the type of processing it uses,

11   signature-based processing, it doesn't need to create or

12   evaluate a list of evaluations to the technology malware,

13   and in fact, it does not.

14          Also, we have heard testimony from Finjan's own

15   experts that their patent doesn't apply to signature-based,

16   so that was just another confirmation for me.

17   Q.    A what is the significance to your opinions of the

18   difference between processing that occurs offline in the

19   Websense Security labs versus online at the gateway?

20   A.    Well, again, all of the independent claims apply to

21   gateway based systems, so things that happen somewhere else

22   offline do not apply.  Again, that's an understanding that I

23   believe Dr. Medvidovic and I both share.

24   Q.    Now, we talked briefly about JTX-406, and Mr. Grimm,

25   if I could have you bring back up pages 176, and we will

Frederiksen-Cross - direct

1    talk about that, and then 177.

2            Did you agree with Dr. Medvidovic's opinion that

3    this JTX-406, at Figure 8, supports finding that Websense

4    infringes the '194 patent, Claim 1?

5    A.    No, I did not.  I feel that he mischaracterizes what

6    this particular diagram represents because he said that the

7    parsing here was comparable to the parsing we will see in

8    Claim 32, which is the parsing in order to create or to

9    extract the downloadable security profile list of

10   operations.

11           And in fact, this parsing is just carving the

12   content of the html up into constituent type, so, for

13   instance, script content over here, header content over

14   there, main body content over here, but it doesn't pull out

15   individual operations.

16   Q.    Now, does your opinion apply to all of these

17   independent and dependent claims?

18   A.    Yes, it does.  They do not have this particular -- the

19   parsing he described.  I mean, obviously they have this

20   parsing to separate context.

21   Q.    Now, what is the significance in Element (c) of the

22   phrase pertaining to the downloadable?

23   A.    Well, again, the prosecution history teaches us that

24   the information that's being compared and that's used as a

25   part of this downloadable security profile pertains to the

Frederiksen-Cross - direct

1    downloadable being evaluated.  So it's not something from

2    somewhere else.  It's actually from that particular

3    downloadable, either at that point in time or at some point

4    in time.

5    Q.    Does that happen in the Websense RTSS analytic?

6    A.    No, it does not, with respect to downloadable security

7    profile data pertaining to the downloadable.

8    Q.    What about Page 177 of JTX-406.  What is your opinion

9    as to whether this document supports Dr. Medvidovic's

10   opinion that Websense infringes?

11   A.    This document does not support the opinion he

12   expressed.  The description he gave of this document was

13   inaccurate.  Again, the highlighted parts here are with

14   respect to that use of the bloom filter that is a pre-filter

15   before the matching occurs.

16             And he told you that that actually was the

17   extraction of this list of suspicious operations.  But the

18   bloom filter doesn't extract any list of anything.  It

19   basically -- it serves as that kind of index to say, is

20   there any possible match for this signature, and if not it's

21   discarded -- I mean, that particular string is discarded and

22   it goes on to look for another string that might have a

23   signature.

24   Q.    Now, if we could turn to Trial Exhibit JTX-458.  This

25   is another -- this is the functional specification and a

1    document that Dr. Medvidovic relied on.

2                Would you please turn to Bates No. 701 and tell

3    us whether you agree that the content of this page proves

4    that Websense infringes Claim 1 of the '194 patent?

5    A.    Actually, this was a page that I asked you to show so

6    that I could show the jury that within these charts bloom

7    filter and BF are used interchangeably.  For instance, you

8    see this line on the top that says If enable bloom filter

9    release BF internal structure, and then down here you have

10   the corresponding logic, enable BF release bloom filter

11   structure.

12                So they are using that BF term interchangeably.

13   It is two pages later where he made that statement about BF

14   being a binary file.

15   Q.    That is exactly where we were going.  If you could

16   turn to Bates No. 703, please.

17                Mr. Grimm, if you could blow up that table.

18                What was your understanding of Dr. Medvidovic's

19   opinion about the term BF on the bottom left-hand side of

20   this chart?

21   A.    He told you when he discussed this chart that the BF

22   was a pioneering file.  And he ignored the fact that it was,

23   in fact, just this pre-filter.  So he misrepresented what

24   this actually is doing.

25   Q.    How about the term threats, find threats in the middle

Frederiksen-Cross - direct

1    column, second box?

2    A.    He told you that with respect to this chart that the

3    threats here are a list of suspicious operations, leaving

4    one to infer, I think, that they are discussed here.  But,

5    in fact, the threats here, this chart corresponds to the

6    logic for finding a signature.  What these threats are are

7    the Websense signatures that are created offline that have

8    those little characters in them that are searched for.

9    Q.    Finally, what about the box that says More Rules?

10   What is your understanding of Dr. Medvidovic's opinion here?

11   A.    That is the box right here.  He told you that that was

12   essentially checking against the security policy.  But, in

13   fact, RTSS is not able to check against the security policy.

14   It's a different server that that information has to be sent

15   to.  All this is doing is checking to see if there are

16   additional constraint rules, if it is an algorithmic

17   signature, to make sure it's processed all the subsignatures

18   that make up this signature.

19             So he misrepresented this logic to you as well.

20   Q.    Did you verify that in the source code?

21   A.    Absolutely, I did.

22   Q.    What is your expert opinion regarding whether

23   categories and reasons that result from signature scanning

24   are really a list of high-level suspicious operations as

25   required under Claim 1?

Frederiksen-Cross - direct

1    A.    They are not and they cannot be, because by their very

2    nature they do not allow you to identify any form of

3    specific operation.  They don't even allow you to know

4    whether you have matched some signature like that "Bleep

5    you.  Black Scorpion is in your system" or some other kind

6    of signature, because they are used as category and codes

7    that are used so widely for thousands of different

8    signatures that they can't even at the highest level be

9    deemed to be a representation of an operation, because you

10   can't tell if an operation was going occur.

11   Q.    What about Dr. Medvidovic's point that categories and

12   reasons map to high-level operations.  Was he right?

13   A.    No.  Again, I don't think so at all.  Again, they are

14   just generic buckets that are used so that you can assign a

15   policy to a particular category or to a particular

16   category/reason combination.

17   Q.    Do Websense's categories and reasons pertain to any

18   particular downloadable as required in Claim 1 of the '194?

19   A.    No.  They actually pertain to the signature.  As you

20   saw when we looked at what's entered for a signature, they

21   are assigned at the time the signature is created.  So when

22   you are looking at a signature, or at a category, you are

23   looking at the category that is associated with the

24   signature.

25   Q.    Do all of those requirements that we have just

Frederiksen-Cross - direct

1    discussed, the list of suspicious operations and the

2    downloadable security profile data pertaining to the

3    downloadable, are those required in every one of the claims

4    that Finjan accuses Websense of infringing?

5    A.    Yes, they are.  They appear in each of the independent

6    claims, and because the dependent claims inherit the

7    requirements of the independent from which they depend, they

8    are also present in each of the independent claims in that

9    fashion.  So none of those claims can infringe without that

10   list of suspicious operations.

11   Q.    How many of the accused products against Websense are

12   missing both of those elements?

13   A.    They are all missing both of those elements.

14   Q.    Okay.  So has your testimony addressed all of the

15   independent claims?

16   A.    Yes, it has.  They all possess this same language.

17   And for the same reasons I have explained to you, each of

18   those independent claims would not infringe.

19   Q.    And, Mr. Grimm, if you could bring up Websense 06302,

20   please.

21         What is your opinion as to whether Claim 1 of

22   the '194 patent is infringed?

23   A.    Well, again, because it doesn't have that downloadable

24   security profile data, I feel it's not infringed.  But also

25   because it doesn't have that data, then we don't have the

Frederiksen-Cross - direct

1    comparing step that is required, either, because we don't

2    have the data that is required for the comparison against

3    the security policy.

4    Q.    And, Mr. Grimm, if you could bring up Websense 024-02,

5    please.

6              What is your opinion with regard to Claim 32,

7    does Websense practice all of the elements of Claim 32 of

8    the '194 patent?

9    A.    No, it does not.  Again, for the same two reasons

10   there at c and d that we have been discussing.

11   Q.    Mr. Grimm, if you could bring up Claim 65 on the

12   board, 025-02.

13             What is your opinion about whether Websense

14   infringes Claim 65?

15   A.    Again, Claim 65 has these same requirements.  So

16   Websense does not infringe these because it doesn't have

17   that list of operations as a part of the downloadable

18   security profile data.

19   Q.    If you could, Mr. Grimm, Websense 026-02.

20             With regard to Claim 66, does Websense practice

21   all of the elements required under Claim 66 of the '194

22   patent?

23   A.    No, it does not.

24   Q.    Is there an additional reason why Websense does not

25   infringe Claim 66?

3171

Frederiksen-Cross - direct

1    A.    Yes, there is.

2    Q.    What is that?

3    A.    If you look at this portion of the claim language

4    right here, decomposing the downloadable into downloadable

5    security profile data, again, that does not happen at the

6    Websense Gateway or as part of the RTSS product.  There is

7    no decomposing.  The decomposing language comes in, in the

8    patent, decomposing it into the downloadable security

9    profile data.  So decomposing it to create that list of

10   operations.  Because Websense doesn't do that, it doesn't

11   have to be disclosing the claim element, either.

12   Q.    Let's talk about the dependent claims quickly.

13            Mr. Grimm, if you could bring up Websense 12501,

14   please.

15            Does Websense infringe Claim 2 of the '194

16   patent?

17   A.    No, it does not.  It doesn't have the decomposing.

18   And again, because this is a dependent claim, it also has to

19   have everything in Claim 1.  So it doesn't have the list of

20   operations in the downloadable security profile, either.

21   Q.    Same question for Claim 35, which Mr. Grimm has

22   numbered 12-502?

23   A.    This one doesn't infringe because of the requirements

24   of its parent claim.  So it also does not infringe.

25   Q.    And Claim 36, please, at 12-503?

Frederiksen-Cross - direct

1  A.     Claim 36 just adds Scanning Visual Basic.  Again,

2  because the parent doesn't have all the requirements for the

3  downloadable security profile, this one does not infringe.

4  Q.     And Claim 37 at Websense 12-504, does Websense

5  infringe Claim 37 of the '194?

6  A.     No, it does not, for the same reasons.  Its parent

7  claim does not have all of the required elements.

8  Q.     What about Claim 58 at Websense 12-505?

9  A.     Again, for the same reasons, Claim 58 depends from a

10 parent and we don't have all of the elements required for

11 the parent.  So Claim 58 cannot infringe, either.

12 Q.     Ms. Frederiksen-Cross, you said something at the very

13 outset of your testimony about disagreeing with Dr.

14 Medvidovic about the scope of RTSS.  Do you recall that?

15 A.     Yes, I do.

16 Q.     Can you explain to us where Dr. Medvidovic got it

17 wrong with regard to the scope of RTSS?

18 A.     It's my opinion hearing his testimony that Dr.

19 Medvidovic did not spend sufficient time to understand how

20 RTSS actually operates before he accused it.  And as a

21 result of kind of short-cutting his analysis, if you will,

22 he left us with some assumptions that I think unfairly

23 characterized how that system operates.

24         He specifically, he told you that ACE and that

25 WTG were part of RTSS.  That means that RTSS would own all

Frederiksen-Cross - direct

1    of the other analytics.  And that is not true.  It's one

2    separate analytic off by itself.

3              He also, I think, ignored evidence that

4    contradicted his opinion of infringement.  Specifically, he

5    misrepresented, as I have already discussed, the way in

6    which RTSS matches in the parts of the code that perform the

7    matching.

8              He also misrepresented to you, I feel, the role

9    and purpose of the categories and reasons.  I do not agree

10   that those are a list of computer operations even at a very

11   high level.

12             Then finally, his testimony has some

13   contradictions that I think are irreconcilable.  At one

14   point he tells you that the DSP data must be extracted at

15   the gateway, and yet he points at threats and says here is a

16   list of suspicious operations.  Well, those threats that he

17   is pointing at are the signatures created in Websense's

18   labs.  So they are not at the gateway.

19             So even to the extent that you would say that a

20   signature is a list of suspicious operations, it is not one

21   that is coming from the extraction information, from the

22   downloadable at the gateway.

23             Then he also told you that the bloom filter was

24   how the downloadable security profile data gets built.

25   Again, the bloom filter doesn't build a list of anything

1     that can be used to compare against anything except just for

2     the qualification of whether or not a particular string of

3     text may possibly match some of the signatures in the file,

4     because you don't want to waste processing on something you

5     don't have any signatures for.

6              In those respects I think he has some real

7     problems with his testimony.  And I want to make sure you

8     are not left with an unreal understanding of how the system

9     works.

10             MR. STIEGLER:  Your Honor, can we have a quick

11     sidebar?

12             (The following took place at sidebar.)

13             MR. GRIMM:  I took the liberty of speaking to

14     our client.  And if I understand Mr. Hannah's offer

15     correctly, I think we could probably agree to it and avoid a

16     problem.

17             That is, we would agree that the general rule

18     applies and the word "a" refers to one or more servers.  So

19     we are all still free to argue that the server that does the

20     comparison has to be the same server that is the gateway.

21             MR. HANNAH:  There is one small problem.  It has

22     to say, where it says comparison by a server, that has to

23     say one or more.  Then when it says by the server, that is

24     also one or more, based on the ruling.  As long as that is

25     clear, that it is not only "a" that says one or more, also

1    when it refers to the server, it is also one or more in that

2    instance as well.

3                  MR. GRIMM:  That is fine, Your Honor, so long as

4    we are free to argue that the one or more must be the same

5    one or more.

6                  MR. HANNAH:  Sure.

7                  THE COURT:  Great.  Okay.

8                  MR. NELSON:  So we are all good on the claim

9    construction issue.

10                 THE COURT:  We are done.  It has just been

11   resolved.

12                 (End of sidebar conference.)

13   BY MR. STIEGLER:

14   Q.   Ms. Frederiksen-Cross, before we conclude, let me just

15   take I hope a few minutes to go back to a subject that we

16   should visit.

17                 What is your understanding and expert opinion

18   about what the '194 requires about the number of servers

19   that must perform the comparison step and whether that is at

20   the gateway?

21                 MR. HANNAH:  Objection, Your Honor.  This goes

22   exactly to the very issue that we were talking about.

23                 MR. STIEGLER:  That is the stipulation that was

24   reached.

25                 THE COURT:  Why don't you three talk for a

Frederiksen-Cross - direct

1    minute.

2                    (Counsel confer.)

3                    MR. STIEGLER:  I think we have agreement.

4                    MR. HANNAH:  We will see, Your Honor.

5                    THE COURT:  All right.  Fair enough.

6                    MR. HANNAH:  It's gray.

7                    MR. STIEGLER:  We will try.

8    BY MR. STIEGLER:

9    Q.    Ms. Frederiksen-Cross, in the Websense architecture,

10   and let's turn to Trial Exhibit 423, please, I believe

11   that's the one, at Page 644.  Where is the gateway server in

12   this architecture?

13   A.    This is the gateway server right here, WTG.

14   Q.    And where is the policy server?

15   A.    The policy server is a part of the legacy Web Filter

16   server.

17   Q.    And where does the comparison step occur?

18   A.    The comparison step happens at the policy server over

19   here.  You can see this line going across, saying get the

20   policy passing in the analytic categories and you can see

21   the response coming out to allow or block.

22   Q.    And test what the function of the gateway server is?

23   A.    The gateway server receives the downloadables and then

24   it's also responsible for invoking, or running the analytic

25   components, which are RTSS and its cousins down here, the AD

Frederiksen-Cross - direct

1    and the AR and the AB and RTC that we talked about briefly.

2    Q.    And tell us what the policy server does that is inside

3    the Web Filter?

4    A.    The policy server actually kind of has two functions.

5    It provides the handle whereby users can enter what they

6    want to have happen for a certain category, and once that is

7    in the database, when the policy server gets a category

8    decision from one of the analysts, they are passed along

9    from the gateway from the analytics.  It looks up the

10   appropriate policy, and it just goes to the database and

11   looks at that policy based on the category and ID's that

12   it's passed.

13   Q.    Can you take a look at Trial Exhibit 441.  What is

14   this document?

15   A.    That is the installation guide that tells one of

16   Websense's customers how to install the product.

17   Q.    If you could, Mr. Grimm, turn to Page 231.  In the

18   middle of the page, I believe you will see a paragraph that

19   begins, "If you subscribe," yes, "If you subscribe" in the

20   middle of the page, what was significant to you about this

21   language?

22   A.    Well, I thought this was important to show because it

23   says if you subscribe to the Web Security Gateway, you get

24   the Websense filtering software and the Content Gateway, as

25   well as some other components there, the SSL manager for

Frederiksen-Cross - direct

1    security, for encryption.

2    Q.    If you would, Mr. Grimm, turn to Page 12, which is

3    Bates 240.  Ms. Frederiksen, what did you find significant

4    about this language?

5    A.    This language says that you have to install the

6    filtering software before you install the Web Content

7    Gateway, which is that part of the Websense Gateway, and

8    actually, that's echoed at the top of the page on the very

9    top line as well which is part of the list of prerequisites

10   that you have to have before you can install the WSG

11   software.

12   Q.    So you have to install the policy server software

13   before the Gateway server?

14   A.    Right.  It says at the bottom here, you know, make

15   sure you make a note of the IP address -- that's the address

16   you would put messages to for that machine -- because you

17   are going to need that when you install the rest of the

18   system.

19   Q.    Were you here for Dr. Medvidovic's testimony about

20   distributing computing?

21   A.    Yes, I was.

22   Q.    Did you agree with his opinion?

23   A.    I did not.

24   Q.    Why not?

25   A.    In order to use the type of architecture that

Frederiksen-Cross - direct

1    Dr. Medvidovic described where components are spread across

2    multiple servers, there are specific technologies, like Dcom

3    or dot net or other distributed architecture that allows you

4    to direct processing to these machines.  And the Websense

5    software doesn't use that paragraph.

6              I don't dispute that somebody could write a

7    system like that, but the Websense software doesn't use it.

8    Instead, it uses two separate software servers that exchange

9    messages via this WISP protocol.

10   Q.    If you can turn to JTX-365, and specifically Bates

11   ending in 197, if you could turn there.

12             Tell us what this is and why it's significant to

13   you.

14   A.    This is significant -- and I saw a number of such

15   documents -- this talks about the annual subscription and

16   maintenance costs.  And as you can see, you can license the

17   Web Filter product separately from the Web Security Gateway.

18   And, in fact, the Web Filter product can be installed and

19   run by itself as a stand-alone product without any part of

20   the gateway.  That was the original Websense product from

21   way back in 1996, and it had the policy server and those --

22   the URL filtering components.  And then later, they

23   developed Websense as an add on.  So this was just some

24   information that confirms that that is a separate server

25   system that can be licensed separately.

Frederiksen-Cross - direct

1          The policy server is a part of that Web Filter.

2     Q.    What did you do to review the code to confirm that

3     this policy server is separate from the Gateway server?

4     A.    I examined the code itself and looked at how the

5     policy server worked and what its role was in that filtering

6     architecture, and in analyzing the code, I actually traced

7     from the very beginning, where a request comes in, all the

8     way through the back and forth between the two servers, and

9     observed that the communication was indeed via this WISP

10    communication protocol that's documented, but I traced all

11    of the software to be able to be sure that I wasn't missing

12    anything.

13          MR. STIEGLER:  I have nothing further for the

14    witness.

15          THE COURT:  All right, Mr. Stiegler.

16          MR. Hannah.

17          Ladies and gentlemen, I may -- in all likelihood

18    will detain you a little beyond or somewhat beyond the 4:30

19    hour today, and that's in the -- what I anticipate will be

20    able to happen is to ultimately put the case in your hands

21    by Wednesday afternoon, hopefully by the lunch hour.  So

22    that's the reason I am holding you.  Okay?

23          MR. HANNAH:  We have a couple binders, Your

24    Honor.

25          THE COURT:  Sure.

1          (Binders passed up.)

2                    MR. HANNAH:  May I approach, Your Honor?

3                    THE COURT:  Yes, you may, counsel.

4                    THE WITNESS:  Thank you.

5     CROSS-EXAMINATION

6     BY MR. HANNAH:

7     Q.    Hi, Miss Frederiksen.

8     A.    Hello.

9     Q.    Good afternoon.  My name is James Hannah.  I am going

10    to be asking you a couple of questions this afternoon.

11                    Could you please pull up PTX-1.

12                    Do you recognize this as the claim that Finjan

13    is asserting that Websense infringes?

14    A.    I recognize it as up with of the claims, yes -- Claim

15    1.

16    Q.    There is also a number of other claims that you were

17    discussing today?

18    A.    Correct.

19    Q.    Now, in performing your analysis, you compared the

20    claim to Websense's product.  Is that right?

21    A.    I prefer to think of it as comparing Websense's

22    product to the claim, but I compared the two, yes.

23    Q.    Sure.  So you compared Websense's product to the

24    claim.  You didn't compare Websense's product to the

25    specification, did you?

1    A.    No, I didn't.

2    Q.    And you didn't compare the Finjan products to the

3    claims, did you?

4    A.    I never compared the Finjan products.

5    Q.    You didn't --

6    A.    I didn't have those available to me, actually.

7    Q.    So for the Finjan products, they had no bearing on

8    your opinions in this case regarding infringement.  Is that

9    right?

10   A.    No.  They wouldn't because they are unrelated to the

11   Websense products.  My charter was just to review the

12   Websense products.

13   Q.    You just locked at Websense products and whether it

14   matches the claim.  Correct?

15   A.    That's correct.

16   Q.    Now, looking at Claim 1, you will agree with me Claim

17   1 is a representative claim of the other asserted claims in

18   this case -- other asserted independent claims, that is?

19   A.    With respect to almost all of the requirements except

20   some of the independent claims and the decomposing, it

21   closely matches the others.

22   Q.    Thank you.  So on your direct testimony, you didn't

23   address a computer-based method, comprising the steps of:

24   receiving an incoming downloadable addressed to a client, by

25   a server that serves as a gateway to the client.  Correct?

1   A.    Correct.

2   Q.    You also didn't address preventing execution of the

3   downloadable by the client if the security policy has been

4   violated.  Is that right?

5   A.    That's correct.

6   Q.    The only element that you focused on was, "comparing

7   by the server, downloadable security profile data pertaining

8   to the downloadable, the downloadable security profile data

9   includes a list of suspicious computer operations that may

10  be attempted by the downloadable, against a security policy

11  to determine if that security policy has been violated."  Is

12  that right?

13  A.    That's correct.  That's the part that Websense

14  disputes.

15  Q.    In particular, you focused on this list of suspicious

16  computer operations through most of your direct testimony.

17  Is that right?

18  A.    That's correct.

19  Q.    Now, at the very end of your testimony, you went over

20  some of the other dependent claims, do you remember that,

21  Claims 35 and 36?

22  A.    Yes, I do.

23  Q.    Claim 35, those claims involve JavaScript and

24  VBScript.  Is that right?

25  A.    Those two particular ones do, yes.

Frederiksen-Cross - cross

1    Q.    The Websense product that's accused of infringement

2    here, that stands for JavaScripts and VBScripts?

3    A.    Yes, it does.

4    Q.    Also we talked about Claim 58, do you remember that,

5    that's the URL claim?

6    A.    Yes, it does.

7    Q.    And the Websense product that's accused, that has a

8    URL filter on it, doesn't it?

9    A.    Yeah.  The URL filtering capability has been in the

10   product since 1996.

11   Q.    Now, earlier in your testimony, you were talking about

12   Dr. Medvidovic's testimony and signatures and sub-signatures

13   and different -- different concepts.  Do you remember that?

14   A.    Yes, I do.

15   Q.    Now, I just want to be clear for the record, it is

16   Dr. Medvidovic's testimony that the signatures and

17   sub-signatures that Websense uses in its products infringe

18   the asserted claims of the '194.  Isn't that right?

19   A.    I don't think he says the signatures alone infringe,

20   but he says the use of Websense's products with respect to

21   those signatures infringe with respect to the RTSS product.

22   Q.    And that's where you two have a dispute, where you

23   have the signatures and the sub-signatures, and you believe

24   that that doesn't correspond to the list of suspicious

25   computer operations.  Is that right?

Frederiksen-Cross - cross

1    A.    I think there are actually two primary areas.  That is

2    one of them, certainly.

3    Q.    Now, earlier, you were talking about some marketing

4    documents, and I want to take a look at a couple of those.

5    Can we look at PTX-1297, please.

6          This should be in your binder if you'd like to

7    look at that.  It's also going to be on the screen.

8    A.    I have also got it on my screen, so that's good.

9    Q.    Sure.  Let's turn to the page ending in Bates label

10   097, please.

11          Now, this is a Websense document, isn't that

12   right, Ms. Frederiksen?

13   A.    Certainly appears to be.

14   Q.    It describes, "Real-Time Security Scanning that

15   protects against dynamic zero-day and scripted attacks that

16   evade antivirus."  Do you see that?

17   A.    I see that language, yes.

18   Q.    Would you agree with that statement?

19   A.    To the extent that Websense's proactive development of

20   those signatures and pushing those out to their customers

21   before a customer -- a zero-day threat is just a brand new

22   threat, it's the first time it's released, so to the extent

23   that Websense does that, I would certainly agree with it.

24   Q.    You would agree that it is a technology that's

25   designed to protect against threats that evade antivirus?

Frederiksen-Cross - cross

1    A.    Yes.   Antivirus historically doesn't check text-based

2    content, or to the extent that the Websense product does,

3    the RTSS component focuses on html, so it has separate

4    signatures from the traditional antivirus.

5    Q.    When you say "traditional antivirus," you are talking

6    about the signature scanning that's matching the sequence of

7    bytes that we have been talking about, is that right, and

8    not the html content?

9    A.    Yes.   Traditional antivirus uses signatures primarily

10   for executable codes, so like for program code as opposed to

11   web pages.

12              The signatures, themselves, are the same kind of

13   concept, just byte streams that are searched for against the

14   incoming content to identify whether something is malicious.

15   Q.    Would you agree with the statement that the RTSS

16   augments integrated antivirus and malicious URL filtering

17   for complete protection against known and unknown threats?

18   A.    I don't know that I would go the full distance on

19   complete because I think there is always new threats that

20   are emerging out there.   I would certainly agree it augments

21   integrated antivirus and malicious URL filtering.   The rest

22   just may be a little bit of an exaggeration for marketing

23   purposes.

24   Q.    How about the part about unknown threats?

25   A.    Certainly with respect to the ability to create those

1    new signatures and push them out there in response to

2    emerging threats, I think that that's something that the

3    RTSS and its ability to use those -- you know, it gets the

4    automatic updates every five minutes, so in that sense, yes.

5    Q.    So, in that sense, it does protect against unknown

6    threats.  Is that correct?

7    A.    Yes.  Unknown to the customer.  The customer doesn't

8    have to encounter the threat and then figure out what went

9    wrong.  They get these virus updates so they can try to be

10   protected before something goes wrong.

11   Q.    Let's turn to JTX-484, please.  Go to the first page,

12   under "Malware protection."  It says, "The Websense Triton

13   Advanced Classification Engine protects against legacy file

14   based attacks as well as dynamic scripted attacks that

15   circumvent traditional antivirus solutions."

16         Would you agree with that statement,

17   Ms. Frederiksen?

18   A.    With respect to the ACE engine as a whole, I think so,

19   yes.  Now, remember that RTSS has plus the other components.

20   Q.    Can we go the next page.  This talks about Real-Time

21   Security Scanning in particular.

22         It says, "Antivirus technology alone cannot keep

23   pace with the dynamic and scripted attacks that dominate the

24   web threat landscape.  Websense proprietary Real-Time

25   Security Scanning analytics address these zero-day threats

1     by identifying malicious content on the fly, without the

2     need to reference previously known attack databases."  Do

3     you see that?

4     A.    I see that.

5     Q.    Do you agree with that statement?

6     A.    I infer that this is a reference to the ability to

7     craft signatures that allow RTSS conditions to be used in

8     combination with the RTC conditions.  But RTSS itself does

9     not do this.  So if you are saying this applies only to

10    RTSS, I would disagree based on what I have seen in the

11    source code.  This does not match how the source code

12    operates.

13    Q.    You understand this is a Websense document that is

14    publicly available?

15    A.    I don't know if it's publicly available or not.  It

16    looks like a marketing document, so I would assume it

17    probably is.

18    Q.    And just for the record, you would disagree with this

19    statement regarding RTSS?

20    A.    If you are speaking specifically of RTSS, the only

21    detection it can do is via that signature database, so this

22    is either including something from another component, or

23    it's wrong.  I mean, I know what's in the code.

24    Q.    Let's turn to PTX-361, please.  PTX-361.  I am sorry,

25    JTX-361.

```
 1              Do you see this is an Evaluation Guide that's
 2    provided by Websense?
 3    A.    I see it's an Evaluation Guide and it appears to be
 4    the Websense logo, yes.
 5    Q.    I'd like to turn your attention to the tenth page in
 6    this document.
 7    A.    I think I have a different document in my notebook.  I
 8    think I have the PTX-361 here.  I will follow along with you
 9    on the screen.
10              MR. STIEGLER:  Let's make sure that document is
11    the same one.
12              MR. HANNAH:  It will be on the screen.  Can you
13    blow this up?
14              MR. STIEGLER:  That's a different document.
15    Which page are you on?
16              MR. HANNAH:  10.
17    BY MR. HANNAH:
18    Q.    You see that this talks about Real-Time Security
19    Scanning?
20    A.    Do you want to direct me?
21    Q.    Sure, right there.
22    A.    Sure.
23    Q.    Now, it says, under the Websense WSG Solution, it
24    says, "The Websense WSG has the ability to identify and
25    prevent scripts that have malicious intent.  The WSG
```

1    achieves this goal by analyzing commands within scripts and

2    determining their behavior and intent even if the scripts

3    are obfuscated.  Malicious scripts are identified and

4    blocked."  Do you see that?

5    A.    I see that language.

6    Q.    Would you agree with that language?

7    A.    Only in the sense that there are things in this

8    language that we know do not happen on the gateway.  For

9    instance, the unpacking of obfuscating code, that happens in

10   Websense laboratories as part of the analysis, as does the

11   analysis of behavior.

12         So this is clearly talking about the use of the

13   signatures from the lab, but I can't read into it anything

14   that says that Websense is doing this at the gateway

15   because, again, I have seen the code and it does not.

16   Q.    So would you disagree specifically with the fact that

17   Websense WSG Solution analyzes command within scripts and

18   determines their behavior and intent?

19   A.    I think you can take Websense Solution to mean the

20   combination of what happens in the labs where the signatures

21   are analyzed and created and what happens on the gateway

22   where they are applied to scanning, it's not an untruthful

23   statement, but it doesn't characterize what happens

24   specifically on the gateway.

25   Q.    And then, let's look at the last sentence in this

Frederiksen-Cross - cross

1   paragraph.  It says, if the website were to be active

2   without the WSG, then the script will be successful, even if

3   antivirus software is installed at the gateway or the

4   endpoint.

5           Do you see that?

6   A.    I see that.

7   Q.    Would you agree with that statement in this document?

8   A.    I think it's probably true, because the antivirus

9   signatures, again, scan a different kind of content.  They

10  are looking for exit Google programs, the .exe, like an

11  infected copy of Microsoft Word or an infected copy of some

12  Zip program, they don't typically look at the HTML content.

13  So it's kind of an apples and oranges thing.

14  Q.    So would you agree that the WSG product itself would

15  block the script but it would be successful only if

16  antivirus software was installed?

17  A.    I can't agree that WSG will necessarily always block

18  the script, because it can only block something it has a

19  signature for.  Assuming it had a signature, I would expect

20  this to be a true statement.

21  Q.    I would like to turn to JTX-473.  This is a document

22  that you referred to in your direct testimony.  Do you

23  remember that?

24  A.    I guess I do.

25  Q.    And if we can go to 953, please.  You identified this

Frederiksen-Cross - cross

1    in your direct testimony as how the RTSS technology works.

2    Is that right?

3    A.    Yes.

4    Q.    Just to make sure we get this right, an HTML file like

5    a web page would come into this technology and it would be

6    parsed and decoded.  Is that right?

7    A.    In the sense that composite parts of the HTML, for

8    instance, links are put in one pile because there is

9    signatures for links, and text-based content in another

10   file, and header-type connect in another file, so it gets

11   parsed and separated into those separate context buffers,

12   that's correct.

13   Q.    So it's parsed.  Right?

14   A.    It's parsed.

15   Q.    Then we go to this prescan filter and we go to this

16   script pattern match.  Do you see that?

17   A.    Right.

18   Q.    Now, in your opinion, this is where the signatures are

19   applied?

20   A.    That is where the signatures are applied to determine

21   category and use code.

22   Q.    These signatures, I believe on your direct testimony

23   you said that in some instances these are referred to as

24   threat profiles.  Is that right?

25   A.    That's correct.  In the outward facing, Websense

1    wasn't sure, they often called their signatures threat

2    profiles or attack profiles.  Those terms seemed to be used

3    pretty much interchangeably.  And I have confirmed that by

4    having conversation with the Websense engineers as well.

5    Q.    Thank you.

6          So the web page comes in, it's parsed, and then

7    these threat profiles are going to be applied against the --

8    can we call it a downloadable?

9    A.    Yes.  It's actually a chunk of the downloadable, but

10   sure.

11   Q.    We are going to apply these threat profiles against

12   the downloadable, then I believe you said it's going to

13   actually run through all of these profiles and it's going to

14   store these in memory.  Is that right?

15   A.    No.  I didn't say that exactly.  Are you talking

16   specifically about the blue filter with respect to the way

17   the filter is constructed?  Or are you talking about how the

18   match logic happens?

19   Q.    I believe you said when the threat profiles are

20   matched, it's going to be stored in memory, the categories

21   and the reason codes?

22   A.    That clarifies it.  The specific categories and reason

23   codes that are determined are stored in memory.  The threat

24   profile itself comes and goes.  They just read it off, read

25   the rules, check, and then go read the next one.  So the

1    threat profile -- the signature is not, except during the

2    time it's being used.  But there is a list of the assigned

3    threat categories, because, for instance, you could have a

4    category of porn and another category of malicious content

5    because there was some known hostile link there.  So a

6    particular downloadable could have a couple different

7    categories assigned.

8    Q.    The categories could include obfuscation.  Is that

9    right?

10   A.    Obfuscation could be one of the category types that

11   gets assigned there.

12   Q.    And malicious would be another one?

13   A.    Malicious, I think specifically malicious web page.

14   It has got the web page on it.

15   Q.    Those are stored in memory.  And that is going to sent

16   to be checked against the security policy.  Is that right?

17   A.    You are missing a step there.  They get started in

18   memory by RTSS, which sends them to the gateway.  And then

19   the gateway sends them across to the security policy as kind

20   of a little table of this is what I found.  And then

21   finally, ultimately, it will be checked against the security

22   policy.

23   Q.    And if it is determined by the policy to block certain

24   types of downloadables, that downloadable is going to be

25   blocked.  Is that right?

Frederiksen-Cross - cross

1    A.    Right, if the customers set a policy saying we block

2    this type, it will be blocked.

3    Q.    So you made some indications -- I am going to jump to

4    JTX-423.

5          First of all, Ms. Frederiksen-Cross, do you

6    recognize this document?

7    A.    Yes, I have seen this before.

8    Q.    It is a Websense document describing the RTSS

9    technology?

10   A.    Well, specifically, the feature test plan.  It has

11   some description of the technology, and then it describes

12   some of the ways it's to be tested.

13   Q.    But it relates to RTSS technology.  Is that right?

14   A.    Yes, it does.  Though, again, the scope is somewhat

15   broader because it puts the RTSS in the context of the

16   components it works with.

17   Q.    If you could go to Bates labeled 2644, please?

18   A.    I am there with you.

19   Q.    I believe we saw this diagram earlier.  It might have

20   been in -- actually, no.  I think it was the same Bates

21   number.  But this is the diagram that you were talking about

22   earlier in your testimony.  Is that right?

23   A.    Yes.  We have actually seen two that are virtually

24   identical.  One showed the multiple bubbles and this one

25   showed the single large bubble.

Frederiksen-Cross - cross

1    Q.    We talked about the flow, about how the content goes

2    through, the user makes a request, it goes to the Web

3    Filter, comes back, goes to the Internet, goes through the

4    RTSS, checks the policy, and it will determine if it gets

5    blocked.  We just follows the numbers?

6    A.    Follow the numbers.  The first request is up here, and

7    we see if it is a known URL that has already been classified

8    that is something that you don't want in your system.  The

9    second request is the line right here, where it gets the

10   policy.

11   Q.    All of these boxes, the WG, the Web Filter, the RTSS

12   and the Websense RTSSDV, they are all in this box.  Right?

13   A.    Which box are you pointing to?

14   Q.    This is the Websense V Series?

15   A.    I was afraid you were pointing at your computer,

16   sorry.

17   Q.    They are all in this box.  Right?

18   A.    They can be.  When a customer initially gets that

19   appliance, it's got all the different servers already pre-

20   installed and configured to talk to each other.  But they

21   can move them off if they need to, like for performance

22   reasons.  Depending what's done in that box, they may or may

23   not be all there.  But --

24   Q.    I will represent to you this is a brand-new box we got

25   from counsel.

Frederiksen-Cross - cross

1   A.     And the database has to be allowed or refreshed before

2   the system is allowed to be used.

3   Q.     But all these boxes are contained, at least when it's

4   shipped.  Right?

5   A.     I would have to double-check if the database itself is

6   there as shipped or if it is not there until it's

7   downloaded.  I know the system won't let you run it unless

8   it's been updated because it wants the special writer

9   signatures, or malware signatures in the box.

10  Q.     So after you run it and do the installation process?

11  A.     After you install it, and put your license in, and

12  download the database, they will all be there, unless you

13  move it some somewhere, that is correct.

14  Q.     If we could turn to DX-6752, please.  This is another

15  document that you talked about during your direct testimony.

16  Is that right, Ms. Frederiksen-Cross?

17  A.     Yes, it is.

18  Q.     That is a WSG technical FAQ.  Do you see that?

19  A.     Yes.

20  Q.     If you could turn to 4182, please, to Bates label

21  4182.  If you could blow up this last half of the page down

22  here.

23         This technical FAQ talks about the WSG product.

24  Is that right?

25  A.     The product as a whole, yes.

Frederiksen-Cross - cross

1    Q.    At the top of this blowup, I believe, it talks about

2    how WSG detects known threats of malware.  Do you see that?

3    A.    I see that.

4    Q.    It talks about Websense uses signatures that are

5    gathered and analyzed by its own research, web security

6    labs, for detecting that the network is blocking unknown

7    threats.

8               Do you see that?

9    A.    Yes.

10   Q.    This document actually distinguishes between the known

11   threats and the unknown threats.  Is that right?

12   A.    On this page it does, yes.

13   Q.    And it talks about Websense Security Labs has

14   developed a variety of techniques for detecting and blocking

15   unknown threats.  These techniques protect customers through

16   web reputation and the realtime security scanning capability

17   included in the Web Security Gateway.

18               Do you see that?

19   A.    Yes.  That's what I was talking about before.  Some

20   signatures can actually combine the results of RTSS with the

21   results of another component, like the web reputation here,

22   which is one of the other analytics that does the reputation

23   evaluation.

24   Q.    You would agree with me that the RTSS is used to

25   detect the unknown threats?

Frederiksen-Cross - cross

1    A.    Obviously, in combination with other components, as is

2    indicated here.

3    Q.    Do you know how many threats that a single threat

4    profile that is developed by Websense, how many -- let me

5    rephrase, sorry.

6          How many threats can be protected by a single

7    threat profile or a signal signature that you were talking

8    about earlier?

9    A.    It depends.  Some signatures are designed to identify

10   a very specific set.  So one single program, that's it, or

11   one single downloadable, that's it.

12         Others, as I mentioned earlier, are defined in a

13   way that they look for common characteristics that are known

14   to be present in a particular family of viruses usually as a

15   result of how those malware files are being created.  In

16   that case, the generic signatures can detect anything that

17   matches that known signature in that family.

18         So it would have to be something that matches

19   that signature, still.  But it might be something that is

20   slightly different from what the Websense labs identified.

21   It was the same known set of characteristics.

22   Q.    So is it true that a single RTSS profile can detect up

23   to 20,000 malicious downloadables?

24   A.    I would be speculating with respect to that.  I know

25   that they can sometimes accidentally have false hits, and I

Frederiksen-Cross - cross

1    know that they can sometimes protect families.  But there is

2    no way I can count them.  There is no way of doing that.  I

3    don't have that data available.

4    Q.    If you would turn to JTX-459, please?

5    A.    Okay.

6    Q.    JTX-459, do you recognize this document?

7    A.    I have seen this before, yes.

8    Q.    I would like to turn to the page starting at 4703.

9    This talks about a test of the RTSS scanning.  Do you see

10   that?

11   A.    Yes.

12   Q.    At the bottom here, it's a little fuzzy, but if you

13   blow it up, you might be able to see it better, it talks

14   about these realtime analysis test pages that are available

15   on the Websense website.  Do you see that?

16   A.    I see that.

17   Q.    Have you visited those web pages before?

18   A.    I have not gone to these specific pages, no.

19   Q.    If you click on this link, I represent to you that it

20   will actually take you to what is the exploit page.

21   A.    Can you do anything to make that more legible?

22          Never mind.  You are representing this is the

23   page if you go to that.

24   Q.    If you clicked on that contact, that's correct.  And

25   you see that it has a category here, Malicious Websites?

1    A.    I see that.

2    Q.    Then the reason is exploit?

3    A.    I see that.

4    Q.    And it says the Websense ThreatSeeker Network detected

5    the presence of code that can take advantage of

6    vulnerability in software and cause unexpected behavior.

7    This is known as an exploit?

8    A.    I see that.

9    Q.    Do you agree with that characterization of the exploit

10   category used by the Websense product?

11   A.    I have no reason to disagree.  A signature can have a

12   snippet of code or any other thing in it.

13   Q.    I am sorry.  Could you says that again?

14   A.    I said a signature can have a snippet of anything in

15   it.  It's just a kind of content.  So if you drafted a

16   signature that had snippets of code, I would have no reason

17   to think this would be an inaccurate description.

18   Q.    If we go to the generic detection, please.

19            THE COURT:  Mr. Hannah, how much more do you

20   think you have today?

21            MR. HANNAH:  Probably 15, 20 minutes.

22            THE COURT:  We are going to recess for the day,

23   ladies and gentlemen.  Unfortunately, we will have to have

24   the witness back tomorrow.

25            Travel safely.  We will see you tomorrow.

Frederiksen-Cross - cross

1              (Jury leaves courtroom at 4:45 p.m.)

2              THE COURT:  You are excused for the evening, Ms.

3    Frederiksen-Cross.

4              (Witness steps down from stand.)

5              Counsel, what is the status of the final jury

6    instructions?

7              MS. KOBIALKA:  I think I have some good news.

8    We just worked through most of it.  I think we have a set --

9    there is only seven that I think are in dispute, which I

10   think can be grouped.  We have agreed that we are going to

11   exchange drafts and we will file it tonight or before court

12   tomorrow morning.  We will bring you copies of it, with a

13   cover letter which indicates which ones are dispute.

14             In a lot of cases we agree on the language.  It

15   will depend on your JMOL ruling with respect to willfulness,

16   for example.  It is not going to be a disagreement about the

17   language.  There are certain things -- I think it's actually

18   going to be pretty short in terms of where the disputes are.

19             THE COURT:  As I recall -- and I could be

20   wrong -- but I think there is only one willfulness, one

21   party's willfulness contention that I have concluded has

22   some merit.  I think that is Sophos.

23             I don't think I am prepared to do anything more

24   with regard to the other defendants on willfulness

25   contentions.  I think -- yes.

Frederiksen-Cross - cross

1          MR. NELSON:  Your Honor, we actually never

2   discussed that with respect to Symantec.

3          THE COURT:  Yes.  But I have taken a look at

4   your stuff.  I don't mean to be flip.

5          MR. NELSON:  You are the boss.

6          THE COURT:  That's what they tell me.

7          I will take a little closer look.  But I think

8   that continues to be my thoughts.  In any event, willfulness

9   is dependant upon the JMOL.

10          MS. KOBIALKA:  Right.  We have agreed to

11  essentially maybe two damages instructions, and there is

12  sections that are just competing.  But the rest of the

13  language we are in agreement with.  I actually think it will

14  be fairly straightforward.

15          THE COURT:  So, then, you will have two hard

16  copies for me tomorrow at least?

17          MS. KOBIALKA:  Yes.  Our plan was to give you

18  one set.  Then the objections included --

19          THE COURT:  That is fine.  I would just like a

20  copy for my clerk.

21          MS. KOBIALKA:  Actually, we will bring you

22  courtesy copies, absolutely.

23          THE COURT:  Take care counsel.

24          (Court recessed at 4:48 p.m.)

25

Frederiksen-Cross - cross

1                         -   -   -

2    **Reporters:   Kevin Maurer and Renee Ewing**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25